# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## RICHMOND DIVISION

| | | |
|---|---|---|
| OWENS & MINOR, INC. and | § | |
| OWENS & MINOR FLEXIBLE | § | Case No. 3:23-cv-00115 |
| BENEFITS PLAN | § | |
| | § | |
| V. | § | COMPLAINT |
| | § | |
| ANTHEM HEALTH PLANS OF | § | |
| VIRGINIA, INC. D/B/A ANTHEM | § | [Jury Trial Demanded] |
| BLUE CROSS AND BLUE SHIELD | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ......................................................................................... 1

    I.    Employers Sponsoring Healthcare Plans for Employees
Almost Universally Hire Third Party Administrators Like
Defendant ...................................................................................... 1

    II.    In Recent Years, Plaintiff Grew More Sensitive to the
Threat Posed by TPA Fraud, Waste, and Abuse ........................... 2

    III.    Defendant Actively Frustrated Plaintiff's Attempts to
Access and Analyze the Plan's Claims Data.................................. 4

    IV.    Despite the Simplicity of the Issues and Requested Relief,
this Case is Important to Plaintiff and Self-Funded Plans
in General ...................................................................................... 5

PARTIES .................................................................................................... 8

DEFENDANT'S CAMPAIGN OF DELAY AND OBFUSCATION FORCED
PLAINTIFF TO SEEK JUDICIAL RELIEF ...................................................... 8

    I.    The Information Sought is Integral to Plaintiff's Duty
to Assess Defendant's Performance of Its Fiduciary Duties
to the Plan ...................................................................................... 8

    II.    Defendant Actively Interfered with Plaintiff's Attempts to
Monitor and Assess Defendant's Performance ........................... 11

THE SIGNIFICANCE OF THE ADMINISTRATIVE SERVICES AGREEMENT
AND THE PARTIES' RESPECTIVE CONDUCT ......................................... 21

    I.    The Administrative Services Agreement Generally.................................... 21

    II.    The Parties Are ERISA Fiduciaries ............................................. 23

        A.    By Virtue of Its Role as the Plan's TPA, Defendant
Possessed and Exercised Control Over Plan Assets
and Over Plan Administration and Management ........................... 25

i

|   | B. | Defendant's Discretion and Control Extended to Recovery of Monies Erroneously Paid by the Plan or Otherwise Owed to the Plan | 30 |
|---|---|---|---|
|   | C. | Defendant Exercised Extensive Control and Discretion Over Plan Data and Information at Issue in this Case | 31 |
|   | D. | Plaintiff Owens & Minor is the Plan Sponsor and a Fiduciary With Standing to Prosecute ERISA Claims on the Plan's Behalf | 33 |

JURISDICTION AND VENUE ................................................................ 34

CAUSE OF ACTION FOR ERISA VIOLATIONS ................................ 34

STATE LAW CAUSES OF ACTION .................................................... 39

I.    Breach of Contract Under Virginia Law ..................................... 39

II.   Breach of Good Faith and Fair Dealing Under Virginia Law .... 40

III.  Breach of Fiduciary Duty under Virginia Law .......................... 41

JURY DEMAND ..................................................................................... 42

PRAYER FOR RELIEF .......................................................................... 42

Plaintiff OWENS & MINOR, INC., individually and on behalf of Plaintiff OWENS & MINOR FLEXIBLE BENEFITS PLAN,[1] files this Complaint against ANTHEM HEALTH PLANS OF VIRGINIA, INC. D/B/A ANTHEM BLUE CROSS AND BLUE SHIELD, and in support thereof states the following:

## **INTRODUCTION**

### I.   **EMPLOYERS SPONSORING HEALTHCARE PLANS FOR EMPLOYEES ALMOST UNIVERSALLY HIRE THIRD PARTY ADMINISTRATORS LIKE DEFENDANT**.

1.   Throughout the country, employers large and small provide healthcare benefits for their employees. Many employers, including Plaintiff Owens & Minor, provide health benefits through self-funded plans, whereby the plan funds employees' and their beneficiaries' healthcare expenses primarily from employer and employee contributions.

2.   As sponsors and plan administrators of self-funded plans, employers owe fiduciary duties under the Employee Retirement Income Security Act (**ERISA**) to the plans and to the employees and beneficiaries covered by those plans. But employers almost universally lack the ability to manage and administer their plans' healthcare claims. Not surprisingly, ERISA allows plan sponsors to delegate those fiduciary responsibilities to third parties who possess that ability.

3.   For these reasons, there is a significant—and lucrative—market for third party administrators (**TPAs**). TPAs specialize in the healthcare benefits business. They

---

[1] In this Complaint, "Plaintiff" refers to Owens & Minor, Inc. in its individual and representative capacities unless otherwise provided expressly or by context.

1

possess the expertise, personnel, and systems to price, administer, and process healthcare claims. TPAs like Defendant market themselves as possessing the expertise and integrity necessary to serve as fiduciary plan administrators. Thus, employers sponsoring self-funded healthcare plans generally entrust the plans' assets and the health of their employees to TPAs.

4.   In 2017, Plaintiff Owens & Minor hired Defendant Anthem, a TPA who purports to be a specialist in the administration of self-funded plans, to manage healthcare claims for Plaintiff's plan with the level of care and loyalty demanded by ERISA. In doing so, Plaintiff entrusted its plan's assets and the care of its employees to Defendant. Nevertheless, as plan sponsor, administrator, and named fiduciary, Plaintiff retained duties under ERISA to monitor Defendant, protect plan assets, and oversee the quality of care provided to its employees and beneficiaries. Plaintiff reasonably expected Defendant to comply with the law and be transparent and candid regarding Defendant's administration of the plan and use of plan assets. Those are core fiduciary duties. But Defendant has been anything but "transparent" and "candid."

## II.   IN RECENT YEARS, PLAINTIFF GREW MORE SENSITIVE TO THE THREAT POSED BY TPA FRAUD, WASTE, AND ABUSE.

5.   Over the past few years, Plaintiff has learned of several instances where opportunistic claims administrators have employed illegal or unethical means to obtain windfall profits—at the expense of self-funded plans and taxpayers alike. Plaintiff learned of accusations against numerous insurers—including Defendant's Anthem affiliates—that they incentivized healthcare providers to report that Medicare

2

Advantage patients are sicker than they actually are because the insurers received more income for patients with more serious documented conditions. According to a recent *New York Times* report, the misconduct caused between $12 billion and $25 billion in overpayments by Medicare in 2020 alone.[2]

6.    Other developments increased Plaintiff's commitment to carefully assess Defendant's claims administration practices.[3] One report revealed that merely replacing a claims administrator saved a governmental entity such a large sum of money that there simply had to be waste or other problems in the claims administration processes.[4] The news was saturated with stories regarding the harm that TPAs can cause.[5] The American Medical Association has estimated that commercial health insurers have an average claims-processing error rate of 19.3 percent, which creates excess costs of $17 billion

---

[2] Reed Abelson and Margot Sanger-Katz, *'The Cash Monster Was Insatiable': How Insurers Exploited Medicare for* Billions, N.Y. TIMES (Oct. 8, 2022) *available at* https://www.nytimes.com/2022/10/08/upshot/medicare-advantage-fraud-allegations.html, last visited Oct. 10, 2022.

[3] *See, e.g.*, *Employer Held Liable for Service Provider's Error*, J.D. SUPRA (Dec. 31, 2020) *available at* https://www.jdsupra.com/legalnews/employer-held-liable-for-service-89209/, last visited Oct. 20, 2022.

[4] *TRS says it will save millions on new health administrators, assures members of minimal plan impacts*, TEXAS AFT (Feb. 27, 2020), *available at* https://www.texasaft.org/government/trs/trs-says-it-will-save-millions-on-new-health-administrators-assures-members-of-minimal-plan-impacts/, last visited Oct. 20, 2022 (Texas teacher retirement system saved hundreds of millions of dollars by replacing claims administrator).

[5] *See, e.g.*, Brendan Pierson, Mass. *Blue Cross sued for 'mismanagement' of state employee health plan*, REUTERS (Mar. 29, 2021), *available at* https://www.reuters.com/article/health-blue-cross/mass-blue-cross-sued-for-mismanagement-of-state-employee-health-plan-idUSL1N2LR2IC, last visited Oct. 20, 2022 (discussing litigation involving allegations of self-dealing).

3

annually.[6] A more recent report comes from the nonpartisan Council on Health Care Spending and Value, which opined that excess administrative costs wasted between $285 billion and $570 billion in healthcare spending in 2019 alone.[7]

7.    The information reported in those articles and similar reports heightened Plaintiff's sensitivity to the risks potentially posed by the TPA managing Plaintiff's plan. Plaintiff therefore increased its efforts to assess Defendant's performance and to ensure Defendant honored its fiduciary duties to the Plan, participants, and beneficiaries.

### III.    DEFENDANT ACTIVELY FRUSTRATED PLAINTIFF'S ATTEMPTS TO ACCESS AND ANALYZE THE PLAN'S CLAIMS DATA.

8.    In September 2021, Plaintiff requested its plan's claims data and information from Defendant in order to assess the plan's performance—both financially and the adequacy of care for Plaintiff's employees and their beneficiaries. What should have been a simple transfer of *the plan's* information from Defendant to Plaintiff—the plan sponsor, named fiduciary, and administrator—turned into a year-long trail of emails and other correspondence, littered with Defendant's excuses, arbitrary conditions, and illusory promises. Defendant would agree to provide the information and then renege, citing some obscure, inapplicable condition in its form agreement, which Defendant

---

[6] *AMA blasts insurers on 19.3 percent claims error rate*, HEALTHCARE IT NEWS (June 20, 2011), *available at* https://www.healthcareitnews.com/news/ama-blasts-insurers-193-percent-claims-error-rate, last visited Oct. 20, 2022.

[7] *The Role Of Administrative Waste In Excess US Health Spending*, HEALTH AFFAIRS (Oct. 6, 2022), *available at* https://www.healthaffairs.org/content/briefs/administrative-waste-excess-health-spending, last visited Oct. 20, 2022.

had carefully crafted in an effort to sidestep its fiduciary duties. Of course, to any extent Defendant's crafty contract provisions purport to relieve Defendant of its fiduciary responsibilities, ERISA invalidates those provisions.

9.   Defendant even sought to impose new conditions restricting Plaintiff's access to information that were ungrounded in any contract language. Determined to obtain the plan's information, Plaintiff patiently endured this parade of promises, delays, obfuscation, and excuses. Plaintiff even attempted to satisfy some of Defendant's arbitrary, baseless conditions.

10. Following its year-long effort to obtain claims data belonging to the plan it sponsors and oversees, Plaintiff found itself still blocked by Defendant from critical information it needs to assess the plan's performance. As a result of Defendant's actions, Plaintiff remains unable to carry out its own fiduciary duties to the plan, plan participants, and beneficiaries as they relate to monitoring and assessing Defendant's claims management practices and performance of its fiduciary duties. Only after Defendant made clear it would not voluntarily provide the plan's information, Plaintiff filed this lawsuit.

## IV.   DESPITE THE SIMPLICITY OF THE ISSUES AND REQUESTED RELIEF, THIS CASE IS IMPORTANT TO PLAINTIFF AND SELF-FUNDED PLANS IN GENERAL.

11. Plaintiff merely seeks the plan's information that it has rightfully sought for well over a year. ERISA and, alternatively, applicable contract language entitles Plaintiff to analyze its own data.

12. This case presents two related questions for the Court, both of which have clear, common-sense answers supported by law and the relevant documents. The first is whether an ERISA healthcare plan's named fiduciary and administrator—who owes a statutory duty to exercise prudence in monitoring, engaging, and terminating TPAs—is entitled to analyze the plan's claims data in order to determine whether the plan's TPA has honored its own fiduciary duties. The answer is, of course, "yes."

13. The second question is whether the plan's TPA can interfere with the plan's named fiduciary and administrator's fiduciary role by withholding *the plan's* claims data based on the TPA's unilateral, erroneous assertion that the data is *the TPA's* "proprietary" and "confidential" information. The answer to this question is unequivocally "no."

14. Therefore, Plaintiff, on behalf of its plan, seeks an order compelling Defendant to produce the plan's claims data, which Plaintiff requested from Defendant more than a year ago. Plaintiffs' requested relief is modest. Nevertheless, because Defendant's and other TPAs' misconduct is so widespread, granting Plaintiff's request here will have important, widespread impacts on the protection of ERISA healthcare plans from opportunistic fiduciaries.

15. In the ERISA context, plan participants and beneficiaries bear the cost of fraud, waste, and abuse by plan fiduciaries who are unable or unwilling to prevent it. Congress has recently taken steps to address these risks. In the Consolidated Appropriations Act of 2021, Congress amended ERISA to clarify that employer-sponsored healthcare plans may obtain information relating to costs and quality of care,

regardless of restrictions in provider network contracts or whether TPAs might deem the information "proprietary."[8] As such, Congress recognized the importance of protecting the plan's right to review its own claims information.

16. Congress is not the only entity taking notice of TPAs' attempts to take advantage of self-funded plans and government healthcare funds. The Department of Labor and plan sponsors across the country are becoming more cognizant of the unfair and illegal conduct of TPAs and the threat that conduct poses for plans, their assets, and their participants and beneficiaries. And in a nearly symmetrical response, TPAs like Defendant have become more defensive.

17. At bottom, this case is about protecting Plaintiff from being forced to make decisions about its plan from a position of ignorance, a position imposed on Plaintiff by Defendant's obstinance and evasive misconduct. Under ERISA, managing healthcare spending and quality of care lies at the heart of a plan fiduciary's duties to a self-funded healthcare plan, plan participants, and beneficiaries. Those duties exist to ensure participants and beneficiaries receive a proper standard of healthcare and to protect contributions by plan participants and their employer. Thus, while Plaintiff merely seeks its plan's healthcare claims data, the impact of this case on the plan and the employees covered by it is potentially immense.[9]

---

[8] 29 U.S.C. § 1185m (emphasizing that plan sponsors are entitled to review data such as "provider-specific cost or quality of care information," "de-identified claims and encounter information," including "financial information, such as the allowed amount" and "any other data element included in claim or encounter transactions").

[9] While Plaintiff's plan has been harmed as set forth below, the extent of *pecuniary* harm is unknown and unknowable at this time given Defendant's misconduct at issue here. Plaintiff

## PARTIES

18.     Plaintiff Owens & Minor, Inc. is a Virginia corporation headquartered in Mechanicsville, Virginia. Plaintiff employs thousands of people in the United States. Plaintiff is the sponsor and named fiduciary for Plaintiff Owens & Minor Flexible Benefits Plan (**Plan**). The Plan is a welfare benefit plan under ERISA that provides healthcare coverage for Plaintiff's employees and their beneficiaries. The Plan is "self-funded," meaning that the Plan is primarily funded by contributions from Plaintiff Owens & Minor and Plan participants—employees of Owens & Minor.

19.     Defendant Anthem Health Plans of Virginia, Inc. dba Anthem Blue Cross and Blue Shield is a Virginia corporation and may be served through its registered agent, CT Corporation System, at 4701 Cox Rd., Ste. 285, Glen Allen, VA 23060-6808.

## DEFENDANT'S CAMPAIGN OF DELAY AND OBFUSCATION FORCED PLAINTIFF TO SEEK JUDICIAL RELIEF

### I.     THE INFORMATION SOUGHT IS INTEGRAL TO PLAINTIFF'S DUTY TO ASSESS DEFENDANT'S PERFORMANCE OF ITS FIDUCIARY DUTIES TO THE PLAN.

20.     As set forth below, *infra* paras. 58-89, Defendant owes fiduciary duties to the Plan commensurate with its fiduciary functions, which are likewise described below. As the Plan's named fiduciary, sponsor, and administrator, Plaintiff Owens & Minor must manage the Plan for the benefit of Plan participants and their beneficiaries. One of

---

therefore expressly reserves the right to pursue any losses caused to its plan and any damages suffered by the Plaintiff individually if it subsequently determines that any losses or damages have occurred.

Plaintiff's key duties is monitoring Defendant and its performance of administrative and fiduciary services that Plaintiff hired Defendant to perform.

21.    An analysis of the Plan's claims information is essential to determining whether Defendant has properly managed the Plan's assets and provided adequate levels of care to participants and beneficiaries. Defendant has actively obstructed Plaintiff's attempts to perform that analysis by depriving Plaintiff of the information necessary to do so. In the process, Defendant has breached its own fiduciary duties under ERISA.

22.    Plaintiff seeks the most comprehensive data layout and element sets internally available to Defendant related to Defendant's administration of medical and prescription claims for the Plan and its participants and beneficiaries. This includes without limitation billed and excluded charges, allowed charges, paid amounts, diagnosis codes, claim codes, and other categories of information and values.

23.    The information Plaintiff seeks will allow it to properly assess a number of issues that bear on whether Defendant has upheld its duties to the Plan, Plan participants, and beneficiaries. Plaintiff owes a fiduciary duty to monitor Defendant and make prudent decisions regarding Defendant's retention or termination. No reasonable reading of ERISA supports the nonsensical—and unfair—conclusion that ERISA imposes a duty on Plaintiff to monitor Defendant but allows Defendant to conceal information necessary for that task.[10]

---

[10] *See* 29 U.S.C. § 1105(a), (c).

24.     The data Plaintiff seeks is critical to adhering to its fiduciary duty by honoring its duty to monitor Defendant. For example, the information will demonstrate whether Defendant harmed the Plan by wasting assets; allowing conflicts of interest and the temptation of self-dealing to interfere with Defendant's judgment; engaging in negligent misconduct; or some combination thereof. And because this information provides the only means by which Plaintiff can analyze and assess Defendant's performance of its claims administration and other duties, it is necessary for Plaintiff to obtain this information in order to honor its own fiduciary duties to the Plan. In other words, the information and data sought provides the only avenue for Plaintiff to determine whether (i) claims were properly paid, (ii) the quality of care for participants and beneficiaries was sufficient, (iii) illegal conduct caused financial harm to the Plan, and (iv) Defendant has carried out its duties with the prudence and loyalty demanded by ERISA.

25.     A reasonably prudent fiduciary in Defendant's position and under the same or similar circumstances would have agreed to produce the information at issue. The information is not "proprietary" to Defendant; it belongs to the Plan. Further, Defendant shares much of this information with competitors and brokers. And even if it were proprietary as Defendant claims, a reasonably prudent administrator would have still produced the information in light of the many protections of "proprietary" and "confidential" information under the relevant agreements.

26.     Defendant, however, has demonstrated time and time again that it is not a reasonably prudent administrator and that its loyalties are severely misplaced.

10

## II.   DEFENDANT ACTIVELY INTERFERED WITH PLAINTIFF'S ATTEMPTS TO MONITOR AND ASSESS DEFENDANT'S PERFORMANCE.

27.    Plaintiff, in its role as Plan sponsor and primary fiduciary, began its quest to obtain the Plan's claims information and data more than a year ago. What followed was Defendant's steady cadence of assurances followed by a pattern of obfuscation and delay.

28.    On September 22, 2021, Plaintiff submitted its initial request for the Plan's information at issue here. Plaintiff emphasized it needed the information in order to evaluate the Plan's performance under Defendant's administration of the Plan. The request emphasized that Defendant's "standard reporting system" historically provided information with insufficient detail to adequately perform the evaluation. Plaintiff specifically requested "line item claim history detail from July 1, 2017 through and including the current year to date." Plaintiff also requested that Defendant retain "all records and data" until Plaintiff completed its analysis.

29.    On September 22, 2021, Defendant responded by email: "I wanted to give you confidence that anything that is requested directly from your team will be fulfilled." However, over a year later Defendant *still* has not "fulfilled" any part of Plaintiff's request for medical claims information.[11] Rather, Defendant engaged in a conscious effort to avoid any oversight analyzing its responsibility for administering the Plan.

---

[11] With respect to the separate prescription information, Plaintiff has received only routine prescription data that is intentionally limited rendering it insufficient to perform a meaningful analysis.

30.     On September 24, 2021, Plaintiff emphasized to Defendant that Plaintiff sought the "most comprehensive data layouts and elements that already exist internally" pertaining to the Plan.

31.     On September 24, 2021, Defendant wrote Plaintiff. Despite Plaintiff's clear, unambiguous request for the most comprehensive set of data and information in Defendant's possession, Defendant represented it would "need a lot more detail" regarding the information sought.

32.     On September 27, 2021, Plaintiff emphasized that it requested the claims information in order to fulfill its duties to the Plan: "We are doing this review as sponsor of the plan and consistent with our responsibility to the beneficiaries."

33.     On September 28, 2021, Defendant represented to Plaintiff, "We're happy to get your data to you, we just need to work within our guidelines/policy for these requests. Sorry for the extra steps, [Defendant] is certainly not trying to be difficult or create unnecessary barriers with our policy." Little did Plaintiff know at the time, Defendant not only sought to "create unnecessary barriers"—it intended to unilaterally conjure new barriers in an effort to shirk its responsibility to the Plan.

34.     On October 20, 2021, Defendant stated that it would transfer the data to Plaintiff: "[W]e'll need a [protected health information] release to indicate the data will come to [Plaintiff] and then you can share as you desire with downstream partners." Defendant added that there would be separate $1,000 charges for the prescription data and medical data.

35.     On November 5, 2021, Plaintiff stated it would comply with the requests in Defendant's October 20, 2021 email.

36.     On November 30, 2021, Plaintiff once again emphasized it sought "the most comprehensive data layout and element sets that are internally available," including at a minimum "every data element that you capture or produce regarding (1) eligibility detail; (2) claims detail; (3) provider detail; and (4) prior authorization detail." This request of course mirrored Plaintiff's prior requests, which were also attached to this email. Plaintiff added it would readily pay the $1,000 fee charged by Defendant for this production.

37.     On February 21, 2022, Plaintiff sent an email in an effort to revisit the status of its request for data. Despite its previous unambiguous request for all information available, Plaintiff specified several data elements necessary for Plaintiff to conduct its analysis, including "billed," "allowed," and "paid" charges. This information is necessary for Plaintiff to determine whether Defendant has protected Plan assets, upheld its fiduciary duty to the Plan, and provided adequate levels of care for participants and beneficiaries.

38.     On February 21, 2022, Defendant responded, "Out of the gate, I will say that we won't release both allowed and paid/billed. This would expose our confidential discounts/payment contracts aligned to each provider."

39.     On March 3, 2022, Plaintiff responded that these components of information were necessary for Plaintiff's analysis. Defendant knew this. Plaintiff also expressed it "would consider a more specific [non-disclosure agreement] than the existing provisions in the agreement if it helps to be more specific than the existing language in place."

40.    On March 18, 2022, responding to Plaintiff's request for an update, Defendant stated, "The report has been submitted to our extract team and has an [estimated completion date] of Tuesday, April 12th. Once the extract has been completed I will forward it over accordingly."

41.    On March 29, 2022, Plaintiff requested that Defendant "provide a record layout and confirm the data format that will be provided" in order to prevent further delay and unnecessary work. Defendant responded that same day: "[We] are getting much closer to the data we will be allowed to share with [Plaintiff]." Defendant added that its data team executive advisor "is advising [Defendant] on what [its] availability of data sharing within our contractual confines with [Plaintiff] will be." Defendant's messaging was becoming increasingly vague and evasive.

42.    After additional back-and-forth about minor matters, on April 7, 2022, Defendant provided the specifications for what it represented was "the most comprehensive set of data that [Defendant] is able to release." Remarkably, there was no additional context or explanation regarding the phrase "able to release." After careful review of the proposed production specifications, on April 25, 2022, Plaintiff identified glaring examples of highly relevant data points that Defendant both possessed but sought to conceal from Plaintiff. Those omissions included amount of billed charges, diagnoses, treatment codes, unique identifiers of patients, and the manner of claim adjudication. Plaintiff emphasized that "[t]his process is part of [Plaintiff's] effort to meet its responsibilities, and [Plaintiff] expects that [Defendant] would be working with, not against us. . . . [W]e have reached a point where we need to know unequivocally whether [Defendant] will provide [the

14

requested data]." After receiving no response to its continued request for data and Defendant's rationale and legal basis for limiting any production, on May 11, 2022, Plaintiff followed up yet again. Defendant responded a day later that it would "follow-up with rationale and any detail asap." Defendant still has not provided plausible "rationale" or any "detail" justifying its interference with Plaintiff's attempt to honor its fiduciary duties to the Plan.

43.     On or about July 19, 2022, in a letter to Defendant's general counsel, Plaintiff voiced frustration in Defendant's continued refusal to provide the Plan's data and its continued interference with Plaintiff's fiduciary duties. Plaintiff's general counsel referenced eight previous attempts to obtain this information and emphasized that the data sought is "derived from [Plaintiff's] health plans" and that Defendant "is in possession of [Plaintiff's] data only because it serves as [Plaintiff's] administrative services organization and ERISA fiduciary for those plans." Plaintiff's general counsel cited Defendant's omission of "large and essential data elements," which are "critical for any meaningful plan review or oversight." Finally, Plaintiff provided Defendant a detailed, non-exhaustive list of data that Plaintiff correctly anticipated would be in "the universe of [the Plan's] medical data" maintained by Defendant on the Plan's behalf.

44.     Defendant responded on July 25, 2022, with further delay and obfuscation and with vague, baseless references to an inability to produce "proprietary" data belonging to the Plan:

> . . . . We have met internally with legal, privacy and our data use teams and
>
> want to provide the most inclusive set of data that Owens and Minor requests

15

and you outline in the attached letter. Before we share data, we need to fully understand the Business Use Case for this set of data. We are requesting a meeting with you/your team to review these items in detail. [Defendant] will supply data per our Data Use & Enabling Policy[12] and according to our ASO Agreement with [Plaintiff].[13] We will be unable to supply some components of the request, which are either unreportable, proprietary or would compromise competitive details of other providers contracted with [Defendant]. (footnotes added).

45.     In its July 28, 2022 response, Plaintiff voiced its continued frustration in Defendant's ten-month campaign to interfere with and delay Plaintiff's attempt to honor its fiduciary duties to Plan participants and beneficiaries. Plaintiff outlined its many attempts to access the Plan's data and reminded Defendant that production and analysis of a complete data set was necessary for *both* parties to satisfy their fiduciary duties. Again, Defendant knew this.

46.     On July 28, 2022, Defendant responded by letter: "It is [Defendant's] desire to share as much data as we are legally allowed to share with your organization." This is perplexing because Defendant is *legally* allowed to share *all* requested Plan data. Indeed, it is required to. Defendant simply elected not to. Then, the letter vaguely stated that

---

[12] There is no evidence Plaintiff agreed to this policy. And to the extent this policy attempts to relieve Defendant of its fiduciary duties under ERISA, it is void. 29 U.S.C. § 1110(a) ("[With inapplicable exceptions], any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy.").

[13] This agreement, the Administrative Services Agreement, is discussed in detail below.

"Proprietary & Confidential Information" would not be included in the data production, nor would "BlueCard data" and "DME data for non-Owens & Minor owned entities." It added, "we are unable to share some of your requested detail due to competitive concerns as well as not having a data sharing agreement stating valid and approved use cases in place with your organization."

47.    On July 30, 2022, responding to Defendant's vague, baseless reference to unproducible "proprietary" and "confidential" data in its data extract proposal, Plaintiff asks, "Please provide us with a clear and specific description of each category of information or data that you contend is proprietary or confidential."

48.    On August 1, 2022, Defendant—nearly a year after Plaintiff requested that it retain all plan data pending Plaintiff's analysis—notified Plaintiff for the first time in this year-long saga that "our reporting system is limited to 36 months of data." Defendant did not state one way or another whether it had destroyed data more than three years old. But given that ERISA's default limitations period is six years for fiduciary claims, it is certainly unreasonable to destroy records of claims information from that six-year timeframe. In that same correspondence, Defendant once again refused to "provide billed, allowed and excluded charges" based on a vague and inaccurate characterization of that information as "proprietary & confidential." Plaintiff responded the same day by emphasizing yet again that the information withheld by Defendant "is what we need to ensure compliance with the [Administrative Services Agreement detailed below] and fulfillment of fiduciary duties."

17

49.    On August 8, 2022, Plaintiff's counsel sent Defendant a notice of representation, once again asking for the Plan's data and reiterating the August 19, 2022 deadline for complying with this request.

50.    On August 18, 2022, Plaintiff's counsel emailed Defendant as a follow-up to a phone conference two days before. Plaintiff's counsel expressed concern regarding Defendant's representation—for the first time in the year-long process—that "a key impediment to the production of data has been one or more Blue Cross Blue Shield National Association (BCBSNA) policies." Plaintiff requested further information regarding how BCBSNA policies bind Plaintiff and prevent Plaintiff from accessing data for its own Plan. As of the filing of this Complaint, Defendant has refused to provide this information.

51.    Also on August 18, 2022, Defendant emailed Plaintiff, disingenuously expressing concern about the involvement of Plaintiffs' counsel in the data review: "If the data were to be shared directly with [Plaintiff], we do not have to take these additional steps," such as execution of a confidentiality agreement by Plaintiff's counsel. But if that were so, why had Defendant not provided the information following one of the numerous requests by Plaintiff directly in the previous eleven months? Defendant went on to state, "we will continue to exclude DME claims for services outside of Owens and Minor, but agree to include the following data elements," which included allowed charges, billed charges, excluded charges, and BlueCard data related to claims detail requested in non-Anthem states. Despite this assurance, Defendant has withheld the information in direct contravention of its duty to the Plan.

52.     On August 19, 2022, Plaintiff reiterated its agreement to preserve the confidentiality of any protected information. Plaintiff also asked that Defendant confirm the specific data that Defendant would share and any data that Defendant would withhold. Finally, Plaintiff requested that the BCBSNA policies—which allegedly limit Plaintiff's access to its own Plan's information—be provided for review.

53.     On August 22, 2022, Defendant sent to Plaintiff's counsel "excerpted and relevant Blue Card Policies" that Defendant previously represented prevented production of Plaintiff's Plan data. But even assuming those policies bound Plaintiff—which is not true—the policies contained explicit exceptions that did not restrict production "to the extent the disclosure is necessary to comply with a legal requirement" and "when such access, use or transfer does not violate applicable state and/or federal law." As set forth below, the information sought is necessary for Plaintiff and Defendant to comply with legal requirements under ERISA and other governing law and agreements. Defendant also represented that it would produce the information once a new confidentiality agreement was signed.

54.     On August 24, 2022, Plaintiff's counsel renewed its request for any evidence that BCBSNA's restrictions on production of data are binding on Plaintiff or the Plan.

55.     On August 31, 2022, nearly a year after Plaintiff commenced these efforts, Defendant emailed its "standard confidentiality agreement" and conditioned production of *Plaintiff's* information on execution of this document. If any doubts remained regarding the veracity of Defendant's promise to cooperate, its purported "standard" confidentiality agreement conclusively demonstrated the falsity of that promise. In truth, Defendant's

"standard" confidentiality agreement represented a further attempt by Defendant to avoid assessment of its administration of the Plan. The confidentiality agreement, to which neither Plaintiff nor any representative of Plaintiff ever agreed, made clear that any agreement by Defendant to produce the Plan's information was illusory:

> **Disclaimer and Exculpation**. [Defendant] provides the Information on an "as-is" basis, and makes no representation or warranty as to the accuracy or reliability of any conclusions or interpretations made by Plans and/or [Plaintiff] on the basis of the Information. [Plaintiff] releases [Defendant] and its agents and employees from any and all liability whatsoever for any erroneous, inaccurate, or incomplete Information.[14] (footnote added).

This provision rendered illusory any promise by Defendant to finally provide the information that Plaintiff requires to fulfill its fiduciary duties to Plan participants and beneficiaries.

56.    Exhausted from the year-long, unsuccessful campaign to extricate the Plan's data from Defendant—and spurned by Defendant's empty assurances and vague references to unproducible "proprietary" data—Plaintiff submitted a letter to Defendant alerting it of Plaintiff's intent to seek judicial relief.

---

[14] According to its September 26, 2022 email, Defendant purportedly "included the Exculpation and Disclaimer provision for several reasons, including [Plaintiff's] own protection." It remains unclear how Plaintiff would be "protected" by shirking its fiduciary responsibilities and agreeing to assess the Plan's performance based on inaccurate, incomplete, or erroneous data.

In a follow-up attempt to justify its decision to hold Plan data hostage and its "Disclaimer and Exculpation" provision, Defendant cited vague, hypothetical reasons and ASA articles 10 and 11. None of these excuses justifies Defendant's misconduct.

57.     Having exhausted all reasonable efforts to uphold its fiduciary duties and to confirm whether Defendant has satisfied its fiduciary duties with respect to Plan funds and quality of care, Plaintiff filed this Complaint.

## THE SIGNIFICANCE OF THE ADMINISTRATIVE SERVICES AGREEMENT AND THE PARTIES' RESPECTIVE CONDUCT

### I.    THE ADMINISTRATIVE SERVICES AGREEMENT GENERALLY

58.     Defendant's cascade of excuses centered on the parties' Administrative Services Agreement (**ASA**), which Defendant frequently and incorrectly cited as imposing restrictions or conditions on Plaintiff's ability to analyze its own information. Defendant's reliance on the ASA is misplaced. *First*, the ASA conclusively establishes that Defendant is a fiduciary under ERISA. *Second*, even if Defendant's wily drafting of the ASA actually purports to relieve Defendant of its fiduciary duties, ERISA nullifies any such provisions. *Third*, the ASA facially demonstrates that, consistent with its rights and duties under ERISA, Plaintiff is entitled to access and analyze its own claims information.

59.     Plaintiff required the services of a third-party administrator (**TPA**) to administer the Plan. Plaintiff is not a claims administrator; nor does Plaintiff have the expertise, personnel, or systems necessary to administer the Plan's claims. Plaintiff therefore engaged Defendant as the Plan's TPA and executed the ASA, delegating much of Plaintiff's fiduciary responsibilities under the Plan to Defendant. Defendant knew Plaintiff lacked the ability to serve as the Plan's claims administrator, and Defendant knew that Plaintiff relied on Defendant's assurances regarding its services.

60.    The ASA became effective on June 1, 2017. **Ex. A** at 1. The parties acknowledged that Plaintiff "is the sponsor of a self-funded Group Health Plan . . . providing . . . health care benefits to certain eligible employees and their qualified dependents." *Id.* The parties agreed that Defendant would "administer certain elements of [Plaintiff's] Group Health Plan." *Id.* The ASA also identified the Plan as an ERISA plan. *Id.*

61.    Plaintiff has complied with all aspects of the ASA and other agreements that comprise the ASA and govern the relationships among the Plan, Plaintiff Owens & Minor, and Defendant.

62.    The ASA defines "billed charges" as "[t]he amount that appears on a Member's Claim form (or other written notification acceptable to [Defendant] that Covered Services have been provided) as the Provider's charge for the services rendered to a Member, without any adjustment or reduction and irrespective of any applicable reimbursement arrangement with the Provider." **Ex. A** at 1. "Allowed amounts" generally refers to amounts that Defendant deems payable by the Plan on particular healthcare claims. Other important values are the sums paid by the Plan and sums paid to providers. These values, along with other data and information, reveal critical information bearing on how the Plan's assets are utilized and whether participants and beneficiaries receive adequate levels of care.

63.    The ASA defines *Plaintiff's* "proprietary information and confidential information" as including "information about the systems, procedures, methodologies and practices used by [Plaintiff] to run . . . the Plan." **Ex. A** at 3.

64.     The ASA contemplated the sharing of "confidential" and "proprietary" information between Plaintiff and Defendant for the purpose of managing the Plan. *See generally* **Ex. A** at 9-10, art. 10. While the ASA reasonably required the parties to safeguard each other's confidential information,[15] it expressly allows Plaintiff to "use or disclose" Defendant's proprietary information for the purpose of "administering the Plan." *Id.* at 9 art. 10.c. The ASA further acknowledges that "use or disclosure" of proprietary information may be called for "pursuant to law." *Id.* at 9-10 art. 10.f. And with respect to data extracts and reports specifically at issue here, even if Plaintiff designates a third party to review Plan information that contains Defendant's purported proprietary information, the ASA merely requires that third party to comply with ASA article 10 and to "enter into a confidentiality agreement with [Defendant]." **Ex. A** at 10, art. 11.b. Thus, the ASA plainly and expressly grants Plaintiff and its designees access to the Plan's data—even if Defendant deems it "proprietary"—in order to administer the Plan and carry out fiduciary duties owed under ERISA and applicable agreements.

## II.     THE PARTIES ARE ERISA FIDUCIARIES.

65.     Defendant and Plaintiff Owens & Minor are both Plan fiduciaries. Plaintiff Owens & Minor is a named fiduciary and the Plan's sponsor and administrator. Defendant is a functional fiduciary and has expressly assumed fiduciary duties to the Plan at issue here.

---

[15] Note, however, that nothing in the ASA's provisions calling for protection of proprietary information contemplated that Plaintiff must accept information "as-is" regardless of its completeness or accuracy. That did not stop Defendant from demanding such an agreement in the correspondence detailed above.

66.   ERISA fiduciaries are either "named" or "functional." A named fiduciary "means a fiduciary who is named in the plan instrument, or who, pursuant to a procedure specified in the plan, is identified as a fiduciary (A) by a person who is an employer or employee organization with respect to the plan or (B) by such an employer and such an employee organization acting jointly." 29 U.S.C. § 1102(a)(2). There are three general categories of functional fiduciaries defined by ERISA:

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan *or* exercises any authority or control respecting management or disposition of its assets,

(ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, *or* has any authority or responsibility to do so, *or*

(iii) he has any discretionary authority or discretionary responsibility in the administration of such plan. Such term includes any person designated [as fiduciary] under section 1105(c)(1)(B) of this title.

29 U.S.C. § 1002(21)(A) (emphasis added). Defendant is a "fiduciary" under one or more of these definitions.

**A. BY VIRTUE OF ITS ROLE AS THE PLAN'S TPA, DEFENDANT POSSESSED AND EXERCISED CONTROL OVER PLAN ASSETS AND OVER PLAN ADMINISTRATION AND MANAGEMENT.**

67.     As noted above, the Plan is self-funded. Thus, the Plan assets represent contributions by Plaintiff Owens & Minor, its employees, and former employees. Those contributions benefit the Plan, Plan participants, and beneficiaries by paying healthcare claims for participants and beneficiaries. Plaintiff expresses to participants and beneficiaries that Plaintiff Owens & Minor's and participants' contributions secure the healthcare benefits promised to them by Plaintiff. The amount of contributions is based in large part on actual Plan costs and expenditures each year. This is a common-sense proposition given that the Plan directly pays for healthcare claims, which Defendant administered for the Plan. Defendant assumed a fiduciary role by accepting and exercising authority, control, and discretion over plan management and assets.

68.     The ASA expressly names Defendant as a plan fiduciary with respect to key functions of the Plan and identifies Defendant as a functional fiduciary with respect to other actions:

> Pursuant to Section 405(c)(1) of ERISA, *[Plaintiff] delegates to [Defendant] fiduciary authority to determine claims for benefits under the Plan* as well as the authority to act as the appropriate fiduciary under Section 503 of ERISA to determine appeals of any adverse benefit determinations under the Plan. [Defendant] shall administer complaints, appeals and requests for independent review according to [Defendant's] complaint and appeals policy, and any applicable law or regulation, unless otherwise provided in

25

the Benefits Booklet. In carrying out this authority, *[Defendant] is delegated full discretion to determine eligibility for benefits under the Plan and to interpret the terms of the Plan*. [Defendant] shall be deemed to have properly exercised such authority unless a Member proves that [Defendant] has abused its discretion or that its decision is arbitrary and capricious. [Defendant] is a fiduciary of the Plan only to the extent necessary to perform its obligations and duties as expressed in this Agreement and only to the extent that its performance of such actions constitutes fiduciary action under ERISA.

**Ex. A** at 4, art. 2.c (emphasis added).

69.     The ASA assigned Defendant the duty and right to process claims and "to determine the amount" that "is due and payable" according to *Defendant's* "medical policies and medical policy exception process, its definition of medical necessity, [and] its precertification and/or preauthorization policies." **Ex. A** at 3, art. 2.b (emphasis added). Thus, Defendant possessed authority—which it exercised during all relevant times—to unilaterally commit Plan funds to pay healthcare claims.

70.     Defendant enjoyed discretion with respect to "[t]he amount charged" against the Plan. **Ex. A** at 2 ("PAID CLAIM"). For instance, the ASA purports to grant Defendant discretion to pay a vender more than actual billed charges for a particular service or supply. *Id.* § 1. It permitted Defendant to decide the reimbursement methodology for claims without express regard to cost. *Id.* And it required the Plan to pay Defendant for claims "without regard . . . to whether such payments are increased or decreased by the . . .

achievement of, or failure to achieve, certain specified goals, outcomes or standards *adopted by [Defendant]*." *Id.* (emphasis added).

71.     Defendant exercised extensive control, authority, and discretion over the Plan and its assets through Defendant's contractual arrangements with providers. Both in practice and under the ASA, Defendant exercised absolute control over reimbursement arrangements with providers, which directly impacted both the amounts paid by the Plan and the quality of healthcare provided under the Plan. *See, e.g.*, **Ex. A** at 5, art. 2.s. ("[Defendant] shall have the authority, in its sole discretion, to build and maintain its Provider network on its own behalf. . . . [Defendant] shall be solely responsible for . . . negotiating rates with Providers or auditing Providers. . . ."), art. 2.o (Defendant's contracts with providers, as Defendant may amend them from time to time, will be used to administer and price claims). This control also extends to pharmaceutical benefits paid with Plan assets. *See, e.g.*, **Ex. A** at 12, art. 14.a.1 ("[Defendant] shall determine, in its sole discretion, which pharmacies shall be Network Pharmacies, and the composition of Network Pharmacies may change from time to time."); art. 14.a.2 (Plan "shall" adopt the formulary that governs, among other things, the amount the Plan pays for prescription drugs).

72.     Defendant also enjoyed control and discretion over sums it retained from the difference of amounts paid by the Plan for prescription drugs and the amount actually invoiced for prescription drugs. **Ex. A** at 2, § 2.

73.     Defendant enjoyed discretion and control with respect to settling claims and other disputes that would then be charged against the Plan. **Ex. A** at 2, § 5.

27

74.     Defendant's control over Plan assets is extensive. Defendant, based on its control and discretion described above, unilaterally determines the amounts to be paid by the Plan for healthcare claims. *See, e.g.*, **Ex. A** at 2-3 ("PAID CLAIM"). Under the ASA, Defendant is authorized to take control of Plan monies and apply them to amounts Defendant determines are due. Under the ASA, the Plan must pay those sums, which are not subject to dispute by Plaintiff, on a weekly basis, and the ASA authorizes Defendant to take that money from the Plan through an automated clearing house (ACH) "pull": "Anthem will initiate an ACH demand debit transaction that will withdraw the amount due from a designated Employer bank account no later than three (3) business days following the Invoice Due Date." **Ex. A** at 21-22, schedule A § 4.

75.     Other documents mirror these ASA provisions:

[Defendant] shall have all the powers necessary or appropriate to enable it to carry out its duties in connection with the operation of the Plan and interpretation of the Benefit Booklet. This includes, without limitation, the power to construe the Administrative Services Agreement, *to determine all questions arising under the Plan*, to resolve Member appeals and to make, establish and amend the rules, regulations and procedures with regard to the interpretation of the Benefit Booklet of the Plan. A specific limitation or exclusion will override more general benefit language. [Defendant] has complete discretion to interpret the Benefit Booklet. *The Claims*

Administrator's[16] *determination shall be final and conclusive and may*

*include, without limitation, determination of whether the services, treatment,*

*or supplies are Medically Necessary, Experimental/Investigative, whether*

*surgery is cosmetic, and whether charges are consistent with the Plan's*

*Maximum Allowed Amount.*" **Ex. B**, 2020 SPD at 84. (emphasis and footnote

added).[17]

76.    The SPD describes the "maximum amount of reimbursement *[Defendant]*

will allow for services and supplies" and refers to Defendant's determination of the

maximum allowed reimbursement for particular services. **Ex. B**, 2020 SPD at 62-63

(emphasis added).

77.    With respect to out-of-network claims, Defendant acknowledged that it

established, "at its[] discretion," the fee schedule/rate for those services. **Ex. B**, 2020 SPD

at 63.

78.    The Plan documents make clear that all monies committed by Defendant to

fund claims belong to the Plan. For instance, Defendant has repeatedly disclaimed any

obligation for payment of claims and concedes that monies Defendant applies to pay claims

belong to the Plan. *See* **Ex. B**, 2020 SPD at 2, 93. Indeed, Defendant represents that it "does

not assume any financial risk or obligation with respect to claims." **Ex. B**, 2020 SPD at 93.

---

[16] "Claims administrator" refers to Defendant Anthem. **Ex. B**, 2020 SPD at 93.

[17] "SPD" refers to Summary Plan Description or the Medical Benefit Booklet attached as exhibit
B.

The Plan assumed all financial risk while Defendant retained control and discretion to administer the Plan and allocate its assets.

**B. DEFENDANT'S DISCRETION AND CONTROL EXTENDED TO RECOVERY OF MONIES ERRONEOUSLY PAID BY THE PLAN OR OTHERWISE OWED TO THE PLAN.**

79.    Defendant's control, authority, and discretion over Plan management, administration, and assets extended beyond the value it allowed and paid on claims in the first instance. With respect to Defendant's authority to pursue recovery of sums caused by its overpayment of claims, Defendant "shall determine which recoveries it will pursue, and in no event will [Defendant] pursue a recovery if it reasonably believes that the cost of the collection is likely to exceed the recovery amount or if the recovery is prohibited by law or an agreement with a Provider or Vendor." **Ex. A** at 11, art. 13.e. With respect to overpayment discovered in Plan-initiated audits, "[a]ny errors identified as the result of the audit shall be subject to [Defendant's] review and acceptance prior to initiating any recoveries of Paid Claims." **Ex. A** at 10, art. 12.d.[18]

80.    Defendant's extensive control and discretion with respect to audits likewise evidences control and authority over Plan assets. As alleged above, even if an audit shows that claims were improperly paid, the Plan can make no recovery of its assets without "[Defendant's] review and acceptance" of the audit results. **Ex. A** at 10, art. 12.d. The ASA purports to grant Defendant extensive control over the audit process, including selection of the auditor and parameters of the audit. *See generally* **Ex. A** art. 12. To the extent Defendant

---

[18] Similarly, "settlements of reimbursement disputes brought by Providers do not require the approval of [Plaintiff]." **Ex. A** at 13, art. 16.e.

recovers Plan monies through its own audit, it exercises extensive control over whether to even pursue recoveries and over the amount of those recovered monies that return to the Plan. *See* **Ex. A** arts. 13.d-e.

81.     Further, "[Defendant] may, but is not required to, readjudicate Claims or adjust [Plan participants' and beneficiaries'] cost share payments related to the recoveries made from a Provider or a Vendor." **Ex. A** at 11, art. 13.e.

### C. DEFENDANT EXERCISED EXTENSIVE CONTROL AND DISCRETION OVER PLAN DATA AND INFORMATION AT ISSUE IN THIS CASE.

82.     Tightly tethered to Plaintiff's claims is Defendant's purported control and discretion over Plan information. **Ex. A** at 10, art. 11.a. (purporting to grant discretion to Defendant to "approve" release of Plan information not in Defendant's "standard account reporting package."). Defendant sought to retain discretion over the "types, format, content and purpose" of the information requested. *Id.*

83.     Defendant attempted to retain discretion and control over whether to permit Plaintiff to utilize a third party to review Plan data and information. *See* **Ex. A** at 10, art. 11.b.

84.     Among the information and data at issue in this lawsuit is Plan claims data that Defendant has mischaracterized as Defendant's "proprietary" or "confidential" information. The ASA purports to provide Defendant "unlimited rights to use" information and data *properly* designated as such. **Ex. A** at 10, art. 11.d. And even with respect to "other Claim-related data collected in [Defendant's] performance of services under [the ASA,]" Defendant exercised control and discretion over the use of that information as well. *Id.*

31

85.   The ASA further purports to allow Defendant to provide claims-related information to third parties "for a variety of lawful purposes including . . . research, monitoring, benchmarking and analysis of industry and health care trends." **Ex. A** at 10, art. 11.d.

86.   The ASA nevertheless acknowledges that Plaintiff is entitled to utilize Defendant's "confidential" information while purporting to grant Defendant further discretion over Plan information and data: "[Defendant] reserves the right to terminate any audit being performed by or for [Plaintiff] if [Defendant] determines that the confidentiality of its information is not properly being maintained . . . ." **Ex.** A at 10-11, art. 12.d.

87.   With respect to authority, discretion, and control that the ASA purportedly grants Defendant with respect to Plan monies and the Plan's information, Defendant has exercised that authority, discretion, and control.

88.   Defendant's conduct over the past year has demonstrated that, with respect to Plan information and data, Defendant exercises authority and discretion over the management and administration of the Plan and its information. Defendant's position that it has authority to conceal claims data at issue here lacks any support under ERISA. Nevertheless, Defendant has represented that it can unilaterally decide to produce the information sought or limit the Plan's access to that information. And the precise question presented to the Court is whether Defendant breached its duties to the Plan by refusing to provide the Plan's claims data so that Plaintiff could adequately assess Defendant's performance of duties owed to the Plan, Plan participants, and beneficiaries.

### D. Plaintiff Owens & Minor is the Plan Sponsor and a Fiduciary With Standing to Prosecute ERISA Claims on the Plan's Behalf.

89.     The ASA identifies Plaintiff as the Plan sponsor, named fiduciary, and as the party with primary discretion and authority over all aspects of the Plan. **Ex. A** at 1 and 7, art. 3.b. (acknowledging that "[Plaintiff] retains all final authority and responsibility for the Plan," which would necessarily include Plan information at issue here).

90.     Indeed, as the sponsor and named fiduciary of the Plan, Plaintiff is afforded discretion and control over Plan assets and management of the Plan. Plaintiff's fiduciary role extends to exercising discretion over and management of TPAs such as Defendant. Relevant here is Plaintiff's authority under the Plan—and its duty to the Plan and Plan beneficiaries and participants—to engage and monitor TPAs and their use of Plan assets and information.

91.     For well over a year—and now through this Complaint—Plaintiff has sought information that is integral to determining whether Defendant, the Plan's TPA, properly administered the Plan and paid healthcare claims according to its duties under ERISA, the ASA, and other Plan documents. Stated another way, Plaintiff requires the relevant information in order to ensure that Defendant is discharging its duties with the requisite prudence and "solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." *See* 29 U.S.C. §§ 1104(a)(1), 1105(a) and (c). This task lies at the heart of Plaintiff's authority and duty as the Plan sponsor, administrator, and named fiduciary.

33

## JURISDICTION AND VENUE

92.     This is a fiduciary action brought by a plan fiduciary pursuant to ERISA.

Thus, United States district courts enjoy subject matter jurisdiction over this dispute. 29

U.S.C. § 1132(e)(1); *see also* 28 U.S.C. § 1331 (federal question); *id.* § 1367 (supplemental

jurisdiction).

93.     Venue is proper in this district and division because the Plan is administered

in Richmond, Virginia, the relevant breaches occurred in Richmond, Virginia, and

Defendant is headquartered in Richmond, Virginia. 29 U.S.C. § 1132(e)(2); 28 U.S.C. §

1391(b); E.D. Va. Loc. Civ. R. 3(B)(4). Those same grounds support this Court's exercise

of personal jurisdiction over Defendant. Moreover, this case arises from Defendant's

misconduct in Virginia; from an agreement or agreements negotiated, executed, and

performable in Virginia and that designate Virginia law as governing state law; and from

Defendant's contacts in Virginia which are described throughout this Complaint.

## CAUSE OF ACTION FOR ERISA VIOLATIONS

94.     Plaintiff incorporates all other paragraphs in this Complaint as if fully

restated here.

95.     Under ERISA, Defendant is a Plan fiduciary.

96.     The Plan is an ERISA welfare benefit plan subject to the protections afforded

by ERISA.

97.     Plaintiff Owens & Minor is a Plan fiduciary and the Plan's sponsor. Plaintiff

Owens & Minor brings this claim on the Plan's behalf in Plaintiff's capacity as Plan

sponsor and named fiduciary.

34

98.    Under ERISA, Defendant must discharge its duties to the Plan solely in the interest of Plan participants and beneficiaries and "for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and defraying reasonable expenses of administering the plan." *See* 29 U.S.C § 1104(a)(1). ERISA requires Defendant to discharge its duties with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims . . . and in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with the provisions of [ERISA]." *Id.* § 1104(a)(2).

99.    Defendant violated its duties under ERISA by refusing to cooperate with Plaintiff's attempt to properly analyze claims data for the purpose of, among other things, ensuring the proper use of Plan assets and assessing the quality of care provided to Plan participants and beneficiaries. A reasonably prudent administrator in Defendant's position—actually discharging its duties in the sole interest of Plan participants and beneficiaries—would readily cooperate with Plaintiff's efforts. But an imprudent administrator—or one attempting to conceal its misconduct—would do exactly what Defendant has done here.

100.    Defendant also violated these duties when it misappropriated and concealed the Plan's claims information by unilaterally, arbitrarily, and erroneously deeming it "proprietary" in order to prevent the Plan from accessing its information. A reasonably prudent administrator would not refuse to provide the claims data sought, especially given

35

Plaintiff's agreement to protect information to any extent it actually contains Defendant's "proprietary" information.

101.   Defendant also violated these duties by placing its own desire to conceal the information over the interests of the Plan, plan participants, and beneficiaries. On information and belief, Defendant seeks to conceal its mismanagement of fund assets, to conceal self-dealing, to prevent Plaintiff from monitoring Defendant's performance, or some other self-interested purpose. No matter the motive, Defendant's loyalty was and remains unlawfully divided.

102.   Defendant also violated these duties by failing to inform Plaintiff that it would withhold and exclude vital claims information from any production of information to Plaintiff Owens & Minor in its capacity as Plan sponsor and named fiduciary. A reasonably prudent claims administrator would know that the information Plaintiff seeks is critical to analyzing claims data and assessing a claims administrator's performance. And a reasonably prudent claims administrator would know that, in engaging and monitoring a claims administrator, a plan fiduciary and sponsor in Plaintiff Owens & Minor's position would need to know whether Defendant would subsequently refuse to share it. As a fiduciary with a duty to monitor TPAs, Plaintiff would not have engaged Defendant's services had Defendant disclosed that it would unilaterally deem *the Plan's data* unproducible based on a faulty and fraudulent claim that the data belonged to Defendant and was "proprietary" in nature.

103.   Defendant has harmed Plaintiff by preventing it from conducting a proper analysis of Defendant's claims administration services in order to ensure the preservation

36

of Plan assets and to assess quality of care. Plaintiff cannot perform a proper analysis without the information and data sought by this lawsuit. Without a proper analysis of the information Plaintiff seeks, the Plan is forced in the untenable position of choosing one of the following options without all the available information: (i) sue Defendant for return of losses caused by its mismanagement given the reasonable inferences supported by Defendant's suspicious concealment of the information and data; (ii) engage a new claims administrator without a full understanding of whether the Plan would benefit from that change; or (iii) allow Defendant to continue administering claims for the Plan and assume the risk that Defendant is mismanaging or misappropriating Plan funds or failing to provide adequate quality of care to participants and beneficiaries.

104.    To any extent sufficient analysis is possible without the outstanding information and data, which Plaintiff denies, it will create much more expense to the Plan and require significant guesswork which will harm the Plan further.

105.    Plaintiff has also been harmed because Defendant's misconduct would interfere with certain disclosure requirements under ERISA. *See, e.g.*, 29 U.S.C. § 1024(b)(4).

106.    Further, the Plan's claims data and information have value and, therefore, constitute "assets." Specifically, the claims information will reveal whether the Plan is operating satisfactorily and whether the Plan could save money or operate more efficiently. The claims data may also reveal whether the Plan is entitled to recoup monies lost due to a breach of fiduciary duty by Defendant or due to conduct by third parties like providers and

vendors. It should be undisputed that this information and data are assets that belong to the Plan.

107.   ERISA prohibits a fiduciary from dealing with assets of the plan in the fiduciary's "own interest or for [its] account." 29 U.S.C. § 1106(b). By strategically *mis*characterizing the Plan's claims information as *Defendant's* "confidential" and "proprietary" information—and by refusing to produce relevant claims data out of fear that its fiduciary breaches will come to light or that the data reveals Defendant's performance was otherwise unsatisfactory—Defendant is unlawfully dealing with this informational asset for its own interest and for its own account.

108.   To remedy these violations, Plaintiff seeks an order requiring Defendant to produce all data and claims information previously requested by Plaintiff. *See supra* paras. 22, 28, 30, 36, 37, 42.

109.   Plaintiff also seeks declaratory judgment under ERISA and 28 U.S.C. § 2201. Specifically, Plaintiff seeks a declaration that, under ERISA and/or the applicable agreements, Plaintiff is entitled to the Plan information it has requested from Defendant.

110.   Plaintiff seeks a declaration that the requested information and data does not constitute Defendant's "proprietary" and "confidential" information."

111.   Plaintiff seeks a declaration that, to the extent the ASA or any other agreement or document purports to permit Defendant to block Plaintiff's access to Plan claims information, it is void under ERISA.

112.    Finally, Plaintiff seeks a declaration that Defendant is required to produce the requested information to Plaintiff without demanding any restriction other than restrictions both allowed by ERISA and to which Plaintiff has expressly agreed.

## STATE LAW CAUSES OF ACTION

113.    To the extent ERISA does not have preemptive effect on relevant state law claims, Plaintiff alleges the following state law causes of action.

### I.    BREACH OF CONTRACT UNDER VIRGINIA LAW

114.    Plaintiff incorporates all other paragraphs in this Complaint as if fully restated here.

115.    Plaintiff further incorporates the ASA, attached as exhibit A, as if fully restated here.

116.    This claim is brought by Plaintiff Owens & Minor in its individual capacity and, alternatively, on behalf of the Plan.

117.    Plaintiff and Defendant are parties to the ASA.

118.    The ASA states, "Nothing in this Agreement shall impair or limit a Party's right to use and disclose its Information for its own lawful business purposes." The ASA also states that each party retains ownership of its own information. Further, even assuming the information at issue contains Defendant's "proprietary" information, the ASA expressly allows Plaintiff to "use or disclose" Defendant's proprietary information for the purpose of "administering the Plan." Defendant breached these provisions by purporting to take ownership of information owned by Plaintiff Owens & Minor individually or, alternatively, by the Plan. Defendant further breached these provisions by impairing

Plaintiff's right to use its information for its own lawful business purposes—*i.e.* confirming that the Plan has been properly administered and managed by Defendant.

119.   As a result of Defendant's breaches, Plaintiff has suffered harm as set forth above.

## II.   BREACH OF GOOD FAITH AND FAIR DEALING UNDER VIRGINIA LAW

120.   Plaintiff incorporates all other allegations in this Complaint as if fully restated here.

121.   This claim is brought by Plaintiff Owens & Minor in its individual capacity and, alternatively, on behalf of the Plan.

122.   Every agreement carries with it an implied duty of good faith and fair dealing. This implied duty applies even when a written contract provides the defendant discretion to perform a particular act.

123.   As set forth above, the ASA assigned Defendant certain levels of control over Plan information. However, neither the ASA nor any other agreement grants Defendant the discretion to deem Plan claims data the "proprietary" or "confidential" information of Defendant. And no agreement grants Defendant discretion to withhold from Plaintiff information belonging to the Plan. Defendant's refusal to provide Plaintiff its Plan's claims data, even if not expressly prohibited by the governing contracts, represents bad faith and evinces a desire by Defendant to evade accountability and deny Plaintiff the bargained-for benefit of the ASA.

124.   To the extent the ASA granted Defendant discretion or control over the information sought by Plaintiff, Defendant has exercised that discretion or control

dishonestly, resulting in its refusal to produce the Plan's information and data. First, Defendant intentionally mischaracterized the information and data as Defendant's "proprietary" or "confidential" information belonging to Defendant in order to justify Defendant's concealment of that information. Second, Defendant agreed to voluntarily produce that information only if Plaintiff agreed to accept the information "as-is," even if it is incomplete, inaccurate, and erroneous. Third, on information and belief, Defendant refused to produce the requested information and data in an effort to conceal its mismanagement of Plan funds and other wrongdoing against the Plan or Plaintiff Owens & Minor.

125.    As a result of Defendant's breach of its implied duty of good faith and fair dealing, Plaintiff has suffered harm as set forth above.

## III.    BREACH OF FIDUCIARY DUTY UNDER VIRGINIA LAW

126.    Plaintiff incorporates all other allegations in this Complaint as if fully restated here.

127.    This claim is brought by Plaintiff Owens & Minor in its individual capacity and, alternatively, on behalf of the Plan.

128.    Plaintiff placed—and Defendant invited and accepted—trust and confidence in Defendant. Indeed, Plaintiff assigned significant discretion to Defendant to spend Plan monies comprised of contributions by Plaintiff Owens & Minor and its employees.

129.    Given this relationship of trust and confidence, Defendant owes a duty of full disclosure to Plaintiff in its individual and representative capacities relating to Defendant's use of Plan assets. That duty extends without limitation to disclosing billed and excluded

charges, allowed charges, paid amounts, diagnosis codes, claim codes, and other categories of information and values.

130.   Defendant breached its fiduciary duties by concealing and withholding Plan data from Plaintiff. And while Plaintiff does not seek any form of monetary relief at this time, Plaintiff suspects that Defendant breached its fiduciary duties by overpaying claims to Defendant-related entities and to entities that pay Defendant kickbacks under the guise of "rebates" or other terms and labels.

## JURY DEMAND

131.   Plaintiff Owens & Minor, individually and on behalf of the Plan, hereby demands a trial by jury for all issues triable by jury.

## PRAYER FOR RELIEF

132.   Plaintiff seeks an order requiring Defendant to produce the Plan information and data previously requested by Plaintiff.

133.   Plaintiff seeks declaratory relief as set forth above, *supra* paras. 109-112.

134.   Plaintiff seeks specific performance of its contractual right to the claims information and data described above. Plaintiff has satisfied any and all conditions applicable to that right.

135.   Plaintiff seeks reasonable attorney's fees and costs.

*[Signature Block on Next Page]*

Respectfully submitted,

OWENS & MINOR, INC. and
OWENS & MINOR FLEXIBLE BENEFITS PLAN

By: _____/s/_____
        Seth Carroll (VSB No. 74745)
        Matthew Lastrapes (VSB No. 84097)
        3311 West Broad Street
        Richmond, VA 23230
        Phone: (804) 551-9650
        Facsimile: (866) 238-6415
        scarroll@hurtinva.com
        mlastrapes@hurtinva.com
        COMMONWEALTH LAW GROUP

        W. MARK LANIER
        Texas State Bar No. 11934600
        *pro hac vice forthcoming*
        Kent C. Sullivan
        Texas State Bar No. 19487300
        *pro hac vice forthcoming*
        Benjamin Major
        Texas State Bar No. 24074639
        *pro hac vice forthcoming*
        10940 W. Sam Houston Pkwy N.
        Suite 100
        Houston, Texas 77064
        Telephone: (713) 659-5200
        Facsimile: (713) 659-2204
        WML@lanierlawfirm.com
        Kent.Sullivan@lanierlawfirm.com
        Ben.Major@lanierlawfirm.com
        THE LANIER LAW FIRM, P.C.

        FRANK GALLUCCI
        Ohio State Bar No. 72680
        *pro hac vice forthcoming*
        55 Public Square
        Suite 2222
        Cleveland, Ohio 44113
        Telephone: (216) 861-0804
        Facsimile: (216) 861-5322
        FGallucci@pglawyer.com
        PLEVIN AND GALLUCCI CO., LPA

        **ATTORNEYS FOR PLAINTIFFS**

43