# EXHIBIT A

**ADMINISTRATIVE SERVICES AGREEMENT**

This Administrative Services Agreement ("Agreement") is entered into by and between Owens & Minor Medical, Inc. ("Employer") and HealthKeepers, Inc. and Anthem Health Plans of Virginia, Inc. dba Anthem Blue Cross and Blue Shield ("Anthem") and is effective as of June 1, 2017 upon the following terms and conditions:

1.   Employer is the sponsor of a self-funded Group Health Plan (as defined below) providing, among other things, health care benefits to certain eligible employees and their qualified dependents.

2.   Employer desires to retain Anthem as an independent contractor to administer certain elements of Employer's Group Health Plan.

3.   Anthem desires to administer certain elements of Employer's Group Health Plan pursuant to the terms and conditions of this Agreement.

In consideration of the promises and the mutual covenants contained in this Agreement, Anthem and Employer (the "Party" or "Parties" as appropriate) agree as follows:

**ARTICLE 1 - DEFINITIONS**

For purposes of this Agreement and any amendments, attachments or schedules to this Agreement, the following words and terms have the following meanings unless the context or use clearly indicates another meaning or intent:

**ADMINISTRATIVE SERVICES FEES.**  The amount payable to Anthem in consideration of its administrative services and operating expenses as indicated in Section 3 of Schedule A, excluding any cost for stop loss insurance coverage or any other policy of insurance, if applicable.  All additional charges not included in the Administrative Services Fees are specified elsewhere in this Agreement.

**AGREEMENT PERIOD.**  The period of time indicated in Section 1 of Schedule A.

**ANTHEM AFFILIATE.**  An entity controlling, under common control with or controlled by Anthem.

**BENEFITS BOOKLET.**  A description of the portion of the health care benefits provided under the Plan that is administered by Anthem.

**BILLED CHARGES.**  The amount that appears on a Member's Claim form (or other written notification acceptable to Anthem that Covered Services have been provided) as the Provider's charge for the services rendered to a Member, without any adjustment or reduction and irrespective of any applicable reimbursement arrangement with the Provider.

**BLUE CROSS BLUE SHIELD ASSOCIATION ("BCBSA").**  An association of independent Blue Cross and Blue Shield companies.

**CLAIM.**  Written or electronic notice of a request for reimbursement of any health care service or supply on a form acceptable to Anthem.

**CLAIMS RUNOUT SERVICES.**  Processing and payment of Claims that are incurred but unreported and/or unpaid as of the date this Agreement terminates.

**COVERED SERVICE.**  Any health care service or supply rendered to Members for which benefits are eligible for reimbursement pursuant to the terms of the applicable Benefits Booklet.

**EMPLOYER AFFILIATES.**  Companies affiliated with Employer that are participating in the Plan and which, along with the Employer constitute a single "control group" as that term is used in the Internal Revenue Code.

**ERISA.**  The Employee Retirement Income Security Act of 1974, as amended, and regulations promulgated thereunder.

**GROUP HEALTH PLAN OR PLAN.**  An employee welfare benefit plan (as defined in Section 3(1) of ERISA) established by the Employer, in effect as of the Effective Date, as described in the Plan Documents, as they may be amended from time to time.

**INTER-PLAN ARRANGEMENTS.**  Blue Cross and Blue Shield Association programs, including the BlueCard Program, where Anthem can process certain Claims for Covered Services received by Members, which may include accessing the reimbursement arrangement of a Provider that has contracted with another Blue Cross and/or Blue Shield plan.

**INVOICE DUE DATE.**  The date on the invoice provided to Employer indicating when payment is due.

**MEMBER.**  The individuals, including the Subscriber and his/her dependents, as defined in the Benefits Booklet, who have satisfied the Plan eligibility requirements of Employer, applied for coverage, and been enrolled for Plan benefits.

**NETWORK PROVIDER.**  A physician, health professional, hospital, pharmacy, or other individual, organization and/or facility that has entered into a contract, either directly or indirectly, with Anthem to provide Covered Services to Members through negotiated reimbursement arrangements.

**PAID CLAIM.**  The amount charged to Employer for Covered Services or services provided during the term of this Agreement and any Claims Runout Period.  Paid Claims may also include any applicable surcharges assessed by a state or government agency and any applicable interest paid.  In addition, Paid Claims shall be determined as follows:

1.  <u>Provider and Vendor Claims.</u> Except as otherwise provided in this Agreement, Paid Claims shall mean the amount Anthem actually pays the Provider or Vendor without regard to: (i) whether Anthem reimburses such Provider or Vendor on a percentage of charges basis, a fixed payment basis, a global fee basis, single case rate, or other reimbursement methodology; (ii) whether such amount is more or less than the Provider's or Vendor's actual Billed Charges for a particular service or supply; or (iii) whether such payments are increased or decreased by the Provider's or Vendor's achievement of, or failure to achieve, certain specified goals, outcomes or standards adopted by Anthem.

2.  <u>Prescription Drug Claims.</u> If applicable to the Plan benefits as indicated in Schedule B, Paid Claims for Prescription Drugs shall mean an amount that Anthem invoices Employer for Prescription Drugs dispensed to Members by pharmacies.  Anthem shall retain the difference, if any, between the amount invoiced to Employer and the amount paid to the pharmacy benefit manager ("PBM") for Prescription Drugs dispensed to Members as a portion of Anthem's reasonable compensation for services under this Agreement.

3.  <u>Payment Innovation Programs.</u> If a Provider or Vendor participates in any Anthem payment innovation program, excluding any programs described in paragraph 1 of this provision, in which performance incentives, rewards or bonuses are paid based on the achievement of cost, quality, efficiency, or service standards or metrics adopted by Anthem ("Payment Innovation Programs"), Paid Claims shall also include the amount of such payments to Providers or Vendors for these Payment Innovation Programs.  Such payments may be charged to Employer on a per Claim, lump sum, per Subscriber, or per Member basis and shall be based on Anthem's predetermined methodology for such Payment Innovation Program, as may be amended from time to time.  The total monies charged in advance to fund a Payment Innovation Program shall be actuarially determined as the amount necessary to fund the expected payments attributable to the Payment Innovation Program.  Prior to its implementation, Anthem shall provide Employer with a description of the Payment Innovation Program, the methodology that will be utilized to charge the Employer, and any reconciliation process performed in connection with such program.  Payments to Providers or Vendors under these Payment Innovation Programs shall not impact Member cost shares.

4.  <u>Fees Paid to Manage and/or Coordinate Care or Costs.</u> Paid Claims may also include fees paid to Providers or Vendors for managing and/or coordinating the care or cost of care for designated Members.

5.  <u>Claims Payment Pursuant to any Judgment, Settlement, Legal or Administrative Proceeding.</u> Paid Claims shall include any Claim amount paid as the result of a settlement, judgment, or legal, regulatory or administrative proceeding brought against the Plan and/or Anthem, or otherwise agreed to by Anthem, with respect to the decisions made by Anthem regarding the coverage of or amounts paid for services under the terms of the Plan.  Paid Claims also includes any amount paid as a result of Anthem's billing dispute resolution procedures with a Provider or Vendor.  Any Claims paid pursuant to this provision will count towards any stop loss accumulators under a stop loss agreement with Anthem.

6.  <u>Claims Payment Pursuant to Inter-Plan Arrangements and Other BCBSA Programs.</u> Paid Claims shall include any amount paid for Covered Services that are processed through Inter-Plan Arrangements or for any amounts paid for Covered Services provided through another BCBSA program (e.g., BCBSA Blue Distinction Centers for Transplant). More information about Inter-Plan Arrangements is found in the Inter-Plan Arrangements Schedule of this Agreement.

7.    <u>Claims Payment Pursuant to a Consumer Directed Health Plan Account</u>. If applicable to Plan benefits and as indicated on Schedule B of this Agreement, Paid Claims shall include any amount actually paid by Anthem from a consumer directed health plan account, such as a health reimbursement account or a health incentive account.

**PLAN DOCUMENTS.**  The documents that set forth the terms of the Plan, and which include the Summary Plan Description and the Benefits Booklet.

**PRESCRIPTION DRUG.**  Insulin and those drugs and drug compounds that are included in the U.S. Pharmacopoeia and that are required to be dispensed pursuant to a prescription or that are otherwise included on Anthem's formulary (e.g., certain over-the-counter drugs).

**PROPRIETARY INFORMATION AND CONFIDENTIAL INFORMATION.**  Employer's Proprietary Information is information about the systems, procedures, methodologies and practices used by Employer to run its operations and the Plan and other non-public information about Employer.  Anthem's Proprietary Information is non-public, trade secret, commercially valuable, or competitively sensitive information, or other material and information relating to the products, business, or activities of Anthem or an Anthem Affiliate, including but not limited to: (1) Information about Anthem's Provider networks, Provider negotiated fees, Provider discounts, and Provider contract terms; (2) information about the systems, procedures, methodologies, and practices used by Anthem and Anthem Affiliates in performing their services such as underwriting, Claims processing, Claims payment, and health care management activities; and (3) combinations of data elements that could enable information of this kind to be derived or calculated.  Anthem's Confidential Information is information that Anthem or an Anthem Affiliate is obligated by law or contract to protect, including: (1) Social Security numbers; (2) Provider tax identification numbers (TINs); (3) National Provider Identification Numbers (NPIs); (4) Provider names, Provider addresses, and other identifying information about Providers; and (5) drug enforcement administration (DEA) numbers, pharmacy numbers, and other identifying information about pharmacies.

**PROVIDER.**  A duly licensed physician, health professional, hospital, pharmacy or other individual, organization and/or facility that provides health services or supplies within the scope of an applicable license and/or certification and meets any other requirements set forth in the Benefits Booklet.

**SUBSCRIBER.**  An employee or retiree of Employer or other eligible person (other than a dependent) who is enrolled in the Plan.

**SUMMARY PLAN DESCRIPTION ("SPD").**  A document provided to Subscribers by Employer or its designee that describes the health care benefits available to Members under the Plan, their rights under the Plan and the obligations of the Plan.  This document may incorporate the Benefits Booklet.  In the event of any conflict or inconsistency between the Summary Plan Description and the Benefits Booklet, the terms of the Benefits Booklet shall control Anthem's performance under this Agreement.

**VENDOR.**  A person or entity other than a Provider, including an Anthem Affiliate, that provides services or supplies pursuant to a contract with Anthem.

## ARTICLE 2 - ADMINISTRATIVE SERVICES PROVIDED BY ANTHEM

a.    Anthem shall process the enrollment of eligible individuals and termination of Members as directed by the Employer subject to the provisions of this Agreement.  Anthem shall, with the assistance of Employer, respond to direct routine inquiries made to it by employees and other persons concerning eligibility in the Plan.

b.    Anthem shall perform the following Claims administrative services:

1.    Process Claims with a Claims Incurred Date indicated in Section 1 of Schedule A and provide customer service, including investigating and reviewing such Claims to determine what amount, if any, is due and payable according to the terms and conditions of the Benefits Booklet and this Agreement.  Anthem shall perform coordination of benefits ("COB") with other payors, including Medicare.  In processing Claims, Anthem shall utilize Anthem's medical policies and medical policy exception process, its definition of medical necessity, its precertification and/or preauthorization policies, Provider contract requirements and applicable Claim timely filing limits.

2.    Disburse to the applicable individuals or entities (including Providers and Vendors) payments that it determines to be due according to the provisions of the Benefits Booklet.

3.   Provide notice in writing when a Claim for benefits has been denied which notice shall set forth the reasons for the denial and the right to a full and fair review of the denial under the terms of the Benefits Booklet and shall otherwise satisfy applicable regulatory requirements, including those of ERISA, governing the notice of a denied Claim.

c.   Pursuant to Section 405(c)(1) of ERISA, Employer delegates to Anthem fiduciary authority to determine claims for benefits under the Plan as well as the authority to act as the appropriate fiduciary under Section 503 of ERISA to determine appeals of any adverse benefit determinations under the Plan. Anthem shall administer complaints, appeals and requests for independent review according to Anthem's complaint and appeals policy, and any applicable law or regulation, unless otherwise provided in the Benefits Booklet. In carrying out this authority, Anthem is delegated full discretion to determine eligibility for benefits under the Plan and to interpret the terms of the Plan. Anthem shall be deemed to have properly exercised such authority unless a Member proves that Anthem has abused its discretion or that its decision is arbitrary and capricious. Anthem is a fiduciary of the Plan only to the extent necessary to perform its obligations and duties as expressed in this Agreement and only to the extent that its performance of such actions constitutes fiduciary action under ERISA. Anthem shall have no fiduciary responsibility in connection with any other element of the administration of the Plan. Anthem shall not act as the "plan administrator" nor shall it be a "named fiduciary" of the Plan. Anthem shall charge Employer the fee described in Section 3.C of Schedule A for any independent review conducted pursuant to this provision.

d.   Anthem shall have the authority, in its reasonable discretion, to institute from time to time, utilization management, case management, disease management or wellness pilot initiatives in certain designated geographic areas. These pilot initiatives are part of Anthem's ongoing effort to find innovative ways to make available high quality and more affordable healthcare services. A pilot initiative may affect some, but not all Members under the Plan. These programs will not result in the payment of benefits which are not provided in the applicable Benefits Booklet, unless otherwise agreed to by the Employer. Anthem reserves the right to discontinue a pilot initiative at any time without advance notice to Employer.

e.   Anthem shall perform recovery services as provided in Article 13.

f.   Anthem shall issue identification cards to Subscribers and/or Members, as applicable, and the content and design of the identification cards shall comply with BCBSA regulations.

g.   This provision is intentionally omitted in its entirety.

h.   Anthem shall provide Members and potential Members access to an online directory of Providers contracted with Anthem ("Provider Directories"). Such Provider Directories shall also be available and distributed in booklet format upon Member request. Additionally, if applicable to Plan benefits, Anthem shall ensure that Members and potential Members have access to the BlueCard directory of Providers via a website sponsored by BCBSA.

i.   Anthem reserves the right to make benefit payments to either Providers or Members at its reasonable discretion. Employer agrees that the terms of the Plan will include provisions for supporting such discretion in determining the direction of payment including, but not limited to, a provision prohibiting Members from assigning their rights to receive benefit payments, unless otherwise prohibited by applicable law.

j.   If applicable to the Plan benefits and as indicated in Schedule B of this Agreement, Anthem may provide or arrange for the provision of the following managed care services:

1.   Conduct medical necessity review, utilization review, and a referral process, which may include, but is not limited to: (a) preadmission review to evaluate and determine the medical necessity of an admission or procedure and the appropriate level of care, and for an inpatient admission, to authorize an initial length of stay; (b) concurrent review throughout the course of the inpatient admission for authorization of additional days of care as warranted by the patient's medical condition; (c) retrospective review; and (d) authorizing a referral to a non-Network Provider. Anthem shall have the authority to waive a requirement if, in Anthem's discretion, such exception is in the best interest of the Member or the Plan, or is in furtherance of the provision of cost effective services under this Agreement.

2.   Perform case management to identify short and long term treatment programs in cases of severe or chronic illness or injury. Anthem may, but is not required to, customize benefits in limited circumstances by approving otherwise non-Covered Services if, in the discretion of Anthem, such exception is in the best interest of the Member and the Plan.

3.      Provide access to a specialty network of Providers if the Plan includes a specialty network. Anthem reserves the right to establish specialty networks for certain specialty or referral care.

4.      Provide any other managed care services incident to or necessary for the performance of the services set forth in this Article 2.

k.      If applicable to the Plan benefits and as indicated in Schedule A or B of this Agreement, Anthem shall offer wellness programs and other programs to help Employer effectively manage the cost of care, and Employer shall pay fees for the programs selected by Employer only if such fees are indicated in Section 3(B) of Schedule A. Employer shall abide by all applicable policies and procedures of the programs selected, which may require Employer to provide requested information prior to Anthem initiating the service.

l.      On behalf of Employer, Anthem shall produce and maintain a master copy of the Benefits Booklet and make changes and amendments to the master copy of the Benefits Booklet and incorporate any approved changes or amendments pursuant to Article 18(a) of this Agreement.  Employer shall determine, in its sole and reasonable discretion, whether Anthem has accurately produced the Benefits Booklet and has fully implemented the approved changes or amendments. Until Employer has approved the Benefits Booklet, Anthem will administer the quoted benefits according to Anthem's most similar standard Benefits Booklet language.

m.      Anthem will provide Employer with Plan data and assistance necessary for preparation of the Plan's information returns and forms required by ERISA or other federal or state laws.  Anthem shall prepare and mail all IRS Form 1099's and any other similar form that is given to Providers or brokers. Form 5500s are the sole responsibility of Employer; however, Anthem shall provide timely information and, if requested, assistance.  Anthem will disclose its fee and compensation information to Employer, as required by applicable law, for Employer to complete its Form 5500 and assess its compliance with section 408(b)(2) of ERISA and any applicable regulations promulgated there under.  Employer is solely responsible for preparing the summary annual reports.

n.      Anthem shall administer unclaimed funds pursuant to unclaimed property or escheat laws and shall make any required payment and file any required reports under such laws.

o.      Unless otherwise agreed to by the Parties and specified in the Benefits Booklet, Anthem's standard policies and procedures, as well as Provider contracts, as they may be amended from time to time, will be used in the provision of services specified in this Agreement.  In the event of any conflict between this Agreement and any of Anthem's policies and procedures, this Agreement will govern.

p.      This provision is intentionally omitted.

q.      Select state laws require Employers to finance health related initiatives through residency-based assessments and/or surcharges added to certain Paid Claims.  After Employer completes any applicable forms, Anthem shall make all assessment and/or surcharge payments on behalf of Employer to the appropriate pools administered by the respective states, based primarily upon Anthem's Paid Claims information and Member information provided to Anthem by Employer.  Examples of such assessments and surcharges include, but are not limited to, the Massachusetts Health Safety Net Trust Fund, the New York Health Care Reform Act and the Michigan Health Insurance Claims Assessment Act.

r.      Anthem shall provide required notices describing Member's rights under the Women's Health and Cancer Rights Act (WHCRA) upon a Member's enrollment and at least annually thereafter.

s.      Anthem shall have the authority, in its sole discretion, to build and maintain its Provider network on its own behalf.  In building and maintaining its Provider network, Anthem is not acting on behalf of or as an agent for any Employer or member.  Nothing in this Agreement shall be interpreted to require Anthem to maintain negotiated fees or reimbursement arrangements or other relationships with certain Providers or Vendors or to negotiate on behalf of or for the benefit of Employer or Employer's Members.  Anthem will be solely responsible for acting as a liaison with Providers including, but not limited to, responding to Provider inquiries, negotiating contract language and negotiating rates with Providers or auditing Providers, and Employer agrees that it will be subject to the terms and conditions of these agreements.

t.      If a catastrophic event (whether weather-related, caused by a natural disaster, or caused by war, terrorism, or similar event) occurs that affects Members in one or more locations, and such catastrophic event prevents or interferes with Anthem's ability to conduct its normal business with respect to such Members or prevents or interferes with Members' ability to access their benefits, Anthem shall have the right, without

first seeking consent from Employer, to take reasonable and necessary steps to process Claims and provide managed care services in a manner that may be inconsistent with the Benefits Booklet in order to minimize the effect such catastrophic event has on Members.  As soon as practicable after a catastrophic event, Anthem shall report its actions to Employer.  Employer shall reimburse Anthem for amounts paid in good faith under the circumstances and such amounts shall constitute Paid Claims, even if the charges incurred were not for services otherwise covered under the Benefits Booklet.

u. Anthem shall submit any claim that is required to be filed under any stop loss policy issued by Anthem or an Anthem Affiliate.  Anthem shall have no obligation to prepare or file any claim for excess risk or stop loss coverage under a policy not issued by Anthem or an Anthem Affiliate.  Anthem shall provide Employer with Claims data pursuant to Article 11 of this Agreement if Employer chooses to file a claim under a stop loss policy issued by an entity other than Anthem or an Anthem Affiliate.  Anthem shall assume no liability or responsibility to Employer for inconsistencies between the determination of Covered Services under the Benefits Booklet and this Agreement and the determination of coverage by an unaffiliated stop loss carrier.

v. Anthem shall assist Employer in determining whether its Prescription Drug benefit constitutes "creditable prescription drug coverage" as that term is used under the Medicare Part D laws (specifically, 42 C.F.R. 423.56).  Unless otherwise agreed to by the Parties, Employer shall be solely responsible for communicating with Members regarding creditable prescription drug coverage matters.

w. If a Member is a Massachusetts resident, Anthem shall mail the Member any notices required by the Massachusetts Health Care Reform Act ("HCRA") reflecting coverage during the current and prior Agreement Period.  If a Member works in Massachusetts for Employer, but resides in another State, Anthem will only provide such notices if Employer notifies Anthem at least 60 days prior to any notice deadline imposed by HCRA that such Member requires the HCRA notices.

x. Anthem is the responsible reporting entity ("RRE") for the Plan as that term is defined pursuant to Section 111 of the Medicare, Medicaid and SCHIP Extension Act of 2007. In order to fulfill its RRE obligation, Anthem requires information from the Employer, including, but not limited to, Member Social Security Numbers. Employer shall cooperate with Anthem and timely respond to any request for information made by Anthem.

y. Anthem will provide Employer with Plan information and assistance necessary for the preparation of the Plan's Summary of Benefits and Coverage ("SBC") related to the elements of the Plan that Anthem administers.  Employer is solely responsible for ensuring that the SBC accurately reflects the benefits Employer will offer and for finalizing and distributing the SBC to Subscribers.  Notwithstanding the provisions in Article 18(a), if Employer's open enrollment period is at a time other than 30 days prior to the end of an Agreement Period, Employer agrees to provide Anthem with any changes to the benefits Anthem administers at least 60 days prior to the start of the open enrollment period.

## ARTICLE 3 - OBLIGATIONS OF EMPLOYER

a. Employer shall furnish to Anthem initial eligibility information regarding Members.  Employer is responsible for determining eligibility of individuals and advising Anthem in a timely manner, through a method agreed upon by the Parties, as to which employees, dependents, and other individuals are to be enrolled Members.  Anthem reserves the right to limit the effective date of retroactive enrollment to a date not earlier than 60 days prior to the date notice is received.  Such retroactive enrollments shall be subject to Anthem's receipt of any applicable fees as indicated in Section 3 of Schedule A.  Employer shall keep such applicable records and furnish to Anthem such notification and other information as may be required by Anthem for the purpose of enrolling Members, processing terminations, effecting COBRA coverage elections, effecting changes in single or family coverage status, effecting changes due to a Member becoming eligible or ineligible for Medicare, effecting changes due to a leave of absence, or for any other purpose reasonably related to the administration of eligibility under this Agreement.  Employer acknowledges that prompt and complete furnishing of the required eligibility information is essential to the timely, accurate, and efficient processing of Claims.

Employer shall notify Anthem monthly of the Subscribers, dependents, or other individuals that will be or have become ineligible for benefits under the Plan.  Upon receipt of such notice, Anthem shall terminate coverage effective as of the date specified in the Benefits Booklet.  Employer shall give Anthem advance notice, if possible, of any Member's expected termination and/or retirement.  Anthem reserves the right to limit retroactive terminations to a maximum of 60 days prior to the date notice is received.  Anthem shall credit Employer any applicable fees for such retroactive terminations as indicated in Section 3 of Schedule

A.
If Anthem has paid Claims for persons no longer eligible for reasons including, but not limited to, Anthem having been provided inaccurate eligibility information, or Anthem having received notice of a retroactive change to enrollment, then Employer shall reimburse Anthem for all unrecovered Paid Claim amounts to the extent that the amounts have not already been paid by Employer.

b.     Employer acknowledges that it or its designee(s) serves as the "plan sponsor, "plan administrator" and "named fiduciary" as those terms are defined in ERISA. Employer has all discretionary authority and control over the management of the Plan, and all discretionary authority and responsibility for the administration of the Plan except as delegated to Anthem in Article 2(c) of this Agreement. Anthem does not serve as "plan sponsor", "plan administrator" or as the Plan's "named fiduciary". Employer retains all final authority and responsibility for the Plan and its operation and Anthem is empowered to act on behalf of Employer in connection with the Plan only as expressly stated in this Agreement or as otherwise agreed to by the Parties in writing.

c.     It is understood and agreed that the provision of any notice, election form, or communication and the collection of any applicable premium or fees required by or associated with Title X of the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("COBRA"), or any other applicable law governing continuation of health care coverage, shall be the responsibility of Employer and not Anthem, except as otherwise agreed to in a written agreement between the Parties.

d.     Employer is responsible for compliance with the Family and Medical Leave Act ("FMLA") and, to the extent applicable to Employers' wellness program(s), for compliance with the Americans with Disabilities Act, the Internal Revenue Code, federal and state nondiscrimination laws, and other applicable federal and state laws and regulations governing wellness programs.

e.     Employer agrees to and shall collect those contributions from Subscribers that are required by Employer for participation in the Plan. If Employer elects Anthem's stop loss coverage, Employer shall abide by Anthem's participation and contribution guidelines.

f.     Unless otherwise agreed to by the Parties in writing, Employer shall prepare and distribute SPDs, summary annual reports, and all notices or summaries of changes or material modifications to the Plan. Employer shall confirm that when it or its designee prepares the SPD, such SPD will accurately reflect the terms of the Benefits Booklet.

g.     To the extent that Medicare, Medicaid, the Veterans Administration or any other federal or state agency or entity asserts a reimbursement right against Employer, the Plan, or Anthem pursuant to that agency's or entity's rights under applicable law with respect to Claims processed by Anthem under this Agreement, the Employer shall be responsible for reimbursing Anthem any such amounts determined to be owed.

h.     Employer shall give notice to Anthem of the expected occurrence of any of the following events (including a description of the event), with such notice to be given at least 30 days prior to the effective date of the event, unless such advance notice is prohibited by law or contract in which case, notice will be provided as soon as practicable:

1.     Change of Employer's name;

2.     Any merger between or consolidation with another entity where, after such merger or consolidation, Employer is not the controlling entity;

3.     The sale or other transfer of all or substantially all of the assets of either Employer or any Employer Affiliates or the sale or other transfer of the equity of Employer or any Employer Affiliates, or;

4.     Any bankruptcy, receivership, insolvency or inability of Employer to pay its debts as they become due.

i.     The Employer shall have the responsibility, in accordance with state or federal law, to develop procedures for determining whether a medical child support order is a "qualified" medical child support order. The Employer shall provide notice to Anthem once it has made such determination.

j.      The Employer may request Anthem, on an exception basis, to process and pay Claims that were denied by Anthem or take other actions with respect to the Plan that are not specifically set forth in this Agreement or the Benefits Booklet. In such cases, any payments shall not count toward the stop loss accumulators under a stop loss agreement issued by Anthem, unless otherwise agreed to by Anthem. Anthem may charge Employer a processing fee that has been mutually agreed to by the Parties prior to the processing of the Claim. Anthem shall not be responsible for any liability associated with any act or omission undertaken at the direction of, or in accordance with, instructions received from the Employer under this provision.

## ARTICLE 4 - CLAIMS PAYMENT METHOD

a.      Employer shall pay or fund Paid Claims according to the Claims payment method described in Section 4 of Schedule A. Employer shall pay or fund such amounts by the Invoice Due Date. In addition, from time to time, the Parties acknowledge that Employer may request a review of the appropriateness of a Claim payment and, during the review period, Employer shall pay or fund such Claim.

b.      The Parties acknowledge that, from time to time, a Claims adjustment may be necessary as a result of coordination of benefits, subrogation, workers' compensation, other third party recoveries, payment errors and the like, and that the adjustment will take the form of a debit (for an additional amount paid by Anthem) or a credit (for an amount refunded to Employer). The Parties agree that such Claims adjustment shall be treated as an adjustment to the Claims payment made in the billing period in which the adjustment occurs, rather than as a retroactive adjustment to the Claim in the billing period in which it was initially reported as paid. Any Claims credit may be reduced by a fee as indicated in Schedule A of this Agreement. In addition, a credit shall not be provided to Employer for a recovery related to a Claim that was covered under stop loss coverage provided by Anthem.

## ARTICLE 5 - ADMINISTRATIVE SERVICES FEES

During the term of this Agreement, Employer shall pay Anthem the Administrative Services Fees, described in Section 3 of Schedule A. Employer shall pay the Administrative Services Fees and other fees authorized under this Agreement by the applicable Invoice Due Date according to the payment method described in Section 5 of Schedule A.

## ARTICLE 6 - RENEWAL SCHEDULES

If Anthem offers to renew this Agreement at the end of an Agreement Period, then Anthem shall provide Employer with the terms and conditions of the proposed renewal in writing within the time period provided in Section 1 of Schedule A. Employer shall notify Anthem in writing of its selection from the renewal options by indicating its selection and signing Anthem's designated renewal form. If Anthem does not receive a signed acceptance of the renewal from Employer prior to the start of the next Agreement Period, Employer's payment of the amounts set forth in the renewal shall constitute Employer's acceptance of the terms. Anthem shall provide a revised Schedule A that will become part of this Agreement without the necessity of securing Employer's signature.

## ARTICLE 7 - CLAIMS RUNOUT SERVICES

a.      Claims Runout Services shall be provided for the period of time provided in Section 6 of Schedule A (the "Claims Runout Period"), except such Claims Runout services shall not be provided in the event that termination is due to non-payment pursuant to Article 19(a) of this Agreement. During the Claims Runout Period, the terms of this Agreement shall continue to apply. Anthem shall have no obligation to process or pay any Claims or forward Claims to Employer beyond the Claims Runout Period. Any amounts recovered beyond the Claims Runout Period shall be retained by Anthem as reasonable compensation for services under this Agreement. Anthem shall, however, as soon as practicable return any recoveries for which Anthem had received monies, but had not processed the recovery prior to the end of the Claims Runout Period. In addition, Employer shall have no obligation to reimburse Anthem for any amounts paid by Anthem due to adjustments to Claims after the end of the Claims Runout Period.

b.      The Administrative Services Fee for the Claims Runout Period, if applicable, is provided in Section 6 of Schedule A. Paid Claims and the Administrative Services Fee shall be invoiced and paid in the same manner as provided in Sections 4 and 5 of Schedule A, unless otherwise provided or agreed to in writing by

the Parties.

## ARTICLE 8 - LATE PAYMENT PENALTY

If Employer fails to timely pay or fund any amount due to Anthem under this Agreement, Employer agrees to pay a late payment penalty for each day the payment is late.  The late payment penalty shall be calculated at the rate of 12% simple interest per annum (365 days), and shall be included on a subsequent invoice and payable by the Invoice Due Date.  If applicable, Employer agrees to reimburse Anthem for any expenses charged to Anthem by a financial institution, Provider or Vendor due to Employer's failure to maintain sufficient funds in a designated bank account. Any acceptance by Anthem of late payments shall not be deemed a waiver of its rights to terminate this Agreement for any future failure of Employer to make timely payments. Anthem will notify Employer in writing of the delinquency before applying any late payment penalty as described in this provision.

## ARTICLE 9 - HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT

a.      Anthem's duties and responsibilities in connection with the requirements imposed by the Health Insurance Portability and Accountability Act ("HIPAA") and the privacy and security regulations promulgated thereunder will be set forth in a separate business associate agreement between the Parties.

b.      In the event the Plan submits Claims or eligibility inquiries or any other HIPAA covered transaction as defined in 45 CFR Part 160 and 162 to Anthem through electronic means, the Plan and Anthem shall comply with all applicable requirements of HIPAA and the Plan and Anthem shall require any of their respective agents or subcontractors to comply with all applicable requirements of HIPAA.

## ARTICLE 10 - PROPRIETARY AND CONFIDENTIAL INFORMATION

a.      Each Party retains ownership of its Proprietary Information and Confidential Information (collectively "Information") and neither conveys ownership rights in its Information nor acquires ownership rights in the other Party's Information by entering into this Agreement or performing its obligations hereunder.  Nothing in this Agreement shall impair or limit a Party's right to use and disclose its Information for its own lawful business purposes.

b.      Each Party shall maintain the other Party's Information in strict confidence, and shall institute commercially reasonable safeguards to protect it.

c.      Employer shall use and disclose Anthem's Information solely for the purpose of administering the Plan.  Employer shall not, without Anthem's advance written consent, (1) use or disclose Anthem's Information, or reports or summaries thereof, for any purpose other than administering the Plan;  (2) combine Anthem's Information with other data to create or add to an aggregated database that will or could be made available to any third party; (3) combine Anthem's Information provided for a particular purpose with Anthem's Information provided for another purpose; or (4) sell or disclose Anthem's Information to any other person or entity except as expressly permitted by this Article 10.

d.      Employer may disclose the minimum amount of Anthem's Information necessary to Employer's stop loss carriers, consultants, auditors, and other third parties engaged by Employer (each a "Plan Contractor"), provided that: (i) each such third party needs to know such Information in order to provide services to Employer;  (ii) the restrictions set forth in subsection c. of this Article 10 shall apply to each such third party as well as to Employer; and (iii)  prior to such disclosure, each such third party shall enter into a confidentiality agreement (or an appropriate amendment to an existing one, as applicable) with Anthem, with respect to the  planned disclosure.

e.      Upon termination of this Agreement, each Party shall return or destroy the other Party's Information or retain the Information in accordance with its record retention policies and procedures; provided; however that each Party shall continue to comply with the provisions of this Article 10 for as long as it retains the other Party's Information.

f.      This Agreement shall not be construed to restrict the use or disclosure of information that: (1) is public knowledge other than as a result of a breach of this Agreement; (2) is independently developed by a Party not in violation of this Agreement; (3) is made available to a Party by any person other than the other Party, provided the source of such information is not subject to any confidentiality obligations with respect to it; or,

(4) is required to be disclosed pursuant to law, order, regulation or judicial or administrative process, but only to the extent of such required disclosures and after reasonable notice to the other Party.

## ARTICLE 11 - DATA REPORTS

a.   Upon Employer's request and only as permitted by the business associate agreement entered into between the Parties, Anthem will provide Anthem's standard account reporting package.  Prior to Anthem providing data or reports to Employer, the Parties must mutually agree to the types, format, content and purpose of the reports requested.  If Employer requests from Anthem information that is not part of Anthem's standard account reporting package, and such request is approved by Anthem, Employer agrees to pay a mutually agreed upon charge to Anthem for such additional reports.

b.   If Employer requests Anthem to provide a data extract or report to any Plan Contractor for use on Employer's behalf and Anthem agrees to do so: (i) to the extent such extract or report includes protected health information ("PHI") as defined in HIPAA, Anthem's disclosure of the PHI and Plan Contractor's subsequent obligations with respect to the protection, use, and disclosure of the PHI will be governed by Employer's applicable business associate agreements with Anthem and the Plan Contractor; and (ii) to the extent such data or report includes Anthem's Proprietary Information and/or Anthem's Confidential Information, Employer acknowledges and agrees that Plan Contractor shall be subject to the restrictions set forth in Article 10 of this Agreement and shall enter into a confidentiality agreement with Anthem (or amend an existing one, as applicable) prior to Anthem's release of the extract or report.

c.   Employer agrees not to contact, or to engage or permit a Plan Contractor to contact on Employer's behalf, any health care Provider concerning the information in any reports or data extracts provided by Anthem unless the contact is coordinated by Anthem.

d.   In addition to their unlimited rights to use Anthem's Proprietary Information and Confidential Information, Anthem and Anthem Affiliates shall also have the right to use and disclose other Claim-related data collected in the performance of services under this Agreement or any other agreement between the Parties, so long as:  (1) the data is de-identified in a manner consistent with the requirements of HIPAA; or (2) the data is used or disclosed for research, health oversight activities, or other purposes permitted by law; or (3) a Member has consented to the release of his or her individually identifiable data.  The data used or disclosed shall be used for a variety of lawful purposes including, but not limited to, research, monitoring, benchmarking and analysis of industry and health care trends.  Anthem may receive remuneration for the data only if permitted by HIPAA.

## ARTICLE 12 - CLAIMS AUDIT

a.   At Employer's expense, Employer shall have the right to audit Claims on Anthem's premises, during regular business hours and in accordance with Anthem's audit policy, which may be revised from time to time.  A copy of the audit policy shall be made available to Employer upon request.

b.   If Employer elects to utilize a third-party auditor to conduct an audit pursuant to this Agreement and Anthem's audit policy, such auditor must be mutually acceptable to Employer and Anthem.  Anthem will only approve auditors that are independent and objective and will not approve auditors paid on a contingency fee or other similar basis.  Anthem reserves the right to charge a fee to Employer for expenditure of time by Anthem's employees in completing any audit which fee shall be reasonable, based on Anthem's actual cost of the services of employees completing the audit.  An auditor or consultant must execute and indemnification agreement with Anthem pertaining to Anthem's Proprietary and Confidential Information prior to conducting an audit.

c.   Employer may conduct an audit once each calendar year and the audit may only relate to Claims processed during the current year or immediately preceding calendar year (the "Audit Period") and neither Employer nor anyone acting on Employer's or the Plan's behalf, shall have a right to audit Claims processed prior to the Audit Period.  The scope of the audit shall be agreed to in writing by the Parties prior to the commencement of the audit.

d.   Employer shall provide to Anthem copies of all drafts, interim and/or final audit reports at such time as they are made available by the auditor or consultants to Employer.  Any errors identified as the result of the audit shall be subject to Anthem's review and acceptance prior to initiating any recoveries of Paid Claims pursuant to Article 13 of this Agreement.  Anthem reserves the right to terminate any audit being performed

by or for Employer if Anthem determines that the confidentiality of its information is not properly being maintained or if Anthem determines that Employer or auditor is not following Anthem audit policy.

e.   An audit performed pursuant to this Agreement shall be the final audit for the Audit Period and for any prior Audit Period unless otherwise agreed to in writing by the Parties; however, Claims may be re-audited if Employer is required to conduct the audit by a government agency with which it has a contractual arrangement.

## ARTICLE 13 - RECOVERY SERVICES

a.   Pursuant to the provisions of this Article 13(a), Anthem shall review Paid Claims processed under this Agreement (including during any Claims Runout Period) to determine whether such Claims have been paid accurately and identify recoveries that can be pursued.  Employer will receive the entire amount of any recovery obtained on its behalf.  In performing these recovery services, Anthem shall not be obligated to retain outside counsel or other third parties if Anthem's recovery efforts are not successful.  The cost of these services provided by Anthem for recovery efforts under this Article 13(a) is included in Anthem's Administrative Services Fee, as set forth in  Section 3(A) ("Base Administrative Services Fee") of Schedule A.

b.   Anthem may become aware of additional recovery opportunities by means other than reviewing Paid Claims processed under this Agreement.  Employer grants Anthem the authority and discretion in those instances to do the following: (1) determine and take steps reasonably necessary and cost-effective to effect recovery; (2) select and retain outside counsel; (3) reduce any recovery obtained on behalf of the Plan by its proportionate share of the outside counsel fees and costs incurred during litigation or settlement activities to obtain such recovery; and (4) negotiate and effect any settlement of Employer's and Plan's rights by, among other things, executing a release waiving Employer's and Plan's rights to take any action inconsistent with the settlement.

c.   During the term of this Agreement and any applicable Claims Runout Period, Anthem may pursue payments to Members by any other person, insurance company or other entity on account of any action, claim, request, demand, settlement, judgment, liability or expense that is related to a Claim for Covered Services ("Subrogation Services").  Anthem shall charge Employer a fee provided in Schedule A to this Agreement ("Subrogation Fee"). Any subrogation recoveries shall be net of the Subrogation Fee.  Subrogation Fees will not be assessed on subrogation recoveries until they are received by Anthem and credited to Employer.

d.   Anthem will engage third parties: (1) to conduct a review of Paid Claims processed under this Agreement and perform other recovery related services that are in addition to the standard recovery services provided under Article 13(a); and, (2) to conduct audits of Provider and Vendor contracts.  The purpose of these services is to determine whether Paid Claims processed under this Agreement have been paid accurately and, if they have not been paid accurately, to pursue recoveries.  If Anthem makes a recovery as a result of the services described in this Article 13(d), then Anthem shall receive a fee provided in Schedule A as compensation for its services, a portion of which shall be paid to third parties for their services, and Employer will receive the remaining recovery amount.

e.   In exercising its authority pursuant to Articles 13(a) through (d), Anthem shall determine which recoveries it will pursue, and in no event will Anthem pursue a recovery if it reasonably believes that the cost of the collection is likely to exceed the recovery amount or if the recovery is prohibited by law or an agreement with a Provider or Vendor.  Anthem will not be liable for any amounts it does not successfully recover.  Anthem shall retain any recoveries it obtains as a result of its recovery services or audits if the cost to administer the refund is likely to exceed the amount of the refund. Employer further understands and agrees that Anthem shall have authority to enter into a settlement or compromise on behalf of Employer and Plan regarding these recovery, subrogation and audit services, including, but not limited to, the right to reduce future reimbursement to Provider or Vendor in lieu of a lump sum settlement. Anthem may have contracts with Network Providers or Vendors or there may be judgments, orders, settlements, applicable laws or regulations that limit Anthem's right to make recoveries under certain circumstances.  Anthem may, but is not required to, readjudicate Claims or adjust Members' cost share payments related to the recoveries made from a Provider or a Vendor.  Anthem shall credit Employer net recovery amounts after deduction of fees and costs as set forth in this Article 13 not later than 150 days following the receipt of the total recovery amount.  If Anthem does not credit Employer within 150 days of its receipt of the total recovery amount, Anthem shall pay Employer interest calculated at the Federal Reserve Funds Rate in

effect at the time of the payment. In no event, however, will Anthem be liable to credit Employer for any recovery after the termination date of this Agreement and any Claims Runout Period, and Employer acknowledges and agrees that such sums shall be retained by Anthem as reasonable compensation for recovery services provided by Anthem.

## ARTICLE 14 - PHARMACY BENEFITS AND SERVICES

a.   If applicable to Plan benefits and as indicated in Schedule B of this Agreement, Anthem, through PBM, shall provide the following Prescription Drug management services:

1.   Anthem shall offer Employer access to a network of pharmacies that have entered into contractual arrangements with PBM under which such pharmacies agree to provide pharmacy services to Members and accept negotiated fees for such services ("Network Pharmacies").  Anthem shall determine, in its sole discretion, which pharmacies shall be Network Pharmacies, and the composition of Network Pharmacies may change from time to time.

2.   Anthem will furnish and maintain a drug formulary for use with the Plan, and Anthem shall periodically review and update its formulary.  The Employer shall adopt such formulary as part of the design of the Plan.  Unless mutually agreed to in writing by the Parties, upon termination of the Agreement, the Employer shall cease adoption and use of Anthem's formulary as part of its Plan. The drug formulary will be made available to Members on Anthem's web site and upon request may be provided to Employer in a mutually acceptable format for Employer's distribution to Members.

3.   Anthem shall offer Employer a home delivery pharmacy program, through which Members may receive home delivery prescription services.  Additional fees for express mail, shipping or handling may be charged to Members.  Anthem shall also offer Employer a specialty pharmacy program, through which Members may receive specialty pharmacy prescription services. Anthem shall provide all necessary information and forms to Members to obtain these services.

4.   Anthem shall arrange for the processing of Prescription Drug Claims in accordance with the Benefits Booklet.

b.   PBM has negotiated programs with pharmaceutical manufacturers under which rebates for certain Prescription Drugs dispensed to Members are made directly to PBM ("Drug Rebate Programs").  Such Drug Rebate Programs are not based on the drug utilization of any one Employer Plan, but rather are based on the drug utilization of all individuals enrolled in PBM managed programs.  In many cases the rebates are conditioned on certain Prescription Drugs being included on the formulary that Anthem requires Employer to adopt as part of the Plan.  PBM will pay Anthem a portion of the rebates it receives (such portion being referred to in this Agreement as "Drug Rebates").  Anthem shall pay Employer an amount attributable to its actual or estimated receipt of the Drug Rebates as described in Section 3(A) of Schedule A.

c.   Anthem may receive and retain administrative fees from PBM or directly from pharmaceutical manufacturers. In addition, Anthem may receive and retain service fees from pharmaceutical manufacturers for providing services (e.g., Provider and Member education programs that promote clinically appropriate and safe dispensing and use of Prescription Drugs).  For purposes of this Agreement, administrative fees and service fees received by Anthem or PBM shall not be considered Drug Rebates.

d.   If Employer terminates the pharmacy benefits portion of its Plan with Anthem at any time, then Anthem shall have the right to amend the Base Administrative Services Fee indicated in Section 3(A) of Schedule A.

## ARTICLE 15 - INTER-PLAN ARRANGEMENTS

This Article is intentionally omitted and replaced by the Inter-Plan Arrangements Schedule.

## ARTICLE 16 - CLAIMS LITIGATION

a.   For purposes of Articles 16 and 17 of this Agreement, "Claims Litigation" means a demand asserted or litigation, proceedings or arbitration commenced, by a Member, Plan beneficiary or Network or non-Network

Provider, or any individual or entity working on any of their behalf ("Claimant(s)"), regardless of how pled or how asserted, where the Claimant seeks to recover monetary damages (including but not limited to actual, compensatory, punitive or other damages), equitable relief, declaratory relief, attorneys' fees, costs, expenses, or other relief, in connection with Anthem's alleged failure to properly handle a request for Covered Services or to pay for all or any portion of Covered Services, including any allegations related to the sufficiency of the amount paid for all or any portion of a Covered Service.  References to "Employer" in this Article 16 shall mean Employer or Plan or both as appropriate given the context.

b.  Anthem shall direct the defense of any Claims Litigation brought against Anthem. If Employer (in addition to Anthem) is also a named party in the Claims Litigation, Anthem shall direct the defense of the Claims Litigation and the Employer will cooperate in defending against the Claims Litigation.  Employer will direct the defense of the Claims Litigation where Anthem is not a named party. Unless there is a conflict that is not waived, in any of the above scenarios, if Anthem's requests, Anthem and the Employer will enter a common interest and/or joint defense agreement to address the sharing of information and any other matters the Parties deem appropriate.  Whether there is such a conflict or not, all other provisions of this Article 16 will continue to apply.  Anthem shall provide notice of Claims Litigation to the Employer as soon as practicable; provided, however, that this notice obligation shall not apply to Claims Litigation brought by any Provider or to any Claims Litigation to which Employer is a named party.

c.  For any Claims Litigation to which Anthem is a named party, Anthem will select and retain counsel for itself and, if Employer is also named, for the representation of Anthem and Employer contemplated by Article 16(b).  If, at the outset or during such Claims Litigation, Employer and Anthem have a conflict of interest, the selected counsel shall represent Anthem only.  Employer shall waive any conflict for such representation and retain separate counsel for Employer.  Subject to Article 16(d), Employer will assume liability for payment of all reasonable attorneys' fees and costs incurred by Anthem and/or Employer in the defense of Claims Litigation.

d.  If it is determined by the third-party decision maker in the Claims Litigation that Anthem failed to perform its responsibility to review and determine Claims for benefits under the Plan in a manner that is consistent with the standard of care in Article 17 of this Agreement, Anthem will assume liability for payment of its legal fees and costs.

e.  Anthem is authorized to settle or compromise any Claims Litigation with the approval of Employer, which approval shall not be unreasonably withheld.  Notwithstanding the above, settlements of reimbursement disputes brought by Providers do not require the approval of Employer.

f.  Anthem is not an insurer of benefits under the Plan nor does it underwrite the risk or otherwise assume any risk for the payment of benefits under the Plan.  Under all circumstances, Employer shall be liable to pay Plan benefits awarded or paid by settlement, judgment, or otherwise.


## ARTICLE 17 - INDEMNIFICATION

Except for Claims Litigation, which is governed exclusively by Article 16 of this Agreement, Anthem and Employer shall each indemnify, defend and hold harmless the other Party, and its directors, officers, employees, agents and affiliates, from and against any and all losses, claims, damages, liabilities, costs and expenses (including without limitation, reasonable attorneys' fees and costs) that are recovered in direct actions between the Parties or actions brought by a third party asserting liability for: (1) the indemnifying Party's or its subcontractor's gross negligence or willful misconduct in the performance of the obligations under this Agreement, and/or (2) the indemnifying Party's failure to provide information required under this Agreement or otherwise required by law that results in a sanction or penalty being assessed against the other Party, and/or (3) the indemnifying Party's or its subcontractor's breach of fiduciary duties under ERISA.  The obligation to provide indemnification under this Agreement shall be contingent upon the Party seeking indemnification: (i) providing the indemnifying Party with prompt written notice of any claim for which indemnification is sought, (ii) allowing the indemnifying Party to control the defense and settlement of such claim; provided, however, that the indemnifying Party agrees not to enter into any settlement or compromise of any claim or action in a manner that admits fault or imposes any restrictions or obligations on an indemnified Party without that indemnified Party's prior written consent, which will not be unreasonably withheld; and, (iii) cooperating fully with the indemnifying Party in connection with such defense and settlement.

## ARTICLE 18 - CHANGES IN BENEFITS BOOKLET AND AGREEMENT

a.     Either Party reserves the right to propose changes to the provisions described in the Benefits Booklet by giving written notice to the other Party not less than 90 days prior to the start of an Agreement Period and such changes will be made to the Benefits Booklet as mutually agreed to in writing by the Parties. Either Party may also propose changes to the Benefits Booklet at a time other than the start of an Agreement Period and such changes will be made to the Benefits Booklet if mutually agreed to in writing by the Parties. Anthem's incorporation of the requested changes into the Benefits Booklet shall constitute Anthem's acceptance of the Employer's requested changes.  If Anthem initiates the proposed changes and does not receive written notice from Employer prior to the effective date of the proposed changes that such changes are unacceptable, the changes shall be deemed approved by Employer and Anthem shall incorporate such changes into the Benefits Booklet.

b.     If changes to the provisions of the Benefits Booklet are mandated as a result of a change to any applicable state or federal law, Anthem shall have the right to make such changes to the Benefits Booklet to comply with the law and shall provide written notice to Employer at least 30 days prior to the effective date of the change, unless the effective date specified in the law is earlier.

c.     Anthem also reserves the right to change the Base Administrative Services Fee provided in Section 3(A) of Schedule A at a time other than the start of an Agreement Period upon the occurrence of one or more of the following events: (1) a change to the Plan benefits initiated by Employer that results in a substantial change in the services to be provided by Anthem; (2) a change in ownership as described in Article 3(h) of this Agreement; (3) a change in the total number of Members resulting in either an increase or decrease of 10% or more of the number of Members enrolled for coverage on the date the Base Administrative Services Fee was last modified; (4) a change in Employer contribution as described in Article 3(e) of this Agreement; (5) a change in nature of Employer's business resulting in a change in its designated Standard Industrial Classification ("SIC") code; or  (6) a change in applicable law that results in a material increase in the cost or amount of administrative services from those currently being provided by Anthem under this Agreement. Anthem shall provide notice to Employer of the change in the Base Administrative Services Fee at least 60 days prior to the effective date of such change.  If such change is unacceptable to Employer, either Party shall have the right to terminate this Agreement by giving written notice of termination to the other Party before the effective date of the change.  If Employer accepts the proposed Base Administrative Services Fee, Anthem shall provide a revised Schedule A that will then become part of this Agreement without the necessity of securing Employer's signature on the Schedule.

d.     In the event any action of any department, branch or bureau of the federal, state or local government is initiated or taken ("Action") against a Party to this Agreement and such Action materially and adversely affects that Party's performance of the obligations under this Agreement, the affected Party shall notify the other Party of the nature of the Action and provide copies of pertinent documents supporting the reason(s) for the Action. If a modification to the Agreement is needed as a result of the Action, the Parties shall meet within 30 days of the notice by the affected Party to the other Party and shall, in good faith, attempt to negotiate a modification to this Agreement that minimizes or eliminates the impact of the Action.  If the Parties are unable to minimize or eliminate the impact of the Action, then either Party may terminate this Agreement by giving at least 90 days notice of termination.  This Agreement may be terminated sooner if agreed to by the Parties or required by the government entity initiating or taking the Action.

e.     No modification or change in any provision of this Agreement shall be effective unless and until approved in writing by an authorized representative of Anthem and evidenced by an amendment or new Schedule attached to this Agreement.  If Anthem proposes such a modification or change, Anthem shall provide written notice to Employer at least thirty (30) days prior to the effective date of such change.  The modification or change will be deemed accepted by Employer unless Anthem receives written notice from Employer prior to the effective date that such change is unacceptable.  If Employer does not accept the proposed change, the Parties will meet and confer to reach agreement prior to implementation of such change.

## ARTICLE 19 - TERMINATION AND/OR SUSPENSION OF PERFORMANCE

a.     Notwithstanding any other provision of this Article, this Agreement automatically terminates, without further notice or action, if Employer fails to pay or fund any amount due under this Agreement within 7 days of the date of Anthem's notice to the Employer of a delinquent amount owed.  Notwithstanding the foregoing, in the event of a bona fide dispute regarding an Administrative Service Fee charge, Anthem shall not

terminate this Agreement on the basis of the alleged delinquency pending the resolution of such dispute if the Employer pays all undisputed amounts when due. Such termination shall be effective as of the last period for which full payment was made. In addition, this Agreement automatically terminates, without further notice or action, at the end of each Agreement Period unless Anthem offers to renew this Agreement and Employer accepts such offer of renewal pursuant to Article 6 of this Agreement. Upon termination of this Agreement, Employer shall remain liable for all payments due to Anthem under the terms of this Agreement. Notwithstanding the above, Anthem has the right to suspend performance of its obligations under this Agreement if full payment is not made by the Invoice Due Date. Anthem shall have no obligation to pay any Claims under the Agreement until all required payments have been paid in full.

b.      If either Party fails to comply with any material duties and obligations under this Agreement other than payment of amounts due under this Agreement, the other Party shall have the right to: (1) terminate this Agreement by giving the non-compliant Party at least 60 days prior written notice of termination; or (2) upon written notice to the other Party, suspend performance of its obligations under this Agreement. Employer acknowledges and agrees that in the event it is the non-compliant Party, Anthem shall have no liability to any Member. Either Party, at its option, may allow the non-compliant Party to cure a breach of this Agreement and, upon acceptance in writing by that Party that a breach is cured, this Agreement may be reinstated retroactive to the date of the breach or suspension of performance. Notwithstanding any other provision of this Agreement, a Party may seek injunctive or other equitable relief from a court of competent jurisdiction should there be any unauthorized use or disclosure of Proprietary Information or Confidential Information by the other Party.

c.      If there shall occur any change in the condition (financial or otherwise) of Employer or an Employer Affiliate that, in the reasonable opinion of Anthem, has a material adverse effect upon the validity, performance, or enforceability of this Agreement, on the financial condition or business operation of Employer (or Employer Affiliate), or on the ability of Employer to fulfill its obligations under this Agreement, then Anthem shall have the right to require Employer to provide adequate assurance of future performance, which may include a payment of a cash deposit, letter of credit, or other method of assurance acceptable to Anthem. Examples of such a change could include, but would not be limited to the actual, or Anthem's reasonable anticipation of: (1) any voluntary or involuntary case or proceedings under bankruptcy law with respect to Employer or an Employer Affiliate; (2) any receivership, liquidation, dissolution, reorganization or other similar case or proceeding with respect to Employer or an Employer Affiliate; (3) any appointment of a receiver, trustee, custodian, assignee, conservator or similar entity or official for Employer or an Employer Affiliate; or (4) any assignment for the benefit of creditors or sale of all or substantially all of Employer's assets or a key Employer Affiliate's assets.

Any deposit amount shall be paid to Anthem within 30 days of the request or in such shorter time as agreed to by the Parties. The deposit amount shall not be paid with Plan assets, shall not be funded in any part by Member contributions, and shall not be paid from any segregated fund or from funds in which the Plan or any Member has a beneficial interest. The deposit amount shall be the property of Anthem, may be held in Anthem's general account, may be subject to satisfy the claims of Anthem's general creditors, and does not govern or limit the benefits available under the terms of the Plan. At the termination of this Agreement and designated Claims Runout Period, if any, the deposit amount, net of any outstanding fees or Claims amounts payable to Anthem, shall be returned to Employer. Any deposit amount returned to Employer under this Article 19(c) shall not include interest. Neither Employer, the Plan, nor any Member shall have any beneficial or legal ownership interest in any deposit amount paid pursuant to this Section.

If such further assurance is required by Anthem, Anthem may, at any time after the date of notice to Employer of such requirement, suspend performance of its obligations under this Agreement until the date of receipt by Anthem of such adequate assurance without being liable to the Employer, the Plan or any Member for such suspension. If such adequate assurance is not received within 30 days of the request, Anthem may terminate this Agreement.

d.      Subject to the provisions of Article 7 of this Agreement, if this Agreement terminates and Anthem makes payment of any Claim that would otherwise have been payable under the terms of this Agreement after the termination date, Employer shall be liable to reimburse Anthem for such Claim to the extent that the amounts have not already been paid by Employer. Employer also agrees to cooperate fully with Anthem in the coordination of pharmacy Claims with any successor pharmacy benefit manager.

e.      Employer may terminate this Agreement at any time other than at the end of an Agreement Period by giving Anthem 60 days written notice of its intent to terminate.

f. In connection with the termination of this Agreement and upon Employer's request, Anthem shall provide reports that are part of Anthem's standard account reporting package at no extra charge. In no event shall Anthem be obligated to produce more than two sets of reports following the termination date of this Agreement. However Anthem shall have no obligation to provide the reports after the termination date of this Agreement if such termination is due to non-payment pursuant to Article 19(a) of this Agreement. In addition, Anthem shall also provide data extract files upon Employer's request for an additional fee mutually agreed to by the Parties.

### ARTICLE 20 - LIMITATION ON ACTIONS AND GOVERNING LAW

a. No action by either Party alleging a breach of this Agreement may be commenced after the expiration of 3 years from the date on which the claim arose.

b. Except to the extent preempted by ERISA or any other applicable provisions of federal law, this Agreement shall be governed by, and shall be construed in accordance with the laws of Virginia but without giving effect to that state's rules governing conflict of laws.

### ARTICLE 21 - NO WAIVER

No failure or delay by either Party to exercise any right or to enforce any obligation herein, and, no course of dealing between Employer and Anthem, shall operate as a waiver of such right or obligation or be construed as or constitute a waiver of the right to enforce or insist upon compliance with such right or obligation in the future. Any single or partial exercise of any right or failure to enforce any obligation shall not preclude any other or further exercise, or the right to exercise any other right or enforce any other obligation.

### ARTICLE 22 - ASSIGNMENT AND SUBCONTRACTING

a. Unless it has first obtained the written consent of an officer of the other Party, neither Party may assign this Agreement to any other person. Notwithstanding the foregoing, Anthem may, with advance written notice to Employer, assign or otherwise transfer its rights and obligations hereunder, in whole or in part, to: (i) any affiliate of Anthem; or (ii) any entity surviving a transaction involving the merger, acquisition, consolidation, or reorganization of Anthem, or in which all or substantially all of Anthem's assets are sold. Additionally, Employer may, with advance written notice to Anthem, assign, delegate, or otherwise transfer its rights and obligations hereunder, in whole, to (i) any affiliate of Employer; or (ii) any entity surviving a transaction involving the merger, acquisition, consolidation or reorganization of Employer, or in which all or substantially all of Employer's assets are sold, provided that such affiliate or other assignee presents, in Anthem's opinion, an equivalent or better financial status and credit risk. Either Party is required to provide advance written notice under this provision only to the extent permissible under applicable law and the reasonable terms of the agreement(s) governing such merger, acquisition, consolidation, reorganization, or asset sale. If advance written notice is not allowed, notice shall be provided as soon as practicable. Upon receipt of notice of an assignment of this Agreement, the other Party may terminate this Agreement by providing the assigning Party with 30 days advance written notice of termination. Any assignee of rights or benefits under this Agreement shall be subject to all of the terms and provisions of this Agreement.

b. Either Party may subcontract any of its duties under this Agreement without the prior written consent of other Party; however, the Party subcontracting the services shall remain responsible for fulfilling its obligations under this Agreement.

### ARTICLE 23 - NOTICES

a. Any notice or demand pursuant to Articles 19 and 22 of this Agreement shall be deemed sufficient when made in writing as follows: to Employer, by first class mail, personal delivery, or electronic mail or overnight delivery with confirmation capability, to its principal office shown upon the records of Anthem; to Anthem, by first class mail, personal delivery, electronic mail or overnight delivery with confirmation capability, to the designated Anthem sales representative.

b. A notice or demand shall be deemed to have been given as of the date of deposit in the United States mail with postage prepaid or, in the case of delivery other than by mail, on the date of actual delivery at the appropriate address.

c.       Employer shall be obligated to provide all notices to Members as may be necessary to effectuate any change in or termination of the Agreement.

## ARTICLE 24 - ADMINISTRATION

a.       Employer, on behalf of itself and its Members, hereby expressly acknowledges its understanding that this Agreement constitutes a contract solely between Employer and Anthem, that Anthem is an independent corporation operating under a license with BCBSA permitting Anthem to use the Blue Cross and Blue Shield Service Marks in Virginia and that Anthem is not contracting as the agent of BCBSA.  Employer further acknowledges and agrees that it has not entered into this Agreement based upon representations by any person other than Anthem and that no person, entity, or organization other than Anthem shall be held accountable or liable to it for any of Anthem's obligations to Employer created under this Agreement.  This paragraph shall not create any additional obligations whatsoever on the part of Anthem other than those obligations created under other provisions of this Agreement.

b.       Anthem is providing administrative services only with respect to the portion of the Plan described in the Benefits Booklet.  Anthem has only the authority granted it pursuant to this Agreement.  Anthem is not the insurer or underwriter of any portion of the Plan.  Anthem has no responsibility or liability for funding benefits provided by the Plan, notwithstanding any advances that might be made by Anthem. Employer retains the ultimate responsibility and liability for the benefits and expenses incident to the Plan, including the applicable taxes that might be imposed relating to the Plan.

c.       The Parties acknowledge that the portion of the Plan described in the Benefits Booklet is a self-funded plan and is not subject to state insurance laws or regulations.

d.       Employer shall confirm that sufficient amounts are available to cover Claims payments, the monthly Administrative Services Fees, and other fees or charges.

## ARTICLE 25 - ENTIRE AGREEMENT

a.       The following documents will constitute the entire Agreement between the Parties: this Agreement, including any amendments and Schedules thereto, and the Benefits Booklet.

b.       This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

c.       This Agreement supersedes any and all prior agreements between the Parties, whether written or oral, and other documents, if any, addressing the subject matter contained in this Agreement.

d.       If any provision of this Agreement is held to be invalid, illegal or unenforceable in any respect under applicable law, order, judgment or settlement, such provision shall be excluded from the Agreement and the balance of this Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

## ARTICLE 26 - DISPUTE RESOLUTION

This Article is intentionally omitted in its entirety.

## ARTICLE 27 - MISCELLANEOUS

a.       Employer and Anthem are separate legal entities.  Anthem is strictly an independent contractor.  Nothing contained in this Agreement shall cause either Party to be deemed a partner, member, agent or representative of the other Party, nor shall either Party have the expressed or implied right or authority to assume or create any obligation on behalf of or in the name of the other Party through its actions, omissions or representations.

b.       Except as may be explicitly set forth in this Agreement, nothing herein shall be construed as an implied license by a Party to use the other Party's name, trademarks, domain names, or other intellectual property.  Neither Party shall use the name, trademarks, domain names, or any other name or mark of the other Party in any press release, printed form, advertising or promotional materials or otherwise, without the prior

written consent of the other Party.  In addition, Employer has no license to use the Blue Cross and/or Blue Shield trademarks or derivative marks (the "Brands") and nothing in the Agreement shall be deemed to grant a license to Employer to use the Brands. Any references to the Brands made by Employer in its own materials are subject to prior review and approval by Anthem.

c.      Nothing contained herein shall cause either Party to be deemed an agent for service of legal process for the other Party.

d.      Anthem or an Anthem Affiliate may enter into business arrangements with certain Network Providers and Anthem may have financial interest in such Network Providers through direct ownership, partnership, joint venture or other arrangements.  The business arrangements may provide practice management or other services to Network Providers that are designed to promote a more effective and cost-efficient health care delivery system that emphasizes continuous improvement and increased patient access to high quality, cost-effective health care.  Because of its ownership or financial interests in Network Providers, Anthem may share in the Network Provider's profits or other revenue.  Any revenue received by Anthem in connection with these business arrangements shall be retained by Anthem.

e.      The Parties acknowledge that Anthem, in making decisions regarding the scope of coverage of services under the Benefits Booklet, is not engaged in the practice of medicine. Providers are not restricted in exercising their independent medical judgment by contract or otherwise and do not act on behalf of, or as agents for, Anthem or the Plan.

f.      In addition to any other provision providing for survival upon termination of this Agreement, the Parties' rights and obligations under Articles 10, 11, 12, 13, 16, 17, 19, 24, 25(a) and 25(c) shall survive the termination of this Agreement for any reason.

g.      Each Party shall comply with all laws and regulations applicable to their respective duties and obligations assumed under this Agreement.

h.      Anthem and Employer agree to the performance standards set forth in Schedule C Performance Guarantees Schedule.


IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by affixing the signatures of duly authorized officers.

Owens & Minor Medical, Inc.                         HealthKeepers, Inc. and Anthem Health Plans of Virginia, Inc. dba Anthem Blue Cross and Blue Shield


By: _____          By: _____

Title: _____          Title: _____

Date: _____          Date: _____

**SCHEDULE A**
**TO**
**ADMINISTRATIVE SERVICES AGREEMENT**
**WITH**
**OWENS & MINOR MEDICAL, INC.**


This Schedule A shall govern the Agreement Period from June 1, 2017 through December 31, 2018.  For purposes of this Agreement Period, this Schedule shall supplement and amend the Agreement between the Parties.  If there are any inconsistencies between the terms and conditions of the Agreement including any prior Schedules, and this Schedule A, the terms and conditions of this Schedule A shall control.

**Section 1.**        **Effective Date and Renewal Notice**

This Agreement Period shall be from 12:01 a.m. June 1, 2017 to the end of the day of December 31, 2018.

Paid Claims shall be processed pursuant to the terms of this Agreement when incurred and paid as follows:

Incurred from June 1, 2017 through December 31, 2018 and
Paid from June 1, 2017 through December 31, 2018.

Anthem shall provide any offer to renew this Agreement at least 120 days prior to the end of an Agreement Period.

**Section 2.**        **Broker or Consultant Base Compensation**

Medical

Broker or Consultant Fee is $3.47 per Subscriber per month. Upon receipt of payment from Employer, Anthem shall remit payment to the broker or consultant designated by Employer.


**Section 3.**        **Administrative Services Fees**

**A.**        **Base Administrative Services Fee**


June 1, 2017 through May 31, 2018:          Composite   $ 35.41 per Subscriber per month

June 1, 2018 through December 31, 2018:     Composite   $ 36.55 per Subscriber per month

Prescription Drug Rebates:  Anthem will pay to Employer 100% of the Drug Rebates collected from PBM and attributable to Employer's Plan subject to Anthem's timely receipt of payment and accompanying data from PBM. On a quarterly basis, Anthem shall credit Employer the Drug Rebates it has collected from PBM. Anthem shall have the right to collect from Employer any rebate amount that Anthem is required to pay PBM as a result of a pharmaceutical manufacturer audit or for any other reason. Anthem shall continue to provide Employer its share of the Drug Rebates under this provision until the termination of this Agreement and any applicable Claims Runout period. Anthem shall provide a final report of the Drug Rebates received attributable to Employer's Plan after the end of any applicable Claims Runout period.

Change to Base Administrative Services Fees.  In addition to the provisions in Article 18(c), Anthem reserves the right to change the Base Administrative Services Fees upon the occurrence of any of the following events:

- Employer's Member to Subscriber ratio is not within +/-5% of 1.93
- Anthem is not the sole third party administrator for medical benefits under Employer's Plan
- Employer's enrollment is not within +/-10% of 4,042 Subscribers
- Employer moves any of the Plan Benefits administered under this Agreement to another third party administrator or public or private exchanges

Multi-year Agreements:  Anthem has the right to charge a fee to Employer if Employer terminates the pharmacy benefits administered by Anthem prior to the end of the multi-year Agreement Period contained in this Agreement.  If Employer terminates the pharmacy benefits administered by Anthem prior to the end of the multi-year Agreement Period, Employer shall pay to Anthem upon receipt of an invoice:

$1.00 Per Subscriber per month multiplied by the monthly average number of Subscribers enrolled in the Plan for the time period that this multi-year Agreement remained in effect multiplied by the number of months remaining in the multi-year Agreement after Employer's termination of the Agreement.

Pharmacy Benefits Administrative Services Fee. Administrative Services Fees shall also include a fee that will be charged monthly for services related to pharmacy benefits management including, but not limited to, pharmacy mail services, clinical services, and customer services. Such fee is included in the Base Administrative Services Fees described in Section 3(A) of this Schedule A.

Article 3(a) Retroactive Adjustments to Enrollment.

Anthem shall credit Administrative Services Fees for each retroactive deletion up to a maximum of 60 days and shall charge Administrative Services Fees for each retroactive addition up to a maximum of 60 days.

**B.**     **Health and Wellness Program Fees**

Integrated Imaging Bundle              $1.28 per Subscriber per month

Mobile Health Consumer              $0.65 per Subscriber Per Month

**C.**     **Other Fees or Credits**

Fee for Subrogation Services.  The charge to Employer is 25% of gross subrogation recovery, or, if outside counsel is retained, 15% of the net recovery after a deduction for outside counsel fees.

Fee for Provider Audit Performed by External Vendors.  The charge to Employer is 25% of the amount recovered from Vendor audits of Provider activity, including but not limited to credit balance, hospital bill audits, DRG readmissions and high-cost drug audits.

Fee for Overpayment Identification Provided by External Vendors.  The charge to Employer is 25% of the amount recovered from review of Claims and membership data to identify overpayments, including but not limited to COB, duplicates, contract compliance and eligibility.

Fee for Collection Services Provided by External Vendors.  The charge to Employer is 25% of the amount recovered by a Vendor in collecting receivables.

Fee for Independent Claims Review:   $550.00 per independent review

Traditional Network Savings Fee.  Employer agrees to pay an additional amount based on the difference between Billed Charges for Covered Services and the Traditional Provider Negotiated Amount.  The "Traditional Provider Negotiated Amount" is the amount Anthem, an Anthem Affiliate and/or Host Blue is contractually obligated to pay a Traditional Provider under a negotiated fee schedule, before application of Member cost-share amounts, such as deductibles, copayments and coinsurance.  Claims submitted by a Provider affiliated with the Employer shall not be included in this calculation.  Prescription Drug Claims, Claims paid on a capitated basis and Payment Innovation Program payments are excluded from the fee calculation.  This fee applies to certain Providers who are paid by Anthem, an Anthem Affiliate and/or Host Blue according to a Traditional Network fee schedule ("Traditional Provider").  The Traditional Network Savings Fee is equal to 50% per Claim.

<u>Non-Network Savings Fee</u>.  When Anthem forwards a non-Network Provider Claim to Vendor to negotiate with the non-Network Provider, the Employer will pay a fee equal to 50% of the difference between the non-Network Provider's Billed Charges and the amount Anthem uses to calculate Plan liability for the Covered Service (the "Plan Liability Amount").  In the case of facility-based Provider Claims, Plan Liability Amount will be based on the negotiated rate; if negotiations are not successful, the Plan Liability Amount shall be determined using Vendor's Data iSight tool.  In the case of professional Provider Claims, Plan Liability Amount will be based upon Vendor's negotiated rate, if applicable (in the absence of successfully negotiated Claims, there will be no fee charged as the amount will be determined by the local Blue plan).  These Claims will not be included in any Performance Guarantee calculations.

<u>Medical Drug Rebates</u>:  Anthem shall retain rebates it receives directly from pharmaceutical manufacturers for Claims for Prescription Drugs administered by Anthem and covered under the medical benefit portion of the Plan(s) ("Medical Drug Rebates") for its own use and as reasonable compensation for its services.

<u>Third Party Stop Loss Reporting Fee</u>:  Employer will pay a fee of $1.00 per Subscriber per month for generation of reports delivered to an external stop loss carrier.  Confidentiality Agreements must be completed with the Employer and third party stop loss carrier prior to files being released.

<u>Fee for Ad Hoc Reports</u>.  Anthem shall provide, on an annual basis, up to 20 hours of time needed to generate custom or ad hoc reports at no additional charge.  The charge to Employer beyond 20 hours per year is $150.00 per hour for time needed to generate custom or ad hoc reports.

<u>Fee for Electronic Data Feeds to an Outside Vendor</u>.  Anthem shall provide, on an annual basis, up to 12 electronic data feeds to an outside vendor in Anthem's standard format.  The charge to Employer is $1,000.00 for each additional feed.

<u>Universal Credit</u>.  Anthem shall provide a credit totaling $18 per Subscriber enrolled on June 1, 2017 to Employer for use from June 1, 2017 through December 31, 2019 and forfeited if not used within 36 months following the effective date.  Services from a vendor that is a direct competitor of Anthem are not eligible for reimbursement.  Anthem will not reimburse Employer's vendors directly.

The credit can be used for the following purposes:

- • Custom communication services provided by either Anthem or an outside vendor;
- • Pre-implementation audit equal to actual billed charges;
- • Implementation expenses;
- • Claims audit equal to actual billed charges*;
- • Clinical audit equal to actual billed charges*;
- • Wellness programs purchased by Employer from Anthem; or
- • Additional reporting or data feeds equal to the actual billed charges.

Personnel expenses, programming expenses and travel are not reimbursable. The Employer acknowledges and agrees that Anthem will report the payment or credit where required by law to do so.

<u>Employee Assistance Program (EAP)</u>:

Basic Program (3 Face-to-Face Counseling Visits)   $1.05 per Subscriber Per Month

**Section 4.**      **Paid Claims, Billing Cycle and Payment Method**

**A.**      **Paid Claims**

Paid Claims are described in Article 1-Paid Claims Definition of the Agreement.

**B.**      **Billing Cycle**

Weekly

Anthem shall notify Employer of the amount due to Anthem as a result of Claims processed and paid by Anthem according to the billing cycle described above.  The actual date of notification of Paid Claims and the Invoice Due Date will be determined according to Anthem's regular business practices and systems capabilities.

**C.**     **Payment Method**

ACH Demand Debit Reimbursement for Paid Claims.  Anthem will initiate an ACH demand debit transaction that will withdraw the amount due from a designated Employer bank account no later than three (3) business days following the Invoice Due Date, however, if the Invoice Due Date falls on either a banking holiday, a Saturday or a Sunday, the withdrawal shall be made on the following banking day.

**Section 5.**     **Administrative Services Fee Billing Cycle and Payment Method**

**A.**     **Billing Cycle**

Monthly List Bill (pay as billed)

Anthem shall notify Employer of the amount due to Anthem pursuant to Section 3 of Schedule A according to the billing cycle described above.  The actual date of notification of amounts due and the Invoice Due Date will be determined according to Anthem's regular business practices and systems capabilities.

**B.**     **Payment Method**

ACH Demand Debit Reimbursement.  Anthem will initiate an ACH demand debit transaction that will withdraw the amount due from a designated Employer bank account no later than three (3) business days following the Invoice Due Date, however, if the Invoice Due Date falls on either a banking holiday, a Saturday or a Sunday, the withdrawal shall be made on the following banking day.

**Section 6.**     **Claims Runout Services**

**A.**     **Claims Runout Period**

Claims Runout Period shall be for the 12 months following the date of termination of this Agreement.

**B.**     **Claims Runout Administrative Services Fees**

Medical:

Claims Runout Administrative Services Fee will be equal to 6% of Claims processed and paid by Anthem or through Inter-Plan Arrangements if Employer terminates prior to 3 years from the effective date of the Agreement Period.  A Claims Runout Administration Services Fee will not be charged if the Employer terminates at least 3 years after the effective date of the Agreement Period.

**Section 7.**     **Inter-Plan Arrangements:**

All Inter-Plan Arrangement-related fees, including any Access Fees paid to Host Blues, the Administrative Expense Allowance ("AEA") Fee and any Negotiated Arrangement fees are included in Anthem's Base Administrative Services Fee.  Other Inter-Plan Arrangement-related fees included in the Base Administrative Services Fee include the Central Financial Agency Fee, ITS Transaction Fee, Toll-Free Number Fee and, if applicable, Blue Cross Blue Shield Global Core Program Fees.  If Employer requests printed Provider directories attributable to a Host Blue's service area, the fee that will be charged is dependent upon page length, number ordered and will include shipping, taxes and system maintenance costs.

**Blue Cross Blue Shield Global Core Fees** – Included in Base Administrative Services Fee.

**Section 8.**     **Other Amendments.  The Administrative Services Agreement is otherwise amended as follows:**

Not Applicable.

**SCHEDULE B**
**TO**
**ADMINISTRATIVE SERVICES AGREEMENT**
**WITH**
**OWENS & MINOR MEDICAL, INC.**

This Schedule B shall govern the Agreement Period from June 1, 2017 through December 31, 2018.  For purposes of this Agreement Period, this Schedule B shall supplement and amend the Agreement between the Parties.  If there are any inconsistencies between the terms of the Agreement including any prior Schedules and this Schedule B, the terms of this Schedule B shall control.

The following is a list of services that Anthem will provide under this Agreement for the Base Administrative Services Fee listed in Section 3(A) of Schedule A.  These services will be furnished to Employer in a manner consistent with Anthem's standard policies and procedures for self-funded plans.  Anthem may also offer services to Employer that have an additional fee.  If Employer has purchased such services, those services and any additional fees are also listed in Schedule A.

**SERVICES INCLUDED IN THE BASE ADMINISTRATIVE SERVICES FEE IN SECTION 3A OF SCHEDULE A**

**Management Services**

- Anthem's Benefits and administration as described in this paragraph:

  - Anthem definitions, and exclusions
  - Employer-specific benefits and exclusions
  - Anthem complaint and appeals process (One mandatory level of appeal, one voluntary level of appeal)
  - Claims incurred and paid as provided in Schedule A
  - Accumulation toward plan maximums beginning at zero on effective date
  - Anthem Claim forms
  - ID card
  - Explanation of Benefits (Non-customized)

- Acceptance of electronic submission of eligibility information in HIPAA-compliant format

- Preparation of Benefits Booklet (accessible via internet)

- Information for ERISA 5500

- Account reporting - standard data reports

- Billing and banking services

- Plan Design consultation

- Employer eServices

  - Add and delete Members
  - Download administrative forms
  - View Member Benefits and request ID cards
  - View eligibility
  - View Claim status and detail

- Responsible Reporting Entity for the Plan

- Information for preparation of SBC

**Claims and Customer Services**

- Claims processing services

- Coordination of Benefits

- Recovery services performed internally by Anthem

- Medicare crossover processing

- Employer customer service, standard business hours

- Member customer service, standard business hours

- 1099s prepared and delivered to Providers

- Residency-based assessments and/or surcharges and other legislative reporting requirements

- Member eServices

- Member identity theft and credit monitoring and identity repair

- Open enrollment meeting support

- Women's Health and Cancer Rights Act notices

**Prescription Benefit Services**

- Home delivery pharmacy

- Specialty Pharmacy Services

- Prescription eServices

  - Pharmacy locator
  - Online formulary

- Point of sale claims processing

- Home delivery claims processing

- Home delivery call center with toll free number

- Home delivery regular shipping and handling

- Standard management reports

- Ad hoc reports (subject to additional programming charge if required)

- Concurrent Drug Utilization Review (DUR) programs

- Retrospective DURs

- Administrative override (i.e., vacation, lost, stolen or spilled medications)

- Clinical review

- Pharmacy help desk with toll free number

- Pharmacy audits (desk and onsite; routine, in depth or focused)

**Care Management**

- Health Care Management

  - Referrals
  - Utilization management
  - Case management
  - Anthem Medical Policy

- SpecialOffers

- HealthCare Advisor

- Care Comparison (where available)

- Transplant services - Blues Distinction

- Healthy Solutions Newsletter (available online)

- MyHealth (Member Portal)

  - Electronic Health Risk Assessment
  - Personal Health Record
  - Online Communities
  - Member Alerts

- Health and Wellness Services (PPO Plan)

  - ConditionCare

    - Asthma
    - Pulmonary disease
    - Congestive heart failure
    - Coronary artery disease
    - Diabetes

  - Future Moms Maternity Program with Mailings

  - ComplexCare

  - 24/7 NurseLine

  - MyHealth Advantage -- Gold Level

  - Healthy Lifestyles Online

  - LiveHealth Online

  - Emergency Room Utilization Management (ERUMI)/Quick Care Options (QCO)

  - Oncology Solution

  - Utilization Review and Case Management (UR-CM)

**Networks**

- • Access to networks

  - Provider Network
  - Mental Health/Substance Abuse Network
  - Coronary Services Network
  - Human Organ and Tissue Transplant Network
  - Complex and Rare Cancer Network
  - Bariatric Surgery Network

- • Network Management

- • Online Provider directory

- • Inter-Plan Arrangements

**SCHEDULE C**
**TO**
**ADMINISTRATIVE SERVICES AGREEMENT**
**WITH**
**OWENS & MINOR MEDICAL, INC.**

This Schedule C provides certain guarantees pertaining to Anthem's performance under the Agreement between the Parties ("Performance Guarantees") and shall be effective for the period from June 1, 2017 through December 31, 2018, unless otherwise specified herein (the "Performance Period").  Descriptions of the terms of each Performance Guarantee applicable to the Parties are set forth in the Attachments (the "Attachments") to this Schedule C and made a part of this Schedule C.  This Schedule shall supplement and amend the Agreement between the Parties.  If there are any inconsistencies between the terms of the Agreement including any prior Schedules and this Schedule C, the terms of this Schedule C shall control. If there are any inconsistencies between the terms contained in this Schedule, and the terms contained in any of the Attachments to this Schedule C, the terms of the Attachments to this Schedule C shall control.  These Performance Guarantees are guaranteed upon offer and acceptance of renewal.

**Section 1.**   <u>**General Conditions**</u>

A.   The Performance Guarantees described in the Attachments to this Schedule C shall be in effect only for the Performance Period indicated above, unless specifically indicated otherwise in the Attachments.  Each Performance Guarantee shall specify a/an:

   1.   Performance Category. The term Performance Category describes the general type of Performance Guarantee.

   2.   Reporting Period. The term Reporting Period refers to how often Anthem will report on its performance under a Performance Guarantee.

   3.   Measurement Period. The term Measurement Period is the period of time under which Anthem's performance is measured, which may be the same as or differ from the period of time equal to the Performance Period.

   4.   Penalty Calculation. The term Penalty Calculation generally refers to how Anthem's payment will be calculated, in the event Anthem does not meet the target(s) specified under the Performance Guarantee.

   5.   Amount at Risk. The term Amount at Risk means the amount Anthem may pay if it fails to meet the target(s) specified under the Performance Guarantee.

B.   Anthem shall conduct an analysis of the data necessary to calculate any one of the Performance Guarantees within the timeframes provided in the Attachments to this Schedule C.  In addition, any calculation of Performance Guarantees, reports provided, or analysis performed by Anthem shall be based on Anthem's then current measurement and calculation methodology, which shall be available to Employer upon request.

C.   Any audits performed by Anthem to test compliance with any of the Performance Guarantees shall be based on a statistically valid sample size with a 95% confidence level.

D.   If the Parties do not have an executed Agreement, Anthem shall have no obligation to make payment under these Performance Guarantees.

E.   Unless otherwise specified in the Attachments to this Schedule C, the measurement of the Performance Guarantee shall be based on data that is maintained and stored by Anthem or its Vendors.

F.   If Employer terminates the Agreement between the Parties prior to the end of the Performance Period, or if the Agreement is terminated for non-payment, then Employer shall forfeit any right to collect any further payments under any outstanding Performance Guarantees, whether such Performance Guarantees are for a prior or current Measurement Period or Performance Period.

G.  Anthem reserves the right to make changes to any of the Performance Guarantees provided in the Attachments to this Schedule C upon the occurrence, in Anthem's determination, of either:

    1.  a change to the Plan benefits or the administration of the Plan initiated by Employer that results in a substantial change in the services to be performed by Anthem or the measurement of a Performance Guarantee; or

    2.  an increase or decrease of 10% or more of the number of Subscribers that were enrolled for coverage on the latter of the effective date or renewal date of this Agreement.

Should there be a change in occurrence as indicated above and these changes negatively impact Anthem's ability to meet the Performance Guarantees, Anthem shall have the right to modify the Performance Guarantees contained in the Attachments.

H.  For the purposes of calculating compliance with the Performance Guarantees contained in the Attachments to this Schedule C, if a delay in performance of, or inability to perform, a service underlying any of the Performance Guarantees is due to circumstances which are beyond the control of Anthem, or its Vendors, including but not limited to any act of God, civil riot, floods, fire, acts of terrorists, acts of war or power outage, such delayed or non-performed service will not count towards the measurement of the applicable Performance Guarantee.

I.  Some Performance Guarantees measure and compare year to year performance.  The term Baseline Period refers to the equivalent time period preceding the Measurement Period.

J.  As determined by Anthem, Performance Guarantees may be measured using either aggregated data or Employer-specific Data.  The term Employer-specific Data means the data associated with Employer's Plan that has not been aggregated with other employer data.  Performance Guarantees will specify if Employer-specific Data shall be used for purposes of measuring performance under the Performance Guarantee.

K.  If any Performance Guarantees are tied to a particular program and its components, such Performance Guarantees are only valid if Employer participates in the program and its components for the entirety of the Measurement Period associated with the Performance Guarantee.


**Section 2.**   **Payment**

A.  If Anthem fails to meet any of the obligations specifically described in a Performance Guarantee, Anthem shall pay Employer the amount set forth in the Attachment describing the Performance Guarantee.  Payment shall be in the form of a credit on Employer's invoice for Administrative Services Fees, which will occur annually unless otherwise stated in the Performance Guarantee.

B.  Notwithstanding the above, Anthem has the right to offset any amounts owed to Employer under any of the Performance Guarantees contained in the Attachments to this Schedule C against any amounts owed by Employer to Anthem under: (1) any Performance Guarantees contained in the Attachments to this Schedule C; (2) the Agreement; or, (3) any applicable Stop Loss Policy.

C.  Notwithstanding the foregoing, Anthem's obligation to make payment under the Performance Guarantees is conditioned upon Employer's timely performance of its obligations provided in the Agreement in this Schedule C, and the Attachments, including providing Anthem with the information or data required by Anthem in the Attachments.  Anthem shall not be obligated to make payment under a Performance Guarantee if Employer or Employer's vendor's action or inaction adversely impacts Anthem's ability to meet any of its obligations provided in the Attachments related to such Performance Guarantee, which expressly includes but is not limited to Employer or its vendor's failure to timely provide Anthem with accurate and complete data or information in the form and format expressly required by Anthem.

D.  Where the Amount at Risk for a Performance Guarantee is on a percentage of a Per Subscriber Per Month (PSPM) fee basis, the Guarantee will be calculated by multiplying the PSPM amount by the actual annual enrollment during the Measurement Period.

**Section 3.    Performance Guarantee Amounts at Risk**

A.    The Amount(s) at Risk under the Performance Guarantees is/are:

- Implementation Guarantee:  5% of the Base Medical Administrative Services Fees listed in Section 3(A) of Schedule A for the PPO Plan.
- Operations Guarantee:  15% of the Base Medical Administrative Services Fees listed in Section 3(A) of Schedule A for the PPO Plan.
- Financial Guarantee: 30% of the Base Medical Administrative Services Fees listed in Section 3(A) of Schedule A for the PPO Plan.
- Integrated Imaging Guarantee:  20% of the Integrated Imaging Fees listed in Section 3(B) of Schedule A for the PPO Plan.
- EAP Guarantee:  20% of the EAP Fees listed in Section 3(C) of Schedule A for the PPO Plan.
- Pharmacy Guarantees:  15% of the Pharmacy Administration Fees listed in Section 3(A) of Schedule A for the PPO Plan.

**ATTACHMENT TO SCHEDULE C**
**Performance Guarantees**
**TO ADMINISTRATIVE SERVICES AGREEMENT**
**WITH**
**OWENS & MINOR MEDICAL, INC.**

**Operation Performance Guarantees**

This Attachment is made part of Schedule C and will be effective for the Performance Period from June 1, 2017 through December 31, 2018. This Attachment is intended to supplement and amend the Agreement between the Parties.

Additional Terms and Conditions:
- For purposes of imposing penalties, measurement shall not begin until the start of the fourth month of the initial Agreement period for the following measures: Claims Timeliness, Claims Financial Accuracy, Claims Accuracy, Average Speed of Answer, Call Abandonment Rate, and First Call Resolution
- Performance will be based on the results of a designated service team/business unit assigned to Employer, unless the guarantee is noted as measured with Employer-specific Data.

| Performance Category | Amount at Risk | Guarantee | Penalty Calculation | | Measurement and Reporting Period |
|---|---|---|---|---|---|
| Implementation | 6/1/2017-12/31/2018<br><br>2.5% of Base Admin. Services Fees | A minimum of 95% of all tasks will be completed by the dates specified in the implementation plan agreed to by the Parties.<br><br>The implementation plan will be developed by Anthem and will contain tasks to be completed by Employer and/or Anthem and a timeframe for completion of each task.  The implementation plan will also contain Measurement Periods specific to each task.  Anthem's payment under this Guarantee is conditioned upon Employer's completion of all designated tasks by the dates specified in the implementation plan.<br><br>This will be measured with Employer-specific Data. | **Result**<br>95.0% or Greater<br>90.0% to 94.9%<br>85.0% to 89.9%<br>Less than 85.0% | **Penalty**<br>None<br>25%<br>50%<br>100% | **Measurement Period**<br>Defined in Implementation Plan<br><br>**Reporting Period**<br>60 calendar days following the end of the implementation period |
| Implementation Survey | 6/1/2017-12/31/2018<br><br>2.5% of Base Admin. Services Fees | A minimum average score of 3.0 will be attained on the Implementation Survey.<br><br>Anthem will prepare and send an Implementation Survey to Employer.  Anthem will only consider survey results received within 30 calendar days from the delivery of the survey to the Employer.<br><br>This will be measured with Employer-specific Data. | **Average Number of Points**<br>3.0 or Greater<br>2.5 to 2.9<br>2.0 to 2.5<br>Less than 2.0 | **Penalty**<br>None<br>25%<br>50%<br>100% | **Measurement Period**<br>Annual<br><br>**Reporting Period**<br>60 calendar days following Anthem's receipt of the survey |
| Claims Timeliness (14 Calendar Days) | 2.0% of Base Admin. Services Fees | A minimum of 90% of Non-investigated medical Claims will be processed timely.<br><br>Non-investigated Claims are defined as medical Claims that process through the system without the need to obtain additional information from the Provider, Subscriber or other external sources.  Processed Timely is defined as Non-investigated medical Claims that have been finalized within 14 calendar days of receipt.<br><br>This Guarantee will be calculated based on the number of Non-investigated Claims that Processed Timely divided by the total number of Non-investigated Claims.<br><br>The calculation of this Guarantee does not include Claim adjustments. The calculation of this Guarantee also excludes in any quarter, Claims for an Employer that requests changes to Plan benefits, until all such changes have been implemented.<br><br>This will be measured with Employer-specific Data. | **Result**<br>90.0% or Greater<br>87.5% to 89.9%<br>85.0% to 87.4%<br>Less than 85.0% | **Penalty**<br>None<br>25%<br>50%<br>100% | **Measurement Period**<br>Annual beginning with the start of the fourth month of the initial Agreement Period<br><br>**Reporting Period**<br>Annual |

| Performance Category | Amount at Risk | Guarantee | Penalty Calculation | | Measurement and Reporting Period |
|---|---|---|---|---|---|
| Claim Timeliness (30 Calendar Days) | 2.0% of Base Admin. Services Fees | A minimum of 98% of Non-investigated medical Claims will be processed timely.<br><br>Non-investigated medical Claims are defined as Claims that process through the system without the need to obtain additional information from the Provider, Subscriber, or other external sources. Processed Timely is defined as Non-investigated medical Claims that have been finalized within 30 calendar days of receipt.<br><br>This Guarantee will be calculated based on the number of Non-investigated Claims that Processed Timely divided by the total number of Non-investigated Claims.<br><br>The calculation of this Guarantee does not include Claim adjustments. The calculation of this Guarantee also excludes in any quarter, Claims for an Employer that requests changes to Plan benefits, until all such changes have been implemented.<br><br>This will be measured with Employer-specific Data. | **Result**<br>98.0% or Greater<br>95.0% to 97.9%<br>92.0% to 94.9%<br>Less than 92.0% | **Penalty**<br>None<br><br>25%<br><br>50%<br><br>100% | **Measurement Period**<br>Annual beginning with the start of the fourth month of the initial Agreement Period<br><br>**Reporting Period**<br>Annual |
| Claims Financial Accuracy | 1.0% of Base Admin. Services Fees | A minimum of 99% of medical Claim dollars will be processed accurately.<br><br>This Guarantee will be calculated based on the total dollar amount of audited medical Claims paid correctly divided by the total dollar amount of audited medical Paid Claims. The calculation of this Guarantee includes both underpayments and overpayments. The calculation of this Guarantee does not include Claim adjustments or Claims in any quarter in which an Employer requests changes to Plan benefits, until all such changes have been implemented. | **Result**<br>99.0% or Greater<br>98.0% to 98.9%<br>97.0% to 97.9%<br>Less than 97.0% | **Penalty**<br>None<br><br>25%<br><br>50%<br><br>100% | **Measurement Period**<br>Annual beginning with the start of the fourth month of the initial Agreement Period<br><br>**Reporting Period**<br>Annual |
| Claims Accuracy | 1.0% of Base Admin. Services Fees | A minimum of 97% of medical Claims will be paid or denied correctly.<br><br>This Guarantee will be calculated based on the number of audited medical Claims paid and denied correctly divided by the total number of audited medical Claims paid and denied. The calculation of this Guarantee excludes in any quarter Claims for an Employer that requests changes to Plan benefits, until all such changes have been implemented. | **Result**<br>97.0% or Greater<br>96.0% to 96.9%<br>95.0% to 95.9%<br>Less than 95.0% | **Penalty**<br>None<br><br>25%<br><br>50%<br><br>100% | **Measurement Period**<br>Annual beginning with the start of the fourth month of the initial Agreement Period<br><br>**Reporting Period**<br>Annual |
| Open Enrollment ID Card Issuance | 1.0% of Base Admin. Services Fees | 100% of ID cards will be mailed to Open Enrollment participants no later than the Employer's effective date provided that Anthem receives an accurate eligibility file.<br><br>An Accurate Eligibility File is defined as (1) an electronic eligibility file formatted in a mutually agreed upon manner; (2) received by Anthem no later than 30 calendar days prior to the Employer's effective date; and, (3) contains an error rate of less than 1%.<br><br>This will be measured with Employer-specific Data. | **Result**<br>100%<br>98.5% to 99.9%<br><br><br><br>97.0% to 98.4%<br>Less than 97.0% | **Penalty**<br>None<br>$100 per ID Card not to exceed 25% of amount at risk for this measure<br>50%<br><br>100% | **Measurement Period**<br>Employer's effective date<br><br>**Reporting Period**<br>60 calendar days following the Employer's effective date |

| Performance Category | Amount at Risk | Guarantee | Penalty Calculation | | Measurement and Reporting Period |
|---|---|---|---|---|---|
| | | | **Result** | **Penalty** | |
| Ongoing ID Cards Issuance | 1.0% of Base Admin. Services Fees | A minimum of 99% of ongoing ID cards will be mailed to Members within 10 business days of Anthem's processing of an accurate eligibility file. | 99.0% or Greater | None | **Measurement Period**<br><br>Annual |
| | | An Accurate Eligibility File is defined as: (1) an eligibility file formatted in a mutually agreed upon manner; (2) received by Anthem outside of an open enrollment period; and, (3) contains an error rate of less than 1%.  This Guarantee will be calculated based on the total number of ongoing ID cards mailed to Members within the timeframe set forth above divided by the total number of Members eligible to receive ongoing ID cards. | 97.5% to 98.9% | 25% | |
| | | | 96.0% to 97.4% | 50% | **Reporting Period**<br><br>Annual |
| | | This will be measured with Employer-specific Data. | Less than 96.0% | 100% | |
| Average Speed to Answer | 1.0% of Base Admin. Services Fees | The average speed to answer (ASA) will be 30 seconds or less. | **Result** | **Penalty** | **Measurement Period** |
| | | ASA is defined as the average number of whole seconds members wait and/or are in the telephone system before receiving a response from a customer service representative (CSR) or an interactive voice response (IVR) unit. This Guarantee will be calculated based on the total number of calls received in the customer service telephone system. | 30 seconds or less | None | Annual beginning with the start of the fourth month of the initial Agreement Period |
| | | | 30 to 35 seconds | 25% | |
| | | | 35 to 39 seconds | 50% | |
| | | | 40 or more seconds | 100% | **Reporting Period**<br><br>Annual |
| Call Abandonment Rate | 1.0% of Base Admin. Services Fees | A maximum of 3.0% of member calls will be abandoned. | **Result** | **Penalty** | **Measurement Period** |
| | | Abandoned Calls are defined as member calls that are waiting for a customer service representative (CSR), but are abandoned before connecting with a CSR.  This Guarantee will be calculated based on the number of calls abandoned divided by the total number of calls received in the customer service telephone system.  Calls that are abandoned in less than 5 seconds will not be included in this calculation. | 3.0% or Less | None | Annual beginning with the start of the fourth month of the initial Agreement Period |
| | | | 3.1% to 3.5% | 25% | |
| | | | 3.6% to 4.0% | 50% | |
| | | | 4.00% or Greater | 100% | **Reporting Period**<br><br>Annual |
| First Call Resolution | 1.0% of Base Admin. Services Fees | A minimum of 85% of member calls will be resolved during the initial contact with no further follow up required. | **Result** | **Penalty** | **Measurement Period** |
| | | First Call Resolution is defined as member callers receiving a response to their inquiry during an initial contact with no further follow-up required. This Guarantee will be calculated based on the total number of members who receive a First Call Resolution divided by the total number of calls received into the customer service telephone system. | 85.0% or Greater | None | Annual beginning with the start of the fourth month of the initial Agreement Period |
| | | | 82.5% to 84.9% | 25% | |
| | | | 80.0% to 82.4% | 50% | |
| | | | Less than 80.0% | 100% | **Reporting Period**<br><br>Annual |
| Member Satisfaction | 1.0% of Base Admin. Services Fees | A minimum average score of 90% will be attained on the service skills component of the member satisfaction survey. | **Result** | **Penalty** | **Measurement Period** |
| | | The survey is conducted within 48 hours of a member calling a customer service representative (CSR).  Each member caller is asked to rate the CSR on 5 attributes using a 5 point scale.  The response is scored based on the total number of attributes that a member caller rates as positive divided by the number of attributes for which the member caller provides an answer (Member Score). This Guarantee will be calculated by determining the average of all Member Scores. | 90.0% or Greater | None | Annual |
| | | | 84.5% to 89.9% | 25% | **Reporting Period** |
| | | | 80.0% to 84.4% | 50% | Annual |
| | | | Less than 80.0% | 100% | |

| Performance Category | Amount at Risk | Guarantee | Penalty Calculation | | Measurement and Reporting Period |
|---|---|---|---|---|---|
| Management Reports | 1.0% of Base Admin. Services Fees | Standard automated reports will be made available to Employer by no later than 25 calendar days following the end of the month. The reports will include financial, utilization and clinical information. This will be measured with Employer-specific Data. | **Result** | **Penalty** | **Measurement Period** Annual **Reporting Period** Annual |
| | | | Reports are late 1 month | None | |
| | | | Reports are late 2 months | 25% | |
| | | | Reports are late 3 or more months | 100% | |
| Account Management Satisfaction | 1.0% of Base Admin. Services Fees | A minimum average score of 3.0 will be attained on the Account Management Satisfaction Survey (AMSS). A minimum of 3 responses per Employer to the AMSS is required to base the score on Employer-specific responses only. If 3 responses are received from the Employer, an average score is calculated by adding the scores from each respondent divided by the total number of Employer respondents. If fewer than 3 responses are received, the score will be calculated as follows: 2 Employer responses: 2/3 of the score will be based on Employer-specific AMSS results and 1/3 of the score will be based on the aggregate score of all AMSS results received by the Account Management Team. 1 Employer- response: 1/3 of the score will be based on Employer-specific AMSS results and 2/3 of the score will be based on the aggregate score of all AMSS results received by the Account Management Team. 0 Employer responses: The score will be based on the aggregate score of all AMSS results received by the Account Management Team. | **Result** | **Penalty** | **Measurement Period** Annual **Reporting Period** Annual |
| | | | 3.0 or higher | None | |
| | | | 2.5 to 2.9 | 25% | |
| | | | 2.0 to 2.4 | 50% | |
| | | | Less than 2.0 | 100% | |
| AHG Engagement by Customer Service | 1% of Base Admin. Services Fees | A minimum of 85% of Eligible Contacts will have Member Engagement. Member Engagement is defined as coaching, education or Member direction from an AHG representative.  This Guarantee will be calculated based on the number of Eligible Contacts with Member Engagement divided by the total number of contacts eligible for Member Engagement. Eligible Contacts include mobile chat, portal click-to-chat and phone contacts with an AHG representative. This will be measured with Employer-specific Data. | **Result** | **Penalty** | **Measurement Period** Annual **Reporting Period** Annual |
| | | | 85% or Greater | None | |
| | | | 83% - 84.9% | 25% | |
| | | | 81% - 82.9% | 50% | |
| | | | 79% - 80.9% | 75% | |
| | | | Less than 79% | 100% | |

**ATTACHMENT TO SCHEDULE C**
**Performance Guarantees**
**TO ADMINISTRATIVE SERVICES AGREEMENT**
**WITH**
**OWENS & MINOR MEDICAL, INC.**

**Network Guarantees**

This Attachment to Schedule C Performance Guarantees is made part of Schedule C, shall be effective for the Performance Period from June 1, 2017 through May 31, 2018 and is intended to supplement and amend the Agreement between the Parties.

Additional Terms and Conditions:
- This Guarantee applies to following time periods: (Measurement Period)
  - Claims Incurred from June 1, 2017 through December 31, 2018 and Paid from June 1, 2017 and through December 31, 2018.
- This Guarantee excludes the total Claims Charges for any Member that exceeds $250,000 in paid claims in the Measurement Period.
- This guarantee replaces in previous financial guarantees presented. Discount guarantees cannot be offered alongside Trend Guarantees.
- Anthem has the right in its sole and reasonable discretion to modify or terminate this Guarantee if any of the following conditions occur:
  - Anthem is no longer the sole administrator for Employer's Plan.
  - Employer fails to maintain at least an average enrollment of 4,038 Subscribers.
  - The geographic distribution of Subscribers changes by more than 5% in any state or 10% in total from the Employer census provided for purposes of establishing this Guarantee.
- As previously mentioned, a change to the Plan benefits or the administration of the Plan initiated by Employer that results in a substantial change in the services to be performed by Anthem or the measurement of a Performance Guarantee.

| Performance Category | Amount at Risk | Guarantee | Penalty Calculation | | Measurement and Reporting Period |
|---|---|---|---|---|---|
| Network Provider Discount | 30% of Base Admin. Services Fees | A minimum Network Provider Discount of 57%. | **Result** | **Penalty** | **Measurement Period** Annual* |
| | | This Guarantee excludes the total Claims Charges for any Member that exceeds $250,000 in paid claims in the Measurement Period. | 57.0% or Greater | None | *This period applies to Claims incurred |
| | | Eligible Claim Charges are defined as charges for Covered Services provided to Members enrolled in PPO Plans. Eligible Claim Charges will be based on Anthem primary Claims only and will not include charges related to Prescription Drug Claims, Inter-Plan Program fees, state surcharges, Anthem Provider payment innovation programs or services rendered outside the United States.  Allowed Amount is defined as the amount paid by Anthem to PPO Network Providers on Eligible Claim Charges plus any Member Cost Shares. | 56.0% to 56.9% | 25% | from June 1, 2017 through May 31, 2018 and Paid from June 1, 2017 and through August 31,2018. |
| | | | 55.0% to 55.9% | 50% | |
| | | | 54.0% to 54.9% | 75% | |
| | | | Less than 54.0% | 100% | |
| | | This Guarantee will be calculated by dividing the PPO Network Provider Allowed Amount by the PPO Network Provider Eligible Claim Charges.  The resulting percentage shall be subtracted from 100% to determine the Network Provider Discount. | | | **Reporting Period** Annual |
| | | This Guarantee will be calculated by dividing the PPO Network Provider Eligible Claim Charges less the Allowed Amount by the PPO Network Provider Eligible Claim Charges less Member cost shares. | | | |
| | | Anthem has the right in its sole discretion to modify or terminate this Guarantee if any of the following conditions occur: | | | |
| | | - Anthem is no longer the sole administrator for Employer's Plan | | | |

| Performance Category | Amount at Risk | Guarantee | Penalty Calculation | Measurement and Reporting Period |
|---|---|---|---|---|
| | | • Employer fails to maintain at least an average enrollment of 4,038 Subscribers.<br><br>• The geographic distribution of Subscribers changes by more than 5% in any state or 10% in total from the Employer census provided for purposes of establishing this Guarantee.<br><br>Only Claims submitted to a Blue Cross and/or Blue Shield licensee for processing and adjudication shall be considered for purposes of this Discount Guarantee.<br><br>This will be measured with Employer-specific Data. | | |

**ATTACHMENT TO SCHEDULE C**
**Performance Guarantees**
**TO ADMINISTRATIVE SERVICES AGREEMENT**
**WITH**
**OWENS & MINOR MEDICAL, INC.**

**Integrated Imaging Management Program**

This Attachment to Schedule C Performance Guarantees is made part of Schedule C, shall be effective for the Performance Period from June 1, 2017 through December 31, 2018 and is intended to supplement and amend the Agreement between the Parties.

<u>Additional Terms and Conditions</u>

- Employer will communicate with its employees about the Integrated Imaging Program using marketing materials provided by Anthem.

- Unless otherwise provided herein, Anthem's Integrated Imaging Program includes high tech imaging services assigned at Anthem's discretion and include services such as CT, MRI, PET, nuclear cardiology, echocardiography, arterial ultrasound, cardiac catheterization and coronary intervention.

- Employer will support the clinical appropriateness decisions and cost/quality initiatives made by Anthem.

- Identified Members are Members who are identified by Anthem as appropriate for inclusion in the measured population, the selection criteria for which may be modified from time to time.

- A Member Redirected Service is an authorization for an imaging service (CT or MRI) provided at a location that is high quality and overall comparable or lower cost than the location originally requested by the ordering Provider.

- Member Redirected Guidance is defined as information provided by Anthem regarding options for imaging services (CT or MRI) at locations that are high quality and overall comparable or lower cost than the location originally requested by the ordering Provider.

- Standard minimum enrolled Members required: 5,000 non-Medicare primary Members.

- Members who are Medicare-primary are not eligible for inclusion in calculations related to these Performance Guarantees.

- Employer shall provide the historical eligibility information and the historical medical and Prescription Drug Claims in the form and for the time frame required by Anthem followed by monthly refreshes of Claims and Prescription Drug data from third party payers other than Anthem, if needed.  All data must be materially complete and in the agreed upon format.  Failure by Employer to provide any data in the time frame and format required by Anthem will nullify the applicable Performance Guarantee.

- Anthem reserves the right to revise Performance Guarantees to reflect modifications and advances in medical standards and practices when such standards and practices become generally accepted.

- Where the Amount at Risk for any Performance Guarantee provided below is based on a Per Subscriber Per Month (PSPM) basis, said Performance Guarantees shall be calculated by multiplying the PSPM amount by the actual enrollment during the Agreement Period.

| Performance Category | Amount at Risk | Guarantee | Penalty Calculation | Measurement and Reporting Period |
|---|---|---|---|---|
| Member Redirected Guidance for CT and MRI Services | 10% of Imaging Services Fees | A minimum of 90% of Identified Members will receive an attempted outreach telephone call which will provide Member Redirected Guidance within 3 business days of a prior authorization approval for a CT or MRI service.  This Guarantee only applies to CT and MRI services.  This Guarantee will be calculated based on the total number of Identified Members who receive an attempted outreach telephone call which provides Member Redirected Guidance divided by the total number of Identified Members receiving a prior authorization approval for a CT or MRI service.  This will be measured with Employer-specific Data. | 100% of Amount at Risk | **Measurement Period** Annual*  *This Guarantee applies to CT and MRI services that receive prior authorization approval during the Measurement Period.  **Reporting Period** Annual |
| Member Redirection for CT and MRI Services: | 10% of Imaging Services Fees | A minimum of 10% of Identified Members will receive a Member Redirected Service.  This Guarantee only applies to CT and MRI services.  This Guarantee will be calculated based on the total number of Identified Members who receive CT and MRI Member Redirected Guidance divided by the total number of Identified Members receiving a prior authorization approval for a CT or MRI Service.  This will be measured with Employer-specific Data | 100% of Amount at Risk | **Measurement Period** Annual.*  *This Guarantee applies to CT and MRI services that receive prior authorization approval during the Measurement Period.  **Reporting Period** Annual |

**ATTACHMENT TO SCHEDULE C**
**Performance Guarantees**
**TO ADMINISTRATIVE SERVICES AGREEMENT**
**WITH**
**OWENS & MINOR MEDICAL, INC.**

**EAP Performance Guarantee**

This Attachment is made part of Schedule C and will be effective for the Performance Period from June 1, 2017 through December 31, 2018. This Attachment is intended to supplement and amend the Agreement between the Parties.

Additional Terms and Conditions:
- Unless otherwise provided in the description of a Performance Guarantee in this attachment, the Performance Guarantees herein require 30 or more of Employer's Members being measured in order for Anthem to have an obligation to make a payment under such Performance Guarantee
- All Performance Guarantees in which Anthem will make outbound calls to Identified Members will exclude Identified Members whom Anthem cannot reach due to incorrect or invalid telephone numbers, including numbers where permission is required by law but not provided, or those Identified Members who have requested that Anthem not contact them.
- Anthem reserves the right to revise Performance Guarantees to reflect modifications and advances in medical standards and practices when such standards and practices become generally accepted.

| Performance Category | Amount at Risk | Guarantee | Penalty Calculation | | Measurement and Reporting Period |
|---|---|---|---|---|---|
| EAP Average Speed to Answer | 5% of EAP Fees | The average speed to answer (ASA) will be 30 seconds or less.  ASA is defined as the average number of whole seconds members wait and/or are in the telephone system before receiving a response from a customer service representative (CSR).This Guarantee will be calculated based on the total number of calls answered by a CSR. | **Result** | **Penalty** | **Measurement Period** |
| | | | 30 seconds or less | None | Annual |
| | | | 31-33 seconds | 25% | |
| | | | 34-36 seconds | 50% | |
| | | | 37-39 seconds | 75% | **Reporting Period** |
| | | | Greater than 40 seconds | 100% | Annual |
| EAP Call Abandonment Rate | 5% of EAP Fees | A maximum of 3% of member calls will be abandoned.  Abandoned Calls are defined as member calls that are waiting for a customer service representative (CSR), but are abandoned before connecting with a CSR.  This Guarantee will be calculated based on the number of calls abandoned divided by the total number of calls received in the customer service telephone system. | **Result** | **Penalty** | **Measurement Period** |
| | | | 3% or Less | None | Annual |
| | | | 3.01% - 3.4% | 25% | |
| | | | 3.41% - 3.7% | 50% | |
| | | | 3.71% - 3.99% | 75% | **Reporting Period** |
| | | | Greater than 4% | 100% | Annual |
| EAP Management Reports | 5% of EAP Fees | Standard EAP reports will be made available to Employer by no later than 15 business days following the end of the month.  The reports will include utilization information.  This will be measured with Employer-specific Data. | **Result** | **Penalty** | **Measurement Period** |
| | | | By day 15 | None | Quarterly |
| | | | Over 15 days – once | 25% | |
| | | | Over 15 days -2 times | 50% | **Reporting Period** |
| | | | Over 15 days -3 times | 75% | Quarterly |
| | | | Over 15 days -4 times | 100% | |

| Performance Category | Amount at Risk | Guarantee | Penalty Calculation | | Measurement and Reporting Period |
|---|---|---|---|---|---|
| EAP Network Access | 5% of EAP Fees | A minimum of 90% of Members will have Member access. Member Access is defined as access to at least 1 Network Provider in the following geographic areas: | **Result** | **Penalty** | **Measurement Period** |
| | | | 90% or Greater | None | Annual |
| | | | 87.5% - 89.9% | 25% | |
| | | Urban: 10 miles | 85% - 87.4% | 50% | |
| | | Suburban: 20 miles | 82.5% - 84.9% | 75% | **Reporting Period** |
| | | Rural: 45 miles | Less than 82.5% | 100% | Annual |

Member Access will be established by running a GeoAccess Report based on criteria established by Anthem prior to the beginning of each Measurement Period.

This Guarantee will be calculated based on the results of a GeoAccess report run at the beginning of a Measurement Period based on criteria established by Anthem compared to the results of a GeoAccess Report run at the end of a Measurement Period using the same criteria.  This Guarantee will not include vision, dental or pharmacy Providers.

This will be measured with Employer-specific Data.

**ATTACHMENT TO SCHEDULE C**
Performance Guarantees
**TO ADMINISTRATIVE SERVICES AGREEMENT**
WITH
**OWENS & MINOR MEDICAL, INC.**

**Pharmacy Performance Guarantees**

This Attachment is made part of Schedule C and will be effective for the Performance Period from June 1, 2017 through December 31, 2018. This Attachment is intended to supplement and amend the Agreement between the **Parties**. These Performance Guarantees are guaranteed upon offer and acceptance of renewal of the medical portion of the Agreement.

Additional Terms and Conditions:
- Employer must implement Exclusive Specialty across all benefits, otherwise Retail dispensing fees will increase by $0.10 per claim.

**Prescription Drug Rebate Guarantees**
**Minimum Drug Rebates:**

(a) The Drug Rebates Employer receives from Anthem will not be less than the following amounts ("Total Drug Rebates Guarantee"):

NON-SPECIALTY BRAND NAME PRESCRIPTION DRUGS
(1) An amount equal to the sum of $64.91 (Yr1) $78.12 (Yr2) $97.19 (Yr3) per Paid Claim for Non-Specialty Brand Name Prescription Drugs dispensed at retail pharmacy Network Providers; plus

(2) An amount equal to the sum of $228.82 (Yr1) $275.25 (Yr2) $333.29 (Yr3) per Paid Claim for Non-Specialty Brand Name Prescription Drugs dispensed at home delivery Network Providers

SPECIALTY BRAND NAME PRESCRIPTION DRUGS
(1) An amount equal to the sum of $553.03 (Yr1) $660.29 (Yr2) $857.46 (Yr3) per Paid Claim for Specialty Brand Name Prescription Drugs dispensed at retail pharmacy Network Providers; plus

(2) An amount equal to the sum of $517.43 (Yr1) $627.42 (Yr2) $758.75 (Yr3) per Paid Claim for Specialty Brand Name Prescription Drugs dispensed at home delivery Network Providers

This Guarantee will be determined by comparing the Total Drug Rebates Guarantee to the Drug Rebates credited to the Employer pursuant to Article 14 of the Agreement and Section 3(A) of Schedule A.  If the Total Drug Rebates Guarantee exceeds the Drug Rebates credited to the Employer, Anthem will credit Employer the difference.

Any payment due to Employer under a Rebate Guarantee will not be offset by favorable results achieved in any other Rebate Guarantee. Any payment due to Employer under this Guarantee will not be offset by favorable results achieved in the Prescription Drug Pricing Guarantee, nor will it be offset by favorable results achieved in the Generic Dispensing Rate Guarantee.

This will be measured with Employer-specific data.

(b) In addition to the provisions contained in Section 1(F) of Schedule C, Anthem reserves the right to make changes to this Guarantee upon the occurrence, in Anthem's determination, of any of the following:
- a failure by Employer to implement its responsibilities under the clinical management programs that are part of the Plan or a failure by Employer to participate throughout the Measurement Period in any clinical management programs listed in Schedule B of this Agreement;
- a failure by Employer to adopt the Formulary;
- a change in the proportionate mix of Employer's retail and home delivery Prescription Drug Claims of more than 10%;
- a change in pharmacy utilization patterns of more than 10%;
- a change that results in Anthem no longer being the exclusive source of Drug Rebates for Employer's Plan; or
- the determination that Employer has an on-site pharmacy with 340b designation or any such designation where the pharmacy receives upfront pricing discounts from pharmaceutical manufacturers, which was not disclosed or known by Anthem as of the effective date of this Attachment to Schedule C.
- Anthem is no longer the sole administrator for Employer's Prescription Drug Plan

(c) For purposes of these Guarantees, the following Claims will not be included in the calculation:
  • Medicare Part D Claims;
  • 340b pharmacy;
  • Prescriptions filled through the Employer's on-site pharmacy;
  • Over-the-counter drugs;
  • Dispense As Written Claims with code 3;
  • Dispense As Written Claims with code 4;
  • Dispense As Written Claims with code 5;
  • Dispense As Written Claims with code 6;
  • Dispense As Written Claims with code 9;

(d) For purposes of these Guarantees, the following terms have the following meanings:

• Brand Name Prescription Drug or Brand Drug is a Prescription Drug product that is not a Generic Drug.

• Generic Prescription Drug or Generic Drug is a Prescription Drug, whether identified by its chemical, proprietary, or non-proprietary name that is therapeutically equivalent and interchangeable with drugs having an identical amount of the same active ingredient.

• Formulary is a list of preferred Prescription Drugs and medical supplies developed, published, and periodically revised by Anthem.

• Specialty Drugs are drugs dispensed from a Specialty Service Pharmacy and/or high-cost, injected, infused, oral, or inhaled medications (including therapeutic biological products) that are used to treat chronic or complex illnesses or conditions.  Specialty Drugs may have special handling, storage, and shipping requirements, such as temperature control.  Specialty Drugs may require nursing services or special programs to encourage patient compliance.

• Dispense As Written Claims With Code 3 are Claims where a Brand Drug was dispensed when a Generic Drug is available, because the pharmacist selected the Brand Drug.

• Dispense As Written Claims With Code 4 are Claims where a Brand Drug was dispensed when a Generic Drug exists, because the Generic Drug was not in stock.

• Dispense As Written Claims With Code 5 are Claims where a Brand Drug was dispensed when a Generic Drug is available, because the pharmacy dispensed the Brand Drug at the Generic Drug cost (also known as House Generic Claims.)

• Dispensed As Written Claims With Code 6 are Claims where a Brand Drug was dispensed when a Generic Drug is available, because of an override.

• Dispense As Written Claims With Code 9 are Claims where a Brand Drug was dispensed when a Generic Drug is available, because of other non-specified reason.

**Prescription Drug Pricing Guarantees**
**Prescription Drug Pricing:**
(a) The Prescription Drug Pricing Guarantees for Ingredient Cost Discount and Dispensing Fees will be the amounts listed under the following Pricing Guarantee Categories:

<u>RETAIL PHARMACY NETWORK PROVIDERS</u>
The Guarantees for retail pharmacy Network Providers will be the following amounts:

1. Brand Discount: AWP minus 17.40% (Yr1) 17.40% (Yr2) 17.40% (Yr3)
2. Brand Dispensing Fee:  $0.70 (Yr1) $0.70 (Yr2) $0.70 (Yr3)
3. Generic Discount: AWP minus 79.20% (Yr1) 79.45% (Yr2) 79.70% (Yr3)
4. Generic Dispensing Fee: $0.70 (Yr1) $0.70 (Yr2) $0.70 (Yr3)
5. Overall Specialty Drugs Discount: AWP minus 16.95% (Yr1) 16.95% (Yr2) 16.95% (Yr3)
6. Overall Specialty Drugs Dispensing Fee: $2.00 (Yr1) $2.00 (Yr2) $2.00 (Yr3)

<u>RETAIL 90 PHARMACY NETWORK PROVIDERS</u>
The Guarantees for retail pharmacy Retail 90 Network Providers dispensing 84-90 day supplies will be the following amounts:

1. Brand Discount: AWP minus 19.50% (Yr1) 19.50% (Yr2) 19.50% (Yr3)
2. Brand Dispensing Fee: $0.35 (Yr1) $0.35 (Yr2) $0.35 (Yr3)
3. Generic Discount: AWP minus 79.20% (Yr1) 79.45% (Yr2) 79.70% (Yr3)
4. Generic Dispensing Fee: $0.35 (Yr1) $0.35 (Yr2) $0.35 (Yr3)

HOME DELIVERY PHARMACY
The Guarantees for home delivery will be the following amounts:

1. Brand Discount: AWP minus 24.25% (Yr1) 24.25% (Yr2) 24.25% (Yr3)
2. Brand Dispensing Fee: $0.00 (Yr1) $0.00 (Yr2) $0.00 (Yr3)
3. Generic Discount: AWP minus 83.30% (Yr1) 83.55% (Yr2) 83.80% (Yr3)
4. Generic Dispensing Fee: $0.00 (Yr1) $0.00 (Yr2) $0.00 (Yr3)
5. Overall Specialty Drugs Discount: AWP minus 16.95% (Yr1) 16.95% (Yr2) 16.95% (Yr3)
6. Overall Specialty Drugs Dispensing Fee: $0.00 (Yr1) $0.00 (Yr2) $0.00 (Yr3)

To determine any payment due to Employer under these Prescription Drug Pricing Guarantees, each Guarantee is calculated based on the Prescription Drugs that were paid during the Measurement Period for Retail Pharmacy, Home Delivery, and Retail 90 Pharmacy (each such subset of Paid Claims is referred to as a "Pricing Guarantee Category").  Each Guarantee within a Pricing Guarantee Category is then compared to the sum of appropriate portion of the Paid Claims for Prescription Drugs plus any Member cost shares associated with each Guarantee within that Pricing Guarantee Category.  Paid Claims for Prescription Drugs include Ingredient Costs plus Dispensing Fees. Therefore, Paid Claims for Prescription Drugs dispensed by a retail pharmacy are separated into Brand and Generic Ingredient Costs and Brand and Generic Dispensing Fees. These Ingredient Costs and Dispensing Fees are compared against each identified Guarantee provided in this Agreement to determine if the Guarantee is met. Any payment due to Employer under any Guarantee within a Pricing Guarantee Category will not be offset by: (i) favorable results achieved in any other Guarantee within that same Pricing Guarantee Category, (ii) overall favorable results for a Pricing Guarantee Category; or (iii) any Rebate Guarantee or Generic Dispensing Rate Guarantee. This will be measured with Employer-specific data.

(b) The following conditions apply to this Guarantee:

• This Guarantee applies to Claims submitted by Network Providers applicable to Employer's Plan.
• The following Claims will be excluded from this Guarantee:
    • Medicare Part D Claims
    • Vaccines;
    • Prescriptions filled through the Employer's on-site pharmacy;
    • Claims paid on the basis of U&C charges;
    • Compound Drugs;
    • Over-the-counter drugs;

• This Guarantee applies only as long as there are at least 78,000 Annualized Adjusted Prescription Drug Claims.
• Drugs identified at the time the prescription is filled as Single Source Generics, will be included in the Generic Discount and Generic Dispensing Fee Guarantees.

• Drugs identified at the time the prescription is filled as Dispensed As Written Claims with code 3, 4, 5, 6, 9 will be included in the Generic Discount and Generic Dispensing Fee Guarantees.

(c) In addition to the provisions contained in Section 1(F) of Schedule C, Anthem reserves the right to make changes to this Guarantee upon the occurrence, in Anthem's determination, of any of the following:

• a change in the proportiate mix of Employer's retail and home delivery Prescription Drug Claims of more than 10%;
• a change in pharmacy utilization patterns of more than 10%; or
• the determination that Employer has an on-site pharmacy with 340b designation or any such designation where the pharmacy receives upfront pricing discounts from pharmaceutical manufacturers, which was not disclosed or known by Anthem as of the effective date of this Attachment to Schedule C.
• Anthem is no longer the sole administrator for Employer's Prescription Drug Plan

In the event that there are court or government imposed or industry wide or pricing source initiated changes in the AWP reporting source or source changes in the methodology used for calculating AWP, including, without limitation, changes in the mark-up factor used in calculating AWP (collectively, the "AWP Changes"), the terms of any financial relationship between the Parties that relate to AWP will be modified by Anthem such that the value of AWP for the purpose of such relationship(s) will have the same economic equivalence in the aggregate to the value used by the Parties prior to the AWP Change.  The intent of this provision is to preserve the relative economics of both Parties for such financial relationships based upon AWP to that which existed immediately prior to the AWP Change.

In the event that the AWP pricing benchmark used by Anthem's PBM hereunder is replaced with another benchmark calculation, Anthem may switch to such new pricing benchmark. If a change to pricing guarantees is deemed necessary Anthem will provide written notice of new pricing terms at least 30 days before the effective date of the change.

(d) For purposes of these Guarantees, the following terms have the following meanings:

• Average Wholesale Price or AWP is the price of a prescription drug dispensed as established and reported by MediSpan or other nationally recognized pricing source selected by PBM in its sole discretion from time to time.  AWP does not represent a true wholesale price, but rather is a fluctuating benchmark provided by third party pricing sources.

• Brand Name Prescription Drug or Brand Drug is a Prescription Drug product that is not a Generic Drug.

• Compound Drug is a mixture of two or more ingredients when at least one of the ingredients in the preparation is an FDA-approved Prescription Drug, excluding the addition of only water or flavoring to any preparation.

• Dispensing Fee is the amount paid by Employer to Anthem for professional services rendered by a licensed pharmacist in dispensing Prescription Drugs.

• Dispense As Written Claims With Code 3 are Claims where a Brand Drug was dispensed when a Generic Drug is available, because the pharmacist selected the Brand Drug.

• Dispense As Written Claims With Code 4 are Claims where a Brand Drug was dispensed when a Generic Drug exists, because the Generic Drug was not in stock.

• Dispense As Written Claims With Code 5 are Claims where a Brand Drug was dispensed when a Generic Drug is available, because the pharmacy dispensed the Brand Drug at the Generic Drug cost (also known as House Generic Claims).

• Dispensed As Written Claims With Code 6 are Claims where a Brand Drug was dispensed when a Generic Drug is available, because of an override.

• Dispense As Written Claims With Code 9 are Claims where a Brand Drug was dispensed when a Generic Drug is available, because of other non-specified reason.

• Generic Prescription Drug or Generic Drug is a Prescription Drug, whether identified by its chemical, proprietary, or non-proprietary name that is therapeutically equivalent and interchangeable with drugs having an identical amount of the same active ingredient.

• Ingredient Cost is the ingredient cost portion of a Paid Claim for Prescription Drugs.

- Most Favored Nations Limitations are government restrictions that preclude pharmacies from making pricing agreements with PBMs or others that are more favorable than those afforded to state-run programs, such as Medicaid.
- Single Source Generics are those Generic Drugs which are provided by two or fewer  Pharmaceutical Manufacturers or such Generic Drugs that are in the market with supply limitations or competitive restrictions.
- Specialty Drugs are drugs dispensed from a Specialty Service Pharmacy or high-cost, injected, infused, oral, or inhaled medications (including therapeutic biological products) that are used to treat chronic or complex illnesses or conditions. Specialty Drugs may have special handling, storage, and shipping requirements, such as temperature control.  Specialty Drugs may require nursing services or special programs to encourage patient compliance.
- Specialty Service Pharmacy is the PBM-owned or contracted specialty pharmacy that primarily dispenses Specialty Drugs, outside of the retail pharmacy Network and home delivery pharmacy.
- Usual and Customary (U&C) Charge is the amount a cash paying customer pays a pharmacy for a Prescription Drug. PBM shall require network pharmacies to submit the Usual and Customary Charges with all Claim submissions.
- Annualized Adjusted Prescription Drug Claims is the annualized sum of the total number of: (i) retail Prescription Drug Claims; (ii) home delivery Prescription Drug Claims multiplied by a factor of 3; and (iii) Specialty Prescription Drug Claims.

**Generic Dispensing Rate Guarantee**

(a) The Generic Dispensing Rate Employer receives from Anthem will not be less than the following amounts:

GENERIC PRESCRIPTION DRUGS RETAIL AND HOME DELIVERY PHARMACY

A minimum of 87.50% (Yr1) 88.00% (Yr2) 88.50% (Yr3) of retail drugs and a minimum of 78.00% (Yr1) 78.75% (Yr2) 79.50% (Yr3) of home delivery drugs will be dispensed as Generic Drugs.

Generic Dispensing Rate is defined as the total number of Generic Prescription Drug Claims received by Anthem divided by the total number of Prescription Drug Claims received by Anthem.

Any penalty owed for this Guarantee will be calculated as follows:  Anthem shall determine the total Ingredient Cost for Generic Prescription Drugs and Brand Name Prescription Drugs by adding the Ingredient Cost for Brand Name Prescription Drugs and the Ingredient Cost for Generic Prescription Drugs.  Anthem shall determine the total number of Claims received by Anthem for Brand Name Prescription Drugs and Generic Prescription Drugs.  Anthem shall determine the average cost per Generic Prescription Drug by dividing the total Ingredient Cost for Generic Prescription Drugs by the total number of Generic Prescription Drug Claims received by Anthem. Anthem shall determine the average cost per Brand Name Prescription Drug by dividing the total brand Ingredient Cost by the total number of Brand Name Prescription Drug Claims received by Anthem.

Anthem shall then recalculate the total Ingredient Cost for Brand Name Prescription Drugs and Generic Prescription Drugs by multiplying the target guarantee percentages separately by the total number of Brand Name Prescription Drugs and Generic Prescription Drug claims received by Anthem which is then multiplied separately by the average Ingredient Cost per Brand Name Prescription Drug and the average Ingredient Cost per Generic Prescription Drug. The resulting difference in Ingredient Cost and the recalculated total Ingredient Cost is the penalty up to an annual maximum payout of $200,000.00.

Any payment due to Employer under this Guarantee will not be offset by any favorable results achieved in the Prescription Drug Pricing Guarantee, nor will it be offset by favorable results achieved in the Minimum Drug Rebates Guarantee. Any payment due to Employer under these Generic Dispensing Rate Guarantees will not be offset by favorable results achieved in any other Generic Dispensing Rate Guarantees.

This will be measured with Employer-specific data.

(b) The following conditions apply to this Guarantee:
• Employer must have a 3-tier benefit structure for Prescription Drugs, and a minimum $25 copay differential between Generic Prescription Drugs and Preferred Brand Name Prescription Drugs, and a $15 copay differential between Preferred Brand Name Prescription Drugs and Non-Preferred Brand Name Prescription Drugs.
• Employer must implement generic management clinical programs as recommended by Anthem.
• Employer cannot make any benefit changes that result in disadvantaging the use of Generic Prescription Drugs.
• Client must include Member pay difference logic for Brand Name Prescription Drugs that offer an AB rated equivalent Generic Prescription Drug.

(c)  In addition to the provisions contained in Section 1(F) of Schedule C, Anthem reserves the right to make changes to this Guarantee upon the occurrence, in Anthem's determination, of any of the following:

• a change in the proportionate mix of Employer's retail and home delivery Prescription Drug Claims of more than 10%;
• a change in pharmacy utilization patterns of more than 10%; or
• the determination that Employer has an on-site pharmacy with 340b designation or any such designation where the pharmacy receives upfront pricing discounts from pharmaceutical manufacturers, which was not disclosed or known by Anthem as of the effective date of this Attachment to Schedule C.
• Anthem is no longer the sole administrator for Employer's Prescription Drug Plan

(d)  For purposes of these Guarantees, the following terms have the following meanings:

•  Brand Name Prescription Drug or Brand Drug is a Prescription Drug product that is not a Generic Drug.

•  Formulary is a list of preferred Prescription Drugs and medical supplies developed, published, and periodically revised by Anthem.

•  Generic Prescription Drug or Generic Drug is a Prescription Drug, whether identified by its chemical, proprietary, or non-proprietary name that is therapeutically equivalent and interchangeable with drugs having an identical amount of the same active ingredient.

•  Ingredient Cost is the ingredient cost portion of a Paid Claim for Prescription Drugs.

•  Non-Preferred Brand Name Prescription Drug is a Brand Name Prescription drug that is not included in the Formulary.

•  Preferred Brand Prescription Drug is a Brand Name Prescription Drug that is included in the Formulary.

| Pharmacy Access | 2% of Rx Administration Fee | Anthem will meet all of the following minimum criteria: (1) 98% of Members in urban areas will have 1 pharmacy Network Provider within 3 miles of their residence; (2) 98% of Members in suburban areas will have 1 pharmacy Network Provider within 5 miles of their residence; and, (3) 96% of Members in rural areas will have a pharmacy Network Provider within 10 miles of their residence. The obligation contained in this Guarantee is contingent upon a pharmacy existing within the GeoAccess Report standard.<br><br>This Guarantee will be calculated based on the results of a GeoAccess report.<br><br>Anthem has the right in its sole discretion to modify or terminate this Guarantee if Employer adopts a limited network of pharmacies.<br><br>This will be measured with Employer-specific Data. | 100% of Amount at Risk | |
|---|---|---|---|---|
| Point-of-Sale Adjudication System Availability | 1% of Rx Administration Fee | The point-of-sale adjudication system will be available a minimum of 99.8% of the time, excluding any scheduled system down time. | 100% of Amount at Risk | **Measurement Period**<br>Annual<br><br>**Reporting Period**<br>Quarterly |
| Point-of-Sale Adjudication System Response Time | 1% of Rx Administration Fee | The average response time for the point-of-sale adjudication system will be within 2 seconds, excluding any scheduled system down time. | 100% of Amount at Risk | **Measurement Period**<br>Annual<br><br>**Reporting Period**<br>Quarterly |
| Retail Electronic Claims Processing Accuracy | 1% of Rx Administration Fee | 99% of retail Claims will be processed without payment errors.<br><br>This Guarantee excludes Prescription Drugs dispensed by Specialty Service Pharmacies. | 100% of Amount at Risk | **Measurement Period**<br>Annual<br><br>**Reporting Period**<br>Quarterly |
| Home Delivery Dispensing Accuracy | 1% of Rx Administration Fee | A minimum of 99.98% of home delivery Prescription Drug Claims will be dispensed without form, drug, dose or patient errors.<br><br>This Guarantee excludes Prescription Drugs dispensed by Specialty Service Pharmacies | 100% of Amount at Risk | **Measurement Period**<br>Annual<br><br>**Reporting Period**<br>Quarterly |

| | | | | |
|---|---|---|---|---|
| Home Delivery Pharmacy Claim Timeliness – Claims Not Requiring Intervention | 1% of Rx Administration Fee | A minimum of 99% of Home Delivery Pharmacy Claims Not Requiring Intervention (Investigation) will be processed within an average of 2 business days of receipt of a valid prescription. Home Delivery Pharmacy Claims Not Requiring Intervention are defined as Home Delivery Pharmacy Claims that process through the system without the need to obtain additional information from the Provider, Subscriber or other external sources to process the Home Delivery Pharmacy Claim.<br><br>This Guarantee will be calculated based on the number of [Employer's] Home Delivery Pharmacy Claims Not Requiring Intervention processed within 2 business days divided by the total number of [Employer's] Home Delivery Pharmacy Claims Not Requiring Intervention. The calculation of this Guarantee does not include Claim adjustments. The calculation of this Guarantee also excludes in any quarter Claims for an Employer that requests changes to Plan benefits, until all such changes have been implemented.<br><br>This Guarantee excludes Prescription Drugs dispensed by Specialty Service Pharmacies.<br><br>This will be measured with Employer-specific Data. | 100% of Amount at Risk | |
| Home Delivery Pharmacy Claim Timeliness – Claims Requiring Intervention | 1% of Rx Administration Fee | A minimum of 98% of Home Delivery Pharmacy Claims Requiring Intervention (Investigation) will be processed within an average of 5 business days of receipt of a valid prescription. Home Delivery Pharmacy Claims Requiring Intervention are defined as Home Delivery Pharmacy Claims that need additional information from the Provider, Subscriber or other external sources to process the Home Delivery Pharmacy Claim.<br><br>This Guarantee will be calculated based on the number of [Employer's] Home Delivery Pharmacy Claims Requiring Intervention processed within 5 business days divided by the total number of [Employer's] Home Delivery Pharmacy Claims Requiring Intervention. The calculation of this Guarantee does not include Claim adjustments. The calculation of this Guarantee also excludes in any quarter Claims for an Employer that requests changes to Plan benefits, until all changes have been implemented.<br><br>This Guarantee excludes Prescription Drugs dispensed by Specialty Service Pharmacies.<br><br>This will be measured with Employer-specific Data. | 100% of Amount at Risk | **Measurement Period**<br>Annual<br><br>**Reporting Period**<br>Quarterly |
| Home Delivery Claims Processing Accuracy | 1% of Rx Administration Fee | 99% of Home Delivery Claims will be processed without payment errors. This Guarantee will be calculated based on the number of Home Delivery Pharmacy Claims paid correctly divided by the total number of Home Delivery Pharmacy Claims paid.<br><br>This Guarantee excludes Prescription Drugs dispensed by Specialty Service Pharmacies. | 100% of Amount at Risk | **Measurement Period**<br>Annual<br><br>**Reporting Period**<br>Quarterly |

| Home Delivery Customer Service – Call Abandonment Rate | 1% of Rx Administration Fee | The call abandonment rate for Home Delivery Customer Service will be 3% or less of all member calls during normal business hours. Abandoned Calls are defined as member calls that are waiting for a customer service representative (CSR), but are abandoned before connecting with a CSR. This Guarantee will be calculated based on the number of calls abandoned divided by the total number of calls received in the customer service telephone system. This Guarantee excludes Prescription Drugs dispensed by Specialty Service Pharmacies. This will be measured with Employer-specific Data. | 100% of Amount at Risk | **Measurement Period** Annual **Reporting Period** Quarterly |
|---|---|---|---|---|
| Home Delivery Customer Service – Average Speed of Answer (ASA | 1% of Rx Administration Fee | 97% of all Home Delivery Customer Service calls will be answered within an average speed to answer (ASA) of 30 seconds or less. ASA is defined as the average number of whole seconds members wait and/or are in the telephone system before receiving a response from a customer service representative (CSR) or an interactive voice response (IVR) unit. This Guarantee will be calculated based on the total number of calls received in the customer service telephone system. This Guarantee excludes Prescription Drugs dispensed by Specialty Service Pharmacies. This will be measured with Employer-specific Data. | 100% of Amount at Risk | **Measurement Period** Annual **Reporting Period** Quarterly |
| Retail Paper Claims Turnaround Time – Claims Not Requiring Intervention | 1% of Rx Administration Fee | Retail Paper Claims Not Requiring Intervention will be processed within an average of 5 business days. Claims Not Requiring Intervention (Investigation) are defined as Pharmacy Claims that process through the system without the need to obtain additional information from the Provider, Subscriber or other external sources. This Guarantee excludes Prescription Drugs dispensed by Specialty Service Pharmacies. | 100% of Amount at Risk | |
| Retail Paper Claims Turnaround Time – Claims Requiring Intervention | 1% of Rx Administration Fee | Retail Paper Claims Requiring Intervention will be processed within an average of 10 business days. Claims Requiring Intervention (Investigation) are defined as Pharmacy Claims that process through the system with the need to obtain additional information from the Provider, Subscriber or other external sources. This Guarantee excludes Prescription Drugs dispensed by Specialty Service Pharmacies. | 100% of Amount at Risk | **Measurement Period** Annual **Reporting Period** Quarterly |
| Retail Paper Claims Accuracy | 1% of Rx Administration Fee | 99% of Retail Paper Claims will be processed without payment errors. This Guarantee will be calculated based on the number of Retail Paper Pharmacy Claims paid or denied correctly divided by the total number of Retail Paper Pharmacy Claims paid. This Guarantee excludes Prescription Drugs dispensed by Specialty Service Pharmacies. | 100% of Amount at Risk | **Measurement Period** Annual **Reporting Period** Quarterly |
| On-Site Pharmacy Audits | 1% of Rx Administration Fee | A minimum of 3% of retail network pharmacies filling more than 250 Claims during the previous calendar year will receive an on-site audit subject to PBM auditing standards. | 100% of Amount at Risk | **Measurement Period** Annual **Reporting Period** Quarterly |

INTER-PLAN ARRANGEMENTS SCHEDULE
TO ADMINISTRATIVE SERVICES AGREEMENT
WITH
OWENS & MINOR MEDICAL, INC.

This Inter-Plan Arrangement Schedule supplements and amends the Administrative Services Agreement and is effective as of June 1, 2017. In the event of an inconsistency between the applicable provisions of this Schedule, any other Schedule and/or the Agreement, the terms of this Schedule shall govern, but only as they relate to the Inter-Plan Arrangements. Except as set forth herein, all other terms and conditions of the Agreement remain in full force and effect.

**Out-of-Area Services**

**Overview**

Anthem has a variety of relationships with other Blue Cross and/or Blue Shield Licensees referred to generally as "Inter-Plan Arrangements". These Inter-Plan Arrangements operate under rules and procedures issued by BCBSA. Whenever Members access healthcare services outside the geographic area Anthem serves (the "Anthem Service Area"), the Claim for those services may be processed through one of these Inter-Plan Arrangements. The Inter-Plan Arrangements are described generally below.

Typically, when accessing care outside the Anthem Service Area, Members obtain care from healthcare Providers that have a contractual agreement ("Participating Providers") with the local Blue Cross and/or Blue Shield Licensee in that other geographic area ("Host Blue"). In some instances, Members may obtain care from healthcare Providers in the Host Blue geographic area that do not have a contractual agreement ("Non-Participating Providers") with the Host Blue. Anthem remains responsible for fulfilling its contractual obligations to Employer.  Anthem's payment practices in both instances are described below.

This disclosure describes how Claims are administered for Inter-Plan Arrangements and the fees that are charged in connection with Inter-Plan Arrangements. Note that dental care, Prescription Drug or vision benefits may not be processed through Inter-Plan Arrangements.

If the Plan covers only limited healthcare services received outside of Anthem's Service Area, services other than those listed as Covered Services (e.g., emergency services) in the Benefits Booklet will not be covered when processed through any Inter-Plan Arrangements, unless authorized by Anthem.  Providers providing such non-Covered Services will be considered Non-Participating Providers.

**A.   BlueCard® Program**

The BlueCard® Program is an Inter-Plan Arrangement. Under this Arrangement, when Members access Covered Services outside the Anthem Service Area, the Host Blue will be responsible for contracting and handling all interactions with its Participating Providers. The financial terms of the BlueCard Program are described generally below.

    **1.   Liability Calculation Method Per Claim**

       a.   Member Liability Calculation

       Unless subject to a fixed dollar copayment, the calculation of the Member liability on Claims for Covered Services will be based on the lower of the Participating Provider's Billed Charges or the negotiated price made available to Anthem by the Host Blue.

       b.   Employer Liability Calculation

       The calculation of Employer liability on Claims for Covered Services will be based on the negotiated price made available to Anthem by the Host Blue. Sometimes, this negotiated price may be greater for a given service or services than the Billed Charges in accordance with how the Host Blue has negotiated with its Participating Provider(s) for specific healthcare services. In cases where the negotiated price exceeds the Billed Charges, Employer may be liable for the excess amount even when

the Member's deductible has not been satisfied. This excess amount reflects an amount that may be necessary to secure (a) the Provider's participation in the network and/or (b) the overall discount negotiated by the Host Blue. In such a case, the entire contracted price is paid to the Participating Provider, even when the contracted price is greater than the Billed Charges.

**2.   Claims Pricing**

Host Blues determine a negotiated price, which is reflected in the terms of each Host Blue's Participating Provider contracts. The negotiated price made available to Anthem by the Host Blue may be represented by one of the following:

(i)   An actual price. An actual price is a negotiated rate of payment in effect at the time a Claim is processed without any other increases or decreases; or

(ii)   An estimated price. An estimated price is a negotiated rate of payment in effect at the time a Claim is processed, reduced or increased by a percentage to take into account certain payments negotiated with the Provider and other Claim- and non-Claim-related transactions. Such transactions may include, but are not limited to, anti-fraud and abuse recoveries, Provider refunds not applied on a Claim-specific basis, retrospective settlements and performance-related bonuses or incentives; or

(iii)   An average price. An average price is a percentage of Billed Charges in effect at the time a Claim is processed representing the aggregate payments negotiated by the Host Blue with all of its Participating Providers or a similar classification of its Participating Providers and other Claim- and non-Claim-related transactions. Such transactions may include the same ones as noted above for an estimated price.

The Host Blue determines whether it will use an actual, estimated or average price. The use of estimated or average pricing may result in a difference (positive or negative) between the price Employer pays on a specific Claim and the actual amount the Host Blue pays to the Participating Provider. However, the BlueCard Program requires that the amount paid be a final price; no future price adjustment will result in increases or decreases to the pricing of past Claims.

Any positive or negative differences in estimated or average pricing are accounted for through variance accounts maintained by the Host Blue and are incorporated into future Claim prices. As a result, the amounts charged to Employer will be adjusted in a following year, as necessary, to account for over- or under-estimation of the past years' prices. The Host Blue will not receive compensation from how the estimated price or average price methods, described above, are calculated. Because all amounts paid are final, neither positive variance account amounts (funds available to be paid in the following year), nor negative variance amounts (the funds needed to be received in the following year), are due to or from Employer. Upon termination, Employer will not receive a refund or charge from the variance account.

Variance account balances are small amounts relative to the overall paid Claims amounts and will be liquidated over time. The timeframe for their liquidation depends on variables, including, but not limited to, overall volume/number of Claims processed and variance account balance. Variance account balances may earn interest at the federal funds or similar rate. Host Blues may retain interest earned on funds held in variance accounts.

**B.  Negotiated Arrangements**

With respect to one or more Host Plans, instead of using the BlueCard Program, Anthem may process Claims for Covered Services through negotiated arrangements.  A negotiated arrangement is an agreement negotiated between Anthem and one or more Host Blues for any Employer that is not delivered through the BlueCard Program ("Negotiated Arrangement").

In addition, if Anthem and Employer agree that (a) Host Blue(s) shall make available (a) custom healthcare Provider network(s) in connection with this Agreement, then the terms and conditions set forth in Anthem's Negotiated Arrangement(s) with such Host Blue(s) shall apply. These include the provisions governing the processing and payment of Claims when Members access such network(s). In negotiating such arrangement(s), Anthem is not acting on behalf of or as an agent for Employer, the Plan or Members.

*Member Liability Calculation*

The calculation of Member cost-sharing will be based on the lower of either Billed Charges or negotiated price (refer to the description of negotiated price under Section A, BlueCard Program) that the Host Blue makes available to Anthem and that allows Members access to Participating Providers.

**C.  Special Cases: Value-Based Programs**

*Definitions*

1. **Accountable Care Organization (ACO):**  A group of Providers who agree to deliver coordinated care and meet performance benchmarks for quality and affordability in order to manage the total cost of care for their member populations.
2. **Care Coordination:**   Organized, information-driven patient care activities intended to facilitate the appropriate responses to a Member's healthcare needs across the continuum of care.
3. **Care Coordinator:**  An individual within a Provider organization who facilitates Care Coordination for patients.
4. **Care Coordinator Fee:**  A fixed amount paid by a Host Plan to Providers periodically for Care Coordination under a Value-Based Program.
5. **Global Payment/Total Cost of Care:**  A payment methodology that is defined at the patient level and accounts for either all patient care or for a specific group of services delivered to the patient, such as outpatient, physician, ancillary, hospital services, and prescription drugs.
6. **Patient-Centered Medical Home (PCMH):**   A model of care in which each patient has an ongoing relationship with a primary care physician who coordinates a team to take collective responsibility for patient care and, when appropriate, arranges for care with other qualified physicians.
7. **Provider Incentive:**  An additional amount of compensation paid to a Provider by a Host Blue, based on the Provider's compliance with agreed-upon procedural and/or outcome measures for a particular population of covered persons.
8. **Shared Savings:**  A payment mechanism in which the Provider and the payer share cost savings achieved against a target cost budget based on agreed upon terms and may include downside risk.
9. **Value-Based Program (VBP):**  An outcomes-based payment arrangement and/or a coordinated care model facilitated with one or more local Providers that is evaluated against cost and quality metrics/factors and is reflected in Provider payment.

*Value-Based Programs Overview*

Members may access Covered Services from Providers that participate in a Host Blue's Value-Based Program. Value-Based Programs may be delivered either through the BlueCard Program or a Negotiated Arrangement. These Value-Based Programs may include, but are not limited to, Accountable Care Organizations, Global Payment/Total Cost of Care arrangements, Patient Centered Medical Homes and Shared Savings arrangements.

*Value-Based Programs under the BlueCard Program*

Value-Based Programs Administration

Under Value-Based Programs, a Host Blue may pay Providers for reaching agreed-upon cost/quality goals in the following ways: retrospective settlements, Provider Incentives, a share of target savings, Care Coordinator Fees and/or other allowed amounts.

The Host Blue may pass these Provider payments to Anthem, which Anthem will pass directly on to Employer as either an amount included in the price of the Claim or an amount charged separately in addition to the Claim.

When such amounts are included in the price of the Claim, the Claim may be billed using one of the following pricing methods, as determined by the Host Blue:

(i)     Actual Pricing: The charge to accounts for Value-Based Programs incentives/Shared Savings settlements is part of the Claim. These charges are passed to Employer via an enhanced Provider fee schedule.

(ii)    Supplemental Factor: The charge to accounts for Value-Based Programs incentives/Shared Savings settlements is a supplemental amount that is included in the Claim as an amount based on a specified supplemental factor (e.g., a small percentage increase in the Claim amount). The supplemental factor may be adjusted from time to time.

When such amounts are billed separately from the price of the Claim, they may be billed using a Per Member Per Month billing for Value-Based Programs incentives/Shared Savings settlements to accounts outside of the Claim system. Anthem will pass these Host Blue charges directly through to Employer as a separately identified amount on the Employer billings.

The amounts used to calculate either the supplemental factors for estimated pricing or PMPM billings are fixed amounts that are estimated to be necessary to finance the cost of a particular Value-Based Program. Because amounts are estimates, there may be positive or negative differences based on actual experience, and such differences will be accounted for in a variance account maintained by the Host Blue (in the same manner as described in the BlueCard Claim pricing section above) until the end of the applicable Value-Based Program payment and/or reconciliation measurement period. The amounts needed to fund a Value-Based Program may be changed before the end of the measurement period if it is determined that amounts being collected are projected to exceed the amount necessary to fund the program or if they are projected to be insufficient to fund the program.

At the end of the Value-Based Program payment and/or reconciliation measurement period for these arrangements, Host Blues will take one of the following actions:

- Use any surplus in funds in the variance account to fund Value-Based Program payments or reconciliation amounts in the next measurement period.

- Address any deficit in funds in the variance account through an adjustment to the PMPM billing amount or the reconciliation billing amount for the next measurement period.

The Host Blue will not receive compensation resulting from how estimated, average or PMPM price methods, described above, are calculated. If the Agreement terminates, Employer will not receive a refund or charge from the variance account. This is because any resulting surpluses or deficits would be eventually exhausted through prospective adjustment to the settlement billings in the case of Value-Based Programs.  The measurement period for determining these surpluses or deficits may differ from the term of this Agreement.

Variance account balances are small amounts relative to the overall paid Claims amounts and will be liquidated over time. The timeframe for their liquidation depends on variables, including, but not limited to, overall volume/number of Claims processed and variance account balance. Variance account balances may earn interest, and interest is earned at the federal funds or similar rate. Host Blues may retain interest earned on funds held in variance accounts.

Note: Members will not bear any portion of the cost of Value-Based Programs except when a Host Blue uses either average pricing or actual pricing to pay Providers under Value-Based Programs.

<u>Care Coordinator Fees</u>

Host Blues may also bill Anthem for Care Coordinator Fees for Provider services which Anthem will pass on to Employer as follows:

1. PMPM billings; or

2. Individual Claim billings through applicable care coordination codes from the most current editions of either Current Procedural Terminology (CPT) published by the American Medical Association (AMA) or Healthcare

Common Procedure Coding System (HCPCS) published by the U.S. Centers for Medicare and Medicaid Services (CMS).

Anthem and Employer will not impose Member cost-sharing for Care Coordinator Fees.

*Value-Based Programs under Negotiated Arrangements*

If Anthem has entered into a Negotiated Arrangement with a Host Blue to provide Value-Based Programs to Members, Anthem will follow the same procedures for Value-Based Programs administration and Care Coordination Fees as noted above.

## D.  Non-Participating Providers Outside Anthem's Service Area

### 1.    Allowed Amounts and Member Liability Calculation

Unless otherwise described in the Benefits Booklet, when Covered Services are provided outside of Anthem's Service Area by Non-Participating Providers, Anthem may determine benefits and make payment based on pricing from either the Host Blue or the pricing arrangements required by applicable state or federal law.  In these situations, the amount the Member pays for such services as deductible, copayment or coinsurance will be based on that allowed amount.  Also, the Member may be responsible for the difference between the amount that the Non-Participating Provider bills and the payment Anthem will make for the covered services as set forth in this paragraph.

### 2.    Exceptions

In certain situations, which may occur at Employer's direction, Anthem may use other pricing methods, such as Billed Charges, the pricing Anthem would use if the healthcare services had been obtained within Anthem's Service Area, or a special negotiated price to determine the amount Anthem will pay for services provided by Non-Participating Providers. In these situations, the Member may be liable for the difference between the amount that the Non-Participating Provider bills and the payment Anthem makes for the Covered Services as set forth in this paragraph.

## E.  Blue Cross Blue Shield Global Core Program

### General Information

If Members are outside the United States (hereinafter, "BlueCard Service Area"), they may be able to take advantage of the Blue Cross Blue Shield Global Core Program when accessing Covered Services. The Blue Cross Blue Shield Global Core Program is not served by a Host Blue. As such, when Members receive care from Providers outside the BlueCard Service Area, Members will typically have to pay the Providers and submit the Claims themselves to obtain reimbursement for these services.

### Inpatient Services

In most cases, if Members contact the Blue Cross Blue Shield Global Core Service Center for assistance, hospitals will not require Members to pay for covered inpatient services, except for their cost-share amounts.  In such cases, the hospital will submit Member Claims to the Blue Cross Blue Shield Global Core Service Center to initiate Claims processing. However, if the Member paid in full at the time of service, the Member must submit a Claim to obtain reimbursement for Covered Services.

### Outpatient Services

Physicians, urgent care centers and other outpatient Providers located outside the BlueCard Service Area will typically require Members to pay in full at the time of service. Members must submit a Claim to obtain reimbursement for Covered Services.

### F.   Return of Overpayments

Recoveries of overpayments can arise in several ways, including, but not limited to, anti-fraud and abuse recoveries, audits, utilization review refunds and unsolicited refunds. Recoveries will be applied, in general, on either a Claim-by-Claim or prospective basis. If recovery amounts are passed on a Claim-by-Claim basis from a Host Blue to Anthem they will be credited to Employer. In some cases, the Host Blue will engage a third party to assist in identification or collection of overpayments. The fees of such a third party may be charged to Employer as a percentage of the recovery.

Unless otherwise agreed to by the Host Blue, for retroactive cancellations of membership, Anthem will request the Host Blue to provide full refunds from Participating Providers for a period of only one year after the date of the Inter-Plan financial settlement process for the original Claim. For Care Coordinator Fees associated with Value-Based Programs, Anthem will request such refunds for a period of only up to ninety (90) days from the termination notice transaction on the payment innovations delivery platform. In some cases, recovery of Claim payments associated with a retroactive cancellation may not be possible if, as an example, the recovery (a) conflicts with the Host Blue's state law or healthcare Provider contracts, (b) would result from Shared Savings and/or Provider Incentive arrangements or (c) would jeopardize the Host Blue's relationship with its Participating Providers, notwithstanding to the contrary any other provision of this Agreement.

### G.   Modifications or Changes to Inter-Plan Arrangement Fees or Compensation

Modifications or changes to Inter-Plan Arrangement fees or compensation are generally made effective January 1 of the calendar year, but they may occur at any time during the year. In the case of any such modifications or changes resulting in an increase in fees paid by Employer, Anthem shall provide Employer with at least thirty (30) days' advance written notice of any modification or change to such Inter-Plan Arrangements fees or compensation describing the change and the effective date thereof and Employer right to terminate this Agreement without penalty by giving written notice of termination before the effective date of the change. If Employer fails to respond to the notice and does not terminate this Agreement during the notice period, Employer will be deemed to have approved the proposed changes, and Anthem will then allow such modifications to become part of this Agreement.

### H.   Fees and Compensation

Employer agrees to reimburse Anthem for certain fees and compensation which Anthem is obligated under the applicable Inter-Plan Arrangements described in this Schedule to pay to the Host Blues, to BCBSA and/or to vendors of BlueCard Program-related services. The specific Inter-Plan Arrangements fees and compensation, including any administrative and/or network access fee that a Host Blue may charge under the BlueCard Program, a Negotiated Arrangement, and BlueCard Worldwide are charged to Employer are set forth  in Section 7 of Schedule A to the Agreement. The various Inter-Plan Arrangements Fees and compensation may be revised from time to time as described in section G.

A description of the various Claim processing fees that may be listed on Schedule A is as follows:

**Access Fee**: The Access Fee is charged by the Host Blue to Anthem for making its applicable Provider network available to Members. The Access Fee will not apply to Non-Participating Provider Claims. The Access Fee is charged on a per Claim basis and is charged as a percentage of the discount/differential Anthem receives from the applicable Host Blue subject to a maximum of $2,000 per Claim.

Instances may occur in which the Claim payment is zero or Anthem pays only a small amount because the amounts eligible for payment were applied to patient cost sharing (such as a deductible or coinsurance). In these instances, Anthem will pay the Host Blue's Access Fee and pass it along directly to Employer as stated above even though Employer paid little or had no Claim liability.

**Administrative Expense Allowance (AEA) Fee**: The AEA Fee is a fixed per Claim dollar amount charged by the Host Blue to Anthem for administrative services the Host Blue provides in processing Claims for Employer's Members. The dollar amount is normally based on the type of Claim (e.g. institutional, professional, international, etc.) and can also be based on the size of group enrollment. When charged, Anthem passes the AEA Fee directly to Employer.

**Per Subscriber Per Month (PSPM) Fee:** The PSPM Fee is a financial arrangement negotiated between the Host Blue and Employer and replaces all other fees, including the Access Fee and AEA. The PSPM dollar amount is

charged on a per Subscriber per month basis by the Host Blue to Anthem for administrative services the Host Blue provides in processing Claims for Employer's Members. The dollar amount can also be based on the size of group enrollment.

**Non-Standard AEA Fee**: The Non-Standard AEA Fee is a financial arrangement negotiated between the Host Blue and Anthem and replaces all other fees, including the Access Fee and AEA. The Non-Standard AEA is a fixed per Claim dollar amount charged by the Host Blue to Anthem for administrative services the Host Blue provides in processing Claims for Employer's Members.

**Central Financial Agency (CFA) Fee**: The CFA connects Blue Cross and/or Blue Shield Licensee's local bank accounts to an automated clearinghouse (ACH). The CFA Fee is a fixed dollar amount per payment notice and is paid by Anthem to BCBSA outside of the CFA. This fee applies each time Anthem receives an electronic payment notice from the CFA indicating that a Host Blue incurred Claim-related liability on Anthem's behalf and requesting that Anthem either approve or deny payment.

**ITS Transaction Fee:** The ITS delivery platform allows all Blue Cross and/or Blue Shield Licensees to connect with each other through a standardized system to facilitate the operation of Inter-Plan Arrangements. The ITS Transaction Fee applies each time a Claims transaction interchange occurs between Anthem and a Host Blue. When a Host Blue receives a Claim, it applies Provider pricing information, sets forth its discount and related savings and sends this information to Anthem electronically. Anthem then adjudicates the Claim, computes the approved Provider payment amount, calculates the AEA and Access Fee, computes net liability and sends a response electronically to the Host Blue. The Host Blue then pays the Provider and issues an electronic payment notice to Anthem via the CFA. The ITS Transaction Fee is five cents per interchange and is paid to BCBSA. For each Claim, there are a minimum of three interchanges, but there could be more depending on the complexity of the Claim.

Other potential BlueCard Program-related fees include:

**Toll-free (e.g., 800 number) Number Fees**: These fees are charged by BCBSA to Anthem.

- BlueCard Eligibility (800.676.BLUE) – This service provides a centralized number for Providers to reach a Member's Home Licensee to obtain information on membership, coverage and pre-certification. The fees represent charges allocated to the member's Home Licensee based on the percentage of calls by alpha prefix.

- BlueCard Access (800.810.BLUE) – This service provides a centralized number for Members to obtain a list of Participating Providers. The fees represent charges allocated to a Member's Home Licensee based on calls by alpha prefix.

**PPO Provider Directory Fee:** This service provides print-on-demand Provider directories.  This fee is charged by BCBSA to Anthem. Anthem passes the PPO Provider Directory Fee directly on to Employer if printed directories are requested. The amount of the fee is dependent upon page length and number ordered; includes shipping, taxes and system maintenance costs.